UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BSD CROWN, LTD., <br><br> Plaintiff, <br><br> v. <br><br> AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TWITCH INTERACTIVE, INC., <br><br> Defendants. | Case No. 3:23-cv-00057-TSH <br><br><br> **JOINT DISCOVERY STATEMENT** |

**ATTESTATION OF COMPLIANCE**

Francisco Villegas and Evan Rosenbaum for Plaintiff, and Robin Brewer and James Miller for Defendants, have met and conferred about this discovery dispute.


By: */s/ Francisco A. Villegas*
    Francisco A. Villegas
    VILLEGAS & CEFO LLP

*Counsel for Plaintiff*
BSD CROWN, LTD.

By: */s/ Robin L. Brewer*
    Robin L. Brewer
    PERKINS COIE LLP

*Counsel for Defendants*
AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TWITCH INTERACTIVE, INC.

Dear Honorable Judge Hixson:

The parties submit this joint statement concerning discovery disputes over similar RFPs served on Defendants Twitch Interactive, Inc. ("Twitch"), Amazon.com, Inc. ("Amazon"), and Amazon Web Services, Inc. ("AWS"). Plaintiff BSD Crown, Ltd. ("BSD") respectfully requests the Court compel Defendants to produce documents responsive to Twitch RFPs 8, 10-11, and 43-44, Amazon RFPs 8, 10-11, and 44-45, and AWS RFPs 8, 10, 55-56.[1]

**BSD's Position**

**RFP Nos. 8, 10-11, and 43-44**. BSD seeks three narrow categories of materials: (i) licenses and agreements for the Accused Products (8, 10); (ii) agreements, marketing documents, and negotiation materials with Defendants' streaming partners and content providers (Amazon 44-45; AWS 55-56; and Twitch 43-44); and (iii) agreements concerning the acquisition of streaming businesses (Amazon and Twitch 11). Because Defendants represented they have produced all agreements *granted to Defendants* relating to the accused technology (including litigation settlements), the focus of this motion is on agreements with third parties relating to their use of the Accused Instrumentalities. These materials are directly relevant both to damages and infringement.

Agreements with third parties concerning use of Defendants' streaming services and agreements with content providers utilizing those services ultimately address the same operative conduct: use of the Accused Instrumentalities. Scope is the only distinction between these requests: RFPs 43–44 concern situations in which the user broadcasts its own content, whereas RFP Nos. 8 and 10 more broadly encompass circumstances in which the user broadcasts content on behalf of others. Regardless of classification, these documents bear on the value of the infringing technology, its associated revenues, and the commercial terms under which Defendants provide the accused real-time broadcasting services. AWS provides (or provided) such broadcasting services to many third parties (some of whom also generate their own content), including, *inter alia*, the NFL, Viacom, and PAC-12 Conference. Twitch's business model is similarly anchored by corporate entities such as the NBA, prominent individual streamers (*e.g.*, Richard Tyler Blevins, aka Ninja), and a large community of everyday users whose content is not at issue in this letter. Defendants do not dispute possession of these agreements. They simply refuse to produce them on the basis of relevance. In fact, after two years, Defendants made a last effort to avoid this letter when they proposed providing 3-4 bespoke agreements from Twitch's largest streamers. That is insufficient because BSD needs to dissect a large section of the largest agreements to determine the various sources of revenue. Defendants are not entitled to dictate what they consider to be the exclusive revenue stream associated with the Accused Instrumentalities. This is precisely what they have attempted to do by, rather than producing the requested agreements, producing only generalized pricing materials that fail to reflect the actual commercial terms governing specific streaming events. Generic rate sheets do not reveal negotiated terms, revenue allocations, or event specific financial arrangements. If standardized pricing governed all third party transactions and constituted the *sole* revenue stream, there would be no need for hundreds of individualized agreements. BSD's damages expert requires those agreements to properly account for all relevant revenue streams.

As BSD explained during multiple lengthy meet-and-confers, these agreements and associated

---

[1] All RFPs are substantially the same, except that No. 11 applies only to Amazon and Twitch, and differences in request numbering is identified in this Statement. BSD's requests and Defendants' respective responses and objections thereto are attached as Exs. 1-12.

negotiation materials are likely to supply critical damages evidence, including royalty rates, business terms (*e.g.*, revenue splits), monies derived from the accused services, and infringing service usage metrics (*e.g.*, viewership, hours consumed, and data volume), all central to BSD's case because all Asserted Claims are methods, meaning BSD must demonstrate usage tied to infringement. BSD likewise needs the market-facing materials category of documents to show that the accused technology drove sales, a point Defendants dispute in their Damages Contentions.

As to Twitch, Defendants misleadingly assert that "Twitch is a free service." That characterization disregards Twitch's well-established commercial structure and diversified monetization model. Although certain content may be accessed without an upfront fee, the platform generates revenue through multiple channels beyond advertising, including at least paid subscription services[2], and monetized user engagement mechanisms (such as the purchase and use of "Bits")[3].

These materials are also relevant to infringement because they likely identify key broadcast parameters, including segment length, latency, and streaming standard. BSD alleges that use of HLS or MPEG DASH to achieve real time latency infringes the '473 Patent. ECF No. 1, ¶¶ 29, 36. Amazon's own technical materials confirm that segment length directly affects latency, explaining that "the segment duration you choose has a *mechanical effect* on the video latency in almost every [video] player."[4] (emphasis added). Thus, latency is central to this case. Defendants acknowledge this stating "the jury here may be asked to determine whether a specified amount of latency sufficiently 'match[es] the human perception of time' or 'proceed[s] at the same rate as a physical or external process,' such that an accused broadcast is 'real time' within the meaning of the claims." ECF No. 85 at 13. Because segment size drives latency, the segment lengths reflected in the withheld agreements are directly probative of whether Defendants operated real time streaming within latency ranges that satisfy the asserted method claims. Moreover, to the extent Defendants contend that only third parties set the latency values, the agreements will identify the entities so that BSD can finally fully explore third party discovery.

Defendants also refuse to produce agreements relating to their acquisitions of streaming businesses (RFP 11) despite BSD's agreement not to seek materials pertaining to Amazon's acquisition of Twitch in exchange for certain other disputed materials (the sufficiency of which is under review). These requested acquisition materials are relevant to show how Defendants valued real-time broadcasting and its related infrastructure, which is a central issue for damages. Defendants contend that it is BSD's burden to identify Defendants' own "specific acquisitions." That is wrong. A party must conduct a reasonable inquiry into its own records and operations; it cannot shift that responsibility to its adversary, particularly where the information at issue lies squarely within its possession, custody, or control. For example, nearly all of the AWS Accused Instrumentalities trace their origins to Amazon's acquisition of Elemental Technologies. Yet, despite two years since BSD first raised this issue, Defendants' production concerning that acquisition remains materially deficient. This agreement is only one example that BSD knows of that Defendants have not produced; again, it is Defendants' duty—not BSD's—to identify each responsive agreement.

**No Burden**. Defendants have not presented any evidence describing the nature and extent of their purported burden. Instead, they *speculate* about the number of documents and, more crucially, the substance of documents. For example, Defendants argue AWS has "potentially hundreds" of such

---

[2] https://help.twitch.tv/s/article/how-to-subscribe  (accessed, Feb. 10, 2026).
[3] https://help.twitch.tv/s/article/cheering-for-partners-affiliates (accessed, Feb. 10, 2026).
[4] https://aws.amazon.com/media/tech/video-latency-in-live-streaming/ (accessed, Dec. 1, 2025).

2

agreements and Twitch has thousands yet never offered any concrete data or analysis. Nonetheless, as a compromise, BSD proposed that Twitch produce representative standard form agreements indicating which streamers they cover and full agreements only for major streamers with unique terms. Defendants rejected the offer, Twitch producing only click-wraps and AWS none, and continue to refuse to identify streaming partners, much less produce the requested bespoke agreements with large content providers (until their inadequate February 12, 2026 offer of 3-4 Twitch agreements discussed above). Lastly, the speculative nature of the asserted burden has been evident during meet and confers where Amazon's counsel could not confirm any search had been conducted, let alone whether any responsive agreements had been reviewed. Such conjectural assertions cannot support Amazon's objection. *Gilbert v. Citigroup, Inc.*, 2009 WL 10692463, at *5 (N.D. Cal. Apr. 2, 2009) ("Where [a discovery request] is objected to as unduly burdensome, the objecting party should submit affidavits or other evidence showing the nature of the burden.").

**Ripeness**. This discovery dispute has been pending for over two years. BSD filed the original letter on March 3, 2024. ECF No. 102. Rather than address the merits at that time, Defendants opted to pursue an unsuccessful *ex parte* reexamination. Now, after extensive meet and confer efforts and substantial narrowing of the issues, Defendants baselessly assert that the dispute is "not ripe." All topics in this statement were raised in the earlier letter and have been extensively discussed since, including the issue Defendants raised as unripe in their original response (related to Agreements). *See, id at 4*. Indeed, the parties even further compromised on that issue. Defendants' ripeness argument, following prolonged delay and refinement of the dispute, is purely tactical.

**Discovery Period**. Defendants falsely claim BSD seeks documents back to 1998. BSD has been consistent since the prior letter, proposing "the following discovery period: June 20, 2012–March 24, 2019 for Twitch, and March 3, 2014–March 24, 2019 for Amazon.com and AWS." *Id*. at 3.

**Defendants' Position**

This case relates to a single patent that expired nearly seven years ago. BSD's claim that it seeks "narrow categories" of discovery is belied by the requests themselves—BSD seeks discovery of *all* agreements related to the accused products, agreements with third parties, and acquisition agreements. BSD claims such expansive discovery is necessary to support its infringement and damages theories. But BSD disregards Defendants' existing productions as well as Defendants' explanations during the meet and confers, including that it is unlikely the documents contain the information BSD speculates are in them and the high burden associated with BSD's request. BSD also includes requests in its discovery letter that were never addressed in the meet and confer process. BSD is incorrect that the original discovery letter did not identify issues as not ripe—it did. Nor does a letter filed almost two years ago reflect the current status of meet and confers or support BSD's assertion that "[a]ll disputed topics have been extensively discuss." BSD's reliance on the letter as support of compliance with the meet and confer requirement reinforces that many of the issues have not been raised in recent meet and confers and the issues are not ripe.

The case was stayed while the UPSTO conducted *ex parte* reexaminations. Once the stay was lifted in July 2025, the parties exchanged written discovery and repeatedly conferred on multiple discovery issues raised by both sides. Despite the many hours of conferrals, BSD rarely provided any detailed explanation as to the reason it was seeking the discovery. Instead, BSD justified the discovery by saying simply it was relevant to the issues of infringement or damages without more. Even in this discovery letter, BSD relies on broad statements to argue that it is entitled to expansive discovery from Defendants. But BSD does not address the individual requests, their supposed

3

relevance, or identify specifically what it seeks to be compelled. By lumping the RFPs together and generalizing them across Defendants, BSD obfuscates the issues. BSD should not be permitted to seek expansive discovery before it properly ties the relevance of those documents to its theories or that the discovery is proportional to the needs of this case. Defendants address each RFP below.

**BSD RFP Nos. 8, 10 (Licenses and agreements for the accused products)**

RFP No. 8 seeks "all licenses since March 24, 1998" concerning the accused products. As Defendants have reiterated multiple times, Defendants have fully complied with the Patent Local Rules and produced relevant licenses. BSD identified no alleged deficiencies in the production of licenses and this was not addressed during the numerous meet and confers. This issue is not ripe.

RFP No. 10 seeks all agreements since March 1998 "that describe the financial terms between [Defendants] and any third-party concerning the Accused Products." BSD has never previously claimed there was a distinction between RFP No. 10 and RFP Nos. 43 and 44. The Twitch bespoke agreements with content creators, addressed below in the context of RFP Nos. 43 and 44, has been the only topic discussed on meet and confers. On its face, this request is unreasonable—BSD seeks agreements over a 27 year period (before AWS or Twitch existed) with any third party. Even with a narrowed time period, the request is overly broad and BSD does not identify the specific discovery it seeks, explain the relevance, or demonstrate that the need is proportional to the burden.

**BSD RFP No. 11 (Agreements concerning the acquisition of streaming businesses)**

Defendants do not understand what BSD seeks related to RFP No. 11. Upon receiving this discovery letter, Defendants requested a further meet and confer to get clarification regarding which acquisitions BSD believes to be relevant as they are not aware of any. While BSD confirmed it is not seeking Amazon-Twitch acquisition documents, it refused to identify any other acquisitions or provide additional insight. BSD subsequently identified the Elemental acquisition in providing revisions to this letter. This has not been the subject of a meet and confer. Further, BSD's assertion that the Elemental acquisition would reflect the value for real-time broadcasting is incorrect. For example, the Elemental products supported video on demand as well as live broadcasts, and BSD does not suggest a way to value one over the other. Given the parties' agreement with respect to the Twitch acquisition, the lack of any meaningful conferral, and BSD's failure to demonstrate relevance, BSD's request should be denied.

**BSD RFP Nos. 43-44 (Agreements, marketing documents, negotiation materials with streaming partners and content providers)**

BSD asks the Court to compel the production of "all" agreements with streaming partners and content creators, plus "marketing" and "negotiation" materials. BSD has identified no deficiencies related to "marketing" materials and it is unclear what BSD seeks related to "negotiation" materials as this has not been addressed in any recent meet and confer. These issues are therefore not ripe. BSD also includes no discussion as to Amazon, and Amazon is not implicated on these RFPs.

Regarding the remaining category of agreements between (1) Twitch and content creators and (2) AWS and streaming partners, BSD asserts without support that they "bear on the value of the infringing technology, revenues associated with that technology, and commercial terms" related to the accused instrumentalities as well as allegedly contain information relevant to damages, such as "royalty rates, business terms (e.g., revenue splits), monies derived from the accused services, and infringing services usage metrics." BSD disregards the existing production, which includes much of the information it seeks. For example, Defendants have produced relevant revenue from

both AWS and Twitch, information regarding revenue splits, and the commercial terms for the accused instrumentalities. BSD does not explain the relevance of negotiated terms when Defendants have produced revenue that captures revenue associated with both standard and negotiated terms. There is no indication that any agreement includes usage metrics, nor is that issue ripe. Usage metrics are the subject of different RFPs not raised in this discovery letter and not discussed in meet and confers since the stay was lifted.

As to Twitch, BSD misunderstands the nature of the Twitch service and the agreements it is requesting. Twitch is a free service. When users sign-up for Twitch, they get their own "channel" where the user can create, stream, and share their video content. Users whose channels reach certain milestones are invited to monetize their streams, meaning they receive a share of revenue generated from subscriptions and other monetization methods for content and engagement with their channel. The monetized streamer agreements BSD seeks are licenses to creators' content and include financial terms reflecting payments Twitch makes for the license. Although these agreements are irrelevant, in a good faith effort to resolve this dispute, Twitch produced both standard and premium versions of the monetized streamer agreements. BSD also requested agreements with the top 100 content creators at one point. Such a request is incredibly burdensome, but as a further compromise, Twitch offered to provide bespoke agreements with three top U.S. content creators for the relevant damages period (including "Ninja"). The offered agreements provide BSD with all the information it would need to determine that these agreements *are not relevant* to any potential damages theory, and do not contain relevant technical information. BSD rejected this offer without reviewing the bespoke agreements, claiming it "needs to dissect a large section of the largest agreements to determine the various sources of revenue." A review of the proffered agreements would demonstrate the falsity of this statement. Quite simply, there is no hidden revenue stream that would be identified by BSD's proposed review of the agreements. Twitch has disclosed its revenue streams, and they are captured by already produced financial information. The bespoke agreements address revenue due to content creators, not Twitch. BSD also disregards the burden associated with its request. Twitch does not have an automated way to identify bespoke agreements. Twitch would have to manually review more than 30,000 agreements with U.S. monetized streamers to identify any that had additional or different terms from the standard or premium contracts. BSD has not shown that the need for any such agreements outweighs the burden for the request if Twitch were required to manually review these agreements.

As to AWS, discussions have focused on Twitch and the bespoke agreements with content creators. The parties have not discussed the AWS customer agreements that BSD seeks that—on the face of BSD's requests—could number in the hundreds if not thousands, and each likely includes a notice provision that would need to complied with prior to production. Even if these agreements had been discussed, the categories of information BSD identifies are unlikely to be included in the agreements or have no apparent relevance. BSD does not explain how it intends to correlate whatever financial terms are in these customer agreements to either the produced revenue or its damages theories. Similarly, the relevance of payment rates and terms to damages is not clear as BSD makes no reference to these in its damages contentions and AWS has produced documents reflecting the pricing for the accused AWS instrumentalities. BSD further provides no explanation as to why such agreements may show broadcast parameters and requirements. This is purely speculative, particularly since the customer ultimately sets the broadcast parameters for the accused products. There are also less burdensome means to identify third parties, and BSD has already issued multiple subpoenas to AWS Elemental customers. Given the unlikely relevance, the need does not outweigh the substantial burden apparent on the face of the requests.

Respectfully submitted,

Dated: February 18, 2026

By: */s/ Francisco A. Villegas*
    Francisco A. Villegas
    VILLEGAS & CEFO LLP

    *Counsel for Plaintiff*
    BSD CROWN, LTD.

By: */s/ Robin L. Brewer*
    Robin L. Brewer
    PERKINS COIE LLP

    *Counsel for Defendants*
    AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TWITCH INTERACTIVE, INC.

## **ATTESTATION CLAUSE**

I, Francisco Villegas, am the ECF user whose credentials were used in this filing. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories have consented to the filing of this document.

Dated:   February 18, 2026

By: */s/ Francisco Villegas*
    Francisco Villegas
