## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BSD CROWN, LTD.,<br><br>       Plaintiff,<br><br>       v.<br><br>AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TWITCH INTERACTIVE, INC.,<br><br>       Defendants. | Case No. 3:23-cv-00057-TSH<br><br><br><br>**JOINT DISCOVERY LETTER** |

## ATTESTATION OF COMPLIANCE

Francisco Villegas and Evan Rosenbaum for Plaintiff, and Robin Brewer and Allegra Kress for Defendants, have met and conferred about this discovery dispute.


By: */s/ Francisco A. Villegas*
Francisco A. Villegas
VILLEGAS & CEFO LLP

*Counsel for Plaintiff*
BSD CROWN, LTD.

By: */s/ Robin Brewer*
Robin Brewer
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*Counsel for Defendants*
AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TWITCH INTERACTIVE, INC.

Dear Honorable Judge Hixson:

The parties submit this omnibus joint statement reflecting the outstanding discovery disputes between the parties. The parties are continuing to discuss the deposition schedule and will file a supplement on Monday, June 8, 2026 with the Court.

## BSD's Introduction

As a preliminary matter, BSD must bring Defendants' unreasonable conduct during the drafting of this joint discovery letter to the Court's attention. The issues that are raised herein have been percolating between the parties for some time, so they should not be a surprise to either party. In addition, the parties specifically identified the issues that would be included in this joint discovery letter during a meet-and-confer held on Friday, May 29, 2026. Recognizing the large number of outstanding issues, the parties ***expressly agreed*** that they would exchange the portions of this letter addressing the issues that they wanted to affirmatively raise with the Court no later than Tuesday evening. BSD honored this agreement and sent the first draft of its discovery dispute sections to Defendants on Tuesday evening. *See* **Ex. 1** at 3 (6/2/26 Email from K. Whidby). The parties also had a second meet-and-confer on Monday, June 1, 2026—in advance of exchanging their written portions of the joint letter—in which they disclosed the issues they planned to raise in this letter. Contrary to Defendants' representations now, all of BSD's issues have been percolating for some time. That is exactly why Defendants did ***not*** object to the issues when BSD raised them at the June 1 meet-and-confer.

Defendants did not provide BSD with any sections for inclusion in the joint discovery letter. After receiving no response whatsoever from Defendants, BSD's counsel reached out to Defendants at 4:08 p.m. EDT (1:08 p.m. PDT) on Thursday, June 4, 2026 to inquire as to when BSD could expect to receive Defendants' draft responses to BSD's discovery dispute sections. *See* **Ex. 1** at 2-3 (6/4/26 Email from K. Whidby). More than three hours later, at 7:45 p.m. EDT (4:45 p.m. PDT), Defendants finally responded that they were "working diligently to prepare their responsive sections," and would send them as soon as possible. *Id.* at 1-2 (7:45 p.m. EDT 6/4/26 Email from A. Kress). Defendants did not disclose in this email that they planned on raising any discovery disputes themselves, despite their failure to exchange their sections on Tuesday evening as agreed.

At 11:37 p.m. EDT (8:37 p.m. PDT) on Thursday, June 4—approximately 27 hours before the joint letter was due—Defendants finally provided BSD with a "partial draft of Defendants' sections of the joint letter." **Ex. 1** at 1 (11:37 p.m. EDT 6/4/26 Email from A. Kress). This description was highly misleading. The draft sent by Defendants only contained ***one*** section responsive to BSD's ten discovery disputes. Instead of other responsive sections, Defendants included ***three entirely new*** sections relating to issues that Defendants sought to raise with the Court. In doing so, Defendants violated the parties' agreement to provide their respective affirmative sections two days earlier and deprived BSD of a meaningful amount of time in which to respond. This was compounded by the fact that, prior to providing BSD with these new sections, Defendants insisted that BSD take responsibility for filing this joint letter and its exhibits, as well as the accompanying motion to seal. *See* **Ex. 2** (8:45 p.m. EDT Email from A. Kress).

Defendants did not provide BSD with the remaining responses to BSD's sections until 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026—a mere eleven hours before the deadline to file this Joint Discovery Letter. *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer). These responses also included revisions to the portions provided to BSD the evening before.

Defendants' actions during the process of drafting this joint discovery letter have violated the well-established "obligation to negotiate in good faith and cooperate in discovery." *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-00561-WHO (LB), 2018 WL 2294281, at *1 (N.D. Cal. May 21, 2018). This Court has recognized that "it is possible to abuse the joint-letter-brief process (e.g., one side could unreasonably delay its responses, or, conversely, one side could give the other side an unreasonably short time to submit its responses)." *Id.* Here, Defendants have engaged in **<u>both</u>** actions warned of in *Synopsys*. They unreasonably delayed in providing their responses to BSD's discovery disputes, waiting until mere hours before the joint letter was due in some cases. Defendants have also given BSD an unreasonably short time to submit responses to Defendants issues by ignoring the parties' self-imposed deadline for exchanging initial drafts and waiting until only about one day was left until the joint letter was due before providing BSD with their initial draft of their dispute sections. This is classic "sandbagging," which the Court should not permit. *See Sayta v. Martin*, No. 16-cv-03775-LB, 2019 WL 1102989, at *2 n.6 (N.D. Cal. Mar. 8, 2019) ("The parties may not 'sandbag' each other by including new issues in a joint letter brief right before filing it with the court in a manner that does not given the other side a meaningful opportunity to respond."). As a result, BSD has been deprived of a meaningful opportunity to evaluate Defendants' arguments, revise BSD's own positions, or prepare well-considered, comprehensive responses to Defendants' late-served sections. Thus, BSD respectfully requests that the Court decline to consider all of Defendants' arguments in this joint letter. *Cf.* **Ex. 4** (Discovery Order, *Karl Gregoire v. San Francisco Bay Area Rapid Transit District*, No. 25-cv-02150-TSH (N.D. Cal. Jan. 13, 2026) (Dkt. No. 33)) at 1 (party's failure to provide responses for joint letter brief constituted "a waiver of all opposing arguments") (Hixson, M.J.).

What is more, Defendants' actions in drafting this joint discovery letter mirror their overall conduct throughout the discovery process. As set forth in detail below, they have repeatedly failed to cooperate in discovery. They obstinately throw up roadblocks at every turn, forcing BSD to return to the Court over and over for assistance. With the end of fact discovery looming on the horizon, this must stop once and for all. BSD respectfully requests that the Court grant BSD's discovery requests as set forth below, and deny Defendants' manufactured disputes.

## Defendants' Introduction

The only party that has abused the letter brief process here is BSD. Indeed, BSD provided its portion of this letter—a 25-page, single-spaced screed—to Defendants on June 2 at 11:51pm ET (8:51 pm PT). That left Defendants scrambling to respond to all of that material in just less than 72 hours. A simple review of the parties' most recent joint discovery status report (Dkt. No. 193) underscores the volume of new material BSD introduced. Consequently, three attorneys for Defendants were forced to work all night to formulate responses to all of BSD's complaints, hardly the streamlined solution the Court envisioned on the May 26 hearing when it ordered the parties to brief their remaining issues. Instead, this represents BSD's effort to expand the universe of discovery disputes so far that neither the parties nor the Court have any choice but to acquiesce to

BSD's demands for an extension.

As this letter brief demonstrates, BSD has worked to expand disputes, not narrow them.[1] Now, months after the original close of fact discovery nears for a third time, BSD introduces new issues not subject to any meet and confer, and re-raises issues dropped months ago. BSD makes sweeping statements about general categories of discovery that obscure, rather than focus, the actual disputes between the parties. BSD largely ignores the language of its discovery requests. It mischaracterizes Defendants' positions. And it elides that Federal Rule 26 sets the scope of discovery not as any theoretically relevant item regardless of burden, but matters relevant "and proportional to the needs of the case." BSD has the documents it needs, and the discovery proportional to the needs of the case has been completed. BSD should focus on the upcoming depositions so that fact discovery can close on July 10, not a scorched earth approach to every discovery dispute it can conjure up.

An extension here—indeed any ruling in BSD's favor—will only encourage and perpetuate its abusive behavior. Defendants understood the Court's suggestion to file an omnibus discovery letter as a means to resolve the disputes that had been lingering between the parties, not as an open invitation to introduce a host of new issues and arguments. Defendants would not have agreed to the proposed schedule for exchanging issues and drafts had they any indication that BSD intended to serve 25 pages of single-spaced argument raising numerous new issues just three days before the filing deadline. Defendants have endeavored to respond to BSD's voluminous complaints concisely and completely herein, and believe this briefing should resolve these discovery battles once and for all.

## BSD'S DISCOVERY DISPUTES

### I.  ORDER COMPELLING DEFENDANTS TO AMEND RESPONSES TO RFAS[2]

#### A.  BSD's Position

In an effort to avoid responding to clearly phrased Requests for Admission ("RFAs"), Defendants have intentionally misread each of BSD's RFAs that contain quotes from Defendants' own documents.[3] Rather than read the RFAs as written, to seek an admission of the truth of the statement, Defendants misread them to seek an admission that the language is contained in the cited document. This misreading is intentionally evasive. Notably, BSD does not need such an admission because the parties agreed to an authenticity stipulation, which the Court ordered. Dkt. No. 178.[4] Contrary to Defendants' assertions, it is not BSD who wishes to redraft the RFAs, which

---

[1] By contrast, Defendants have worked to resolve their disputes without judicial assistance. Only three remain for Defendants, and they primarily relate to instances where BSD has not complied with its own promises or this Court's orders.

[2]     Defendants' position to the issue in Section I was first provided to BSD at 11:37 p.m. EDT (8:37 p.m. PDT) on Thursday, June 4, 2026. *See* **Ex. 1** at 1 (11:37 p.m. EDT 6/4/26 Email from A. Kress).  A revised version was provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

[3]     BSD's RFAs to AWS and Twitch, and Defendants' responses are attached hereto as **Ex. Nos. 5-8**, respectively.

[4]     Indeed, before the stipulation, BSD served a separate set of authenticity RFAs, so Defendants knew that none of these RFAs sought information related to authenticity or

are clear on their face, but Defendants who have already misread them to request information Defendants know BSD neither asked nor needs. Defendants' argument that BSD "claims not to need the responses" completely misses this argument: BSD does not need Defendants' ***current*** responses to the RFAs, because those responses are not directed to the RFAs as drafted. BSD ***does*** need responses to the RFAs ***as drafted***.[5] Defendants' argument below is not about whether they need to respond to the RFAs as written. Instead, they focus on why they do not want to respond to the RFAs. BSD understands that Defendants would prefer to admit that a document contains a quote rather than admit that the quote is a true statement. But these RFAs clearly seek the latter.

Rule 36 requires a responding party to reasonably interpret RFAs and answer in good faith so that the response fairly meets the substance of the request. Hyper-technical or evasive interpretations are improper. *See* Fed. R. Civ. P. 36(a)(4); *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1246 (9th Cir. 1981) ("The discovery process is subject to the overriding limitation of good faith."); *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 938 (9th Cir. 1994) ("Parties may not view requests for admission as a mere procedural exercise requiring minimally acceptable conduct. They should focus on…full and efficient discovery, not evasion and word play."). Because Defendants' responses rely on evasive interpretations and invoke word play, they are inadequate. Notably, Defendants do not present a single case stating that a minor typographical error renders discovery unanswerable where that error that does not change the substance of the request and is clearly and error. BSD respectfully requests that Defendants be ordered to amend their responses or their responses should be deemed admissions.

Moreover, Defendants baldly misrepresent the substance of meet and confers on this issue. BSD did not request that Defendants respond to revised versions of the RFAs (except where minor typographical errors existed) but merely requested Defendants respond to the RFAs in good faith, *i.e.*, as the RFAs are clearly written. Notably, the parties discussed 67 of Defendants' responses to RFAs. Defendants agreed to amend their responses to a handful of RFAs, but BSD has not included a large number of RFAs on which the Parties could not agree. However, the RFAs discussed below are clear examples of Defendants' refusal to conduct discovery in good faith. Notably, although Defendants still have not served amended responses to BSD's RFAs,[6] BSD served supplemental responses to Defendants' RFAs and Defendants have not sought to move to compel any additional responses, suggesting Defendants agree that BSD's responses are sufficient.

Defendants purport to complain that BSD's RFAs did not include a temporal restriction. That is not a defense to any of the RFAs discussed because: (1) Defendants included an objection and purported interpretation of the relevant time period; (2) the quotations involved are from

---

genuineness.

[5]     Contrary to Defendants' representations, BSD never stated that it did not need the responses to the RFAs. The changes that BSD made to this section of the joint discovery letter have only been to clarify BSD's position since Defendants previously seemed to misunderstand what BSD argued herein.

[6]     Although the parties last met and conferred on this issue in ***April***, Defendants still have not provided the promised amended responses. Indeed, as recently as Monday, May 31, 2026, Defendants promised the amended responses would be served by June 1, 2026. Yet, BSD still has not received those amended responses.

Defendants' own documents so, if necessary, Defendants can qualify their admissions based on the date of the document; and (3) during meet and confers, Defendants never included timing as an issue specific to these RFAs. Moreover, despite Defendants' false statements regarding their willingness to "look past issues," Defendants explicitly refused during meet and confers to read out typographical errors. In short, Defendants have refused to respond to the RFAs in good faith.

### *RFA's Merely Containing Quotes Do Not Seek Authenticity or Genuineness.*

RFA No. 9 to AWS reads, "Admit that MediaPackage 'is a just-in-time packaging and origination service that customizes live video assets for distribution into a format that is compatible with the device that makes the request.' as identified at AWS_000336." Although this RFA contains two minor typographical errors, the RFA is clear. First, there should be no period before "as identified." Second, as AWS notes in its objections, the Bates number for the citation should read "AWS_0003363." These errors did not affect AWS's ability to understand the RFA and do not affect the substance of the RFA. The language is clear, simple, and direct: this RFA seeks an admission that the quoted language is true, not an admission that the quoted language exists in the cited document, which is how AWS responded. The quote and citation are there merely for reference. AWS's refusal to read the RFA as written and attempt to engage in unsupportable word play is improper. Contrary to Defendants' assertions, the RFA seeks admission of a simple fact: this is how AWS itself describes the accused service. BSD wants confirmation that it is a true and accurate description. AWS should be required to amend its response to admit or deny the truth of the statement in the RFA.

RFA No. 13 to AWS reads: "Admit that MediaLive divides streams into chunks or segments, so that on-the-fly changes in bitrate can be made from one bitrate to another 'to ensure that the viewer is always receiving the best possible quality level' as identified in AWS_007183." This RFA, like RFA No. 9, contains two typographical errors, neither of which affects AWS's ability to understand and respond. First, the word "level" should be "video" such that the quoted language should read "to ensure that the viewer is always receiving the best possible quality video." Second, the cited Bates-numbered page omitted a "0" and should read AWS_0007183 instead of AWS_007183. AWS again objects that "it is not clear whether it is seeking an admission manners [*sic*] regarding the capabilities of MediaLive or an admission that it is accurately summarizing the cited document." AWS then disingenuously responds, "AWS lacks the information needed to admit or deny this Request for Admission because it has been unable to locate a document that includes the quoted language, and therefore denies it." First, the intended document and quoted language are clear. More importantly, though, an admission or denial of this RFA is not dependent on the document from which the quote was pulled. The RFA does not seek an admission that the quoted language exists. AWS should be required to amend its response to admit or deny the statement with the corrected quote.

RFA No. 16 to AWS reads: "Admit that You promoted AWS Elemental MediaLive as follows: '[Y]ou'll configure . . . the actual encoding settings [to] specify the resolution, codec, bitrate, and all other encoding attributes.' AWS__0006605, at 8:09." AWS denies the RFA "because it misquotes the cited video." This RFA contains minor misquotes and should read: "Admit that You promoted AWS Elemental MediaLive as follows: '[Y]ou'll configure . . . the actual encoding instructions [to] specify the resolution, the codec, the bitrate, and all other

encoding attributes.' AWS_0006605, at 8:09."  Again, these are minor typographical errors. Courts' requirement of good faith and Rule 36's requirement that "a denial must fairly respond to the substance of the matter" require AWS to amend its response.  *See, e.g.*, *Asea*, 669 F.2d at 1246.

RFA Nos. 4-8 and 22-29 to Twitch are similar.  They ask Twitch to admit the truth of its own statements in its documents produced in this litigation.  RFA No. 4 reads: "Admit that low-level Latency is ███████████████████████ as identified at TWITCH_0000142."  RFA No. 5 reads: "Admit that Twitch believed that the low-Latency capability is █████████████████████ as identified at TWITCH_0000142."  RFA No. 6 reads: "Admit that as of February 2019 You had ████████████████ as identified at TWITCH_0000197."  RFA No. 7 reads: "Admit that as of February 2019 You had ██████████████████████ as identified at TWITCH_0000197."  RFA No. 8 reads: "Admit that as of February 2019 You had █████████████ as identified at TWITCH_0000197."  RFA Nos. 22-29 read: "Admit that You ███████████████████████████ as identified at TWITCH_0000864 in [a certain quarter]."

Twitch objects that each RFA "is not clear whether the Request seeks a general description of Twitch's priorities or an admission that the quoted language appears in the cited documents. Twitch will interpret this Request for Admission to seek an admission that the page bearing Bates TWITCH_000[XXXX] includes the quoted language."  For RFA Nos. 4-8, Twitch then merely admits that the quoted language is found in the cited document.  That misreading is improper for the same reasons discussed above.  For RFA Nos. 22-29, Twitch denies the RFAs because "[t]he cited document does not state that Twitch ████████████████████████████████ in the [certain quarter]."  This self-serving misinterpretation, especially given authenticity stipulation in this case, is bad faith evasion and word play.  This series of RFAs is designed to determine ████████████████████████; the document does not state when that happened—that is why BSD served the RFAs.  Twitch's denial based on the fact that ████████████████████████████████████ is intentionally evasive misinterpretation.

Twitch's response below does not address its ***actual*** response to the RFAs, responses that merely discuss whether the quote is contained in the referenced document.  If, for any reason, Twitch needs to qualify its admission to the RFAs ***as written***, Rule 36 expressly contemplates and demands an explanation.  The Rules, however, do not permit a party to respond to a different RFA than the one served.

### *AWS's Refusal to Interpret "Use" In Its Ordinary Sense Is Improper Word Play.*

RFA No. 6 to AWS reads: "Admit that You use CloudFront to deliver live streaming to players."  AWS responds that it "lacks the information needed to admit or deny this Request for Admission, and therefore denies it. AWS does not maintain data regarding which customers used CloudFront as a CDN for accused streaming configurations during the Damages Period."  First, nothing about this RFA requires AWS to maintain data regarding ***which*** or even how many customers choose CloudFront to deliver live streaming to players.  If AWS's own system,

CloudFront, delivered live streaming to players, this RFA should be admitted.  Second, although AWS maintains that this RFA is not relevant because CloudFront is not at issue, BSD's Patent Infringement Contentions clearly put CloudFront at issue by identifying it as responsible for part of the uploading step of independent Claim 1 and in dependent Claim 2.  Moreover, AWS again engages in evasive wordplay by purporting not to understand the word "use" and to interpret "this to refer to the use of AWS CloudFront by customers of the AWS Accused Instrumentalities."  The RFA is clear: does AWS's CloudFront deliver live streaming to players?  If yes, the RFA must be admitted.  This is AWS's use of the CloudFront system, not any third party as AWS argues below.  While a third party may choose CloudFront, it is AWS that operates the system.

RFA No. 12 to AWS similarly reads: "Admit that Your live streaming services use CMAF to deliver video to some viewers."  AWS objects "because the use of CMAF is not accused in this litigation" and does not respond to the RFA.  But CMAF is used for both HLS and MPEG-DASH to contribute to lowering latency.  It is thus important to a central issue in this case, *i.e.*, whether the Accused Instrumentalities satisfy the preamble's "real-time broadcasting" limitation.  Defendants' argument that CMAF is not relevant is neither true nor a reason to refuse to respond to discovery.  AWS also stated during meet and confers that it objects to the word "use."  As with RFA No. 6, this objection is unfounded.  There is nothing ambiguous about "use."  Either the live streaming services employ CMAF when delivering video to some viewers, or they do not.  It is not about whether customers choose CMAF when configuring their live stream.

Defendants' responses to these RFAs are not made in good faith.  They are evasive and full of word play.  As such, BSD respectfully requests the Court order Defendants to amend their responses or deem the RFAs admitted as written.

## B.  Defendants' Position

BSD's own section makes clear that this dispute is at best illusory or at worst one of BSD's own making. To begin, BSD's original version of this section claimed not to need the responses to these RFAs, yet raised this as its first issue in this omnibus set of discovery disputes. That implicitly illustrated how fruitless BSD's set of discovery complaints is. BSD's revised argument merely reinforces the specious nature of BSD's request. BSD claims that it wants Defendants to respond "to the RFAs *as drafted*." But BSD proceeds to note that virtually every request it is asking the Court do deem admitted contains numerous typographical errors or other limitations about the underlying subject matter that necessitate a denial. How are Defendants supposed to "admit" something that is incorrect? Even worse, how could the Court order such an incorrect admission?

BSD further clarifies that what it actually seeks with these RFAs is for Defendants to admit the truth of the underlying statement. There are multiple issues with BSD's request: (1) the Requests are not clear; (2) the Requests are flawed; and (3) BSD now claims the Requests seek the truth of the underlying statement in what appears to be an attempt to sidestep hearsay.

As with many of the disputes BSD identifies, the crux of this issue changes and Defendants are left trying to respond to a moving target. After Defendants identified the typographical errors and negating limitations as the basis for their denials, BSD has repeatedly demanded that Defendants respond to revised versions of BSD's requests. But the simple truth is that BSD was obligated to draft clear, accurate requests yet failed to do so. BSD's requests lacked temporal restrictions, such

as within the damages period, and often sought admissions related to "live streaming services" rather than the accused products. *See, e.g.*, AWS RFA 12. And then there were the typographical errors, including on Bates numbering of referenced documents. Defendants looked past what issues they could to provide meaningful responses, but BSD's request here essentially asks the Court for a "do over" to correct its own mistakes. That is not the way discovery works—as the adage goes, "ask a silly question, get a silly answer."

***Defendants Properly Responded to the RFAs Containing Quotes***

AWS: Defendants appropriately responded to BSD's RFAs as written. Doing so required significant interpretation—contrary to Rule 36(a), the RFAs were neither simple nor direct. *See Blackwood v. De Vries*, No. ED CV 14-395-JGB, 2015 WL 13905814, at \*1 (C.D. Cal. Dec. 16, 2015) ("RFAs must be 'simple and direct; limited to singular relevant facts; not be so framed as to permit voluntary statements or unresponsive matter to be inserted in the responses made thereto by the adverse party.'" (internal citation omitted)); *see also McConnell v. PacifiCorp, Inc.*, No. C 07-2382 WHA, 2008 WL 3843003, at \*3 (N.D. Cal. Aug. 15, 2008); *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 446 (C.D. Cal. 1998).

Many of BSD's RFAs utilized long quotes from specific documents. For example, AWS RFA 9 states: "Admit that MediaPackage 'is a just-in-time packaging and origination service that customizes live video assets for distribution into a format that is compatible with the device that makes the request.' as identified at AWS_000336." What BSD seeks in this Request is unclear. Most RFAs quoting documents seek an admission that the statement is correct, not an admission of the truth of the underlying statement. But BSD asserts it seeks the latter in what appears to be a work around on hearsay. Even if the truth of the underlying statement is considered, the quoted text does not describe a "singular relevant fact;" it instead compounds multiple concepts, none of which will narrow the issues in this case. As Defendants noted in their objections, that interpretation broadly seeks a general description of MediaPackage (bounded by no particular time period), making this a discovery request akin to an Interrogatory.

The same holds true for AWS RFA 13. The Request is unclear and BSD now acknowledges that its seeking an admission as to the truth of the underlying statement, in an odd work around for hearsay. Further, as it relates to the truth of the underlying statement, the quoted language directed to multiple concepts with no identified time period with typographical errors in both the quotation and citation of the document—not a singular relevant fact. BSD further acknowledges there is a typographical error and it included the wrong word in its Requests. None of the cases BSD cites suggest that Defendants must admit an incorrect statement. Rather, the stand for the proposition that Defendants must respond to the Requests in good faith—which they did. AWS properly responded and is not required to amend its response in response to BSD's proposed revision of that RFA. It is the serving party's burden to draft accurate requests for admission, just as the responding party is expected to admit or deny based on what the request says, not what the serving party meant for it to say.

The same applies to AWS RFA 16, where BSD references a video and asks whether AWS promoted Elemental Live with specific language. The quoted language was not used in the video and the video was an instructional video rather than a promotional video. AWS is under no obligations to correct BSD's errors or respond to a Request other than the one drafted. Where Defendants

8

previously served RFAs that BSD objected to based on the wording, Defendants took the appropriate action—they served additional RFAs with different wording. BSD's RFAs were poorly drafted, and BSD should be held to the requests they wrote.

Twitch: BSD's issue with the Twitch responses are akin to the AWS responses described above— BSD drafted poorly-worded Requests and Defendants responded to the Requests as written rather than as BSD would like to rewrite them retrospectively. In Twitch RFAs 4-8, BSD quotes two of many documents provided during discovery. As with the AWS RFAs, BSD has now clarified that it seeks the truth of the underlying statements. But the quoted text includes highly subjective language including "extremely important," "one of the top projects," and "key technology." BSD is not seeking admission of a single fact and these are not statements that, if taken from a document and imputed to Twitch as a whole, would narrow the scope of the case whether admitted or denied. BSD's reliance on ellipses in Twitch RFA 5 is further misleading as it removes the quote's identification of specific products that are not at issue in this case. The documents' metrics are similarly irrelevant, as they relate to worldwide numbers for more than the accused instrumentalities.

Twitch RFAs 22-29 are even more misleading, taking a quote from a different Twitch document related to latency, and then inaccurately imputing such latency to specific quarters of different years. Twitch independently confirmed this was not accurate, and denied the Request on that basis. BSD's assertion that these RFAs are directed to determining when the ███████████████ does not make sense for multiple reasons. First, different protocols achieved different latencies and the RFAs fail to specify a specific protocol. Second, no reduction of latency was achieved in a single quarter. Rather, Twitch's efforts to reduce latency spanned multiple quarters and was rolled out in phases. Third, BSD already seeks information related to the reduction of latency in the context of Interrogatory No. 11, which Twitch has agreed to supplement. BSD will, therefore, receive information related the reduction in latency for HLS live streams by Twitch, including the time to the extent determined after a reasonable search, in response to Interrogatory No. 11.

BSD has made no showing it deserves a do-over when it comes to RFAs. It drafted its requests by including specific quotations from produced documents, and Defendants responded to those quotes. BSD should not now be granted the opportunity to change strategies retrospectively after reaching the agreed-upon RFA limit.

### *BSD's Attempts to Redraft its Poorly Phrased RFAs Related to "Use" Should Be Rejected.*

BSD drafted AWS RFAs 6 and 12 to seek an admission on AWS's use of different services or features for live streaming while ignoring that AWS does not itself perform the live streaming. Rather, AWS *customers* are the ones performing the live streaming, and the accused Elemental products and services support a portion of the live streaming pipeline. BSD now seeks to re-write its RFAs to ask about anyone's use, rather than AWS's use. But that is not how the RFAs were originally drafted.

Specifically, RFA 6 seeks an admission related to AWS's alleged "use" of CloudFront for live streaming, but AWS does not use CloudFront. Instead, CloudFront was one of many Content

Delivery Networks (CDNs) available to customers, in addition toother delivery methods. In a hypothetical where a customer chose CloudFront, it would be that customer who used CloudFront to deliver its stream, not AWS. BSD now takes the position that if "CloudFront[] delivered live streaming to players, this RFA should be admitted." That is simply not what the Request asks. AWS responded to the RFA as drafted; to respond otherwise would be misleading and inaccurate.[7]

AWS properly objected to AWS RFA 12 as irrelevant. BSD does not accuse CMAF of infringement patent and did not chart CMAF. BSD's claims that CMAF contributes to reduced latency, by itself, is not sufficient to put CMAF at issue. Across 236 pages of infringement charts (Ex. A and C to infringement contentions for HLS & DASH), "CMAF" appears only in a single block quote that is repeated four times. That quote came from a document unrelated to any of the accused Elemental products or services. *Id.* at *Id.* at A-38, C-40, C-45, C-49. As with CloudFront, CMAF is not the relevant part of the quote and is only included so that the block quote is not incomplete.

AWS RFA 12 suffers from the same issues as RFA 6—as drafted, it seeks an admission related to AWS's use, but AWS does not perform the video livestream. AWS's customers configure their livestreams. Accordingly, an admission to the RFA as written would be misleading and inaccurate, and BSD should not be permitted to redraft the RFA retrospectively.

## II. ORDER COMPELLING DOCUMENTS, INTERROGATORY RESPONSES, AND TESTIMONY RELATED TO DEFENDANTS' EFFORTS TO REDUCE LATENCY[8]

### A. BSD's Position

Latency is the delay between the moment a live event occurs and the moment an end-user sees it on their screen. In the Accused Instrumentalities, the source video stream is encoded into segments, packaged, delivered through a content-delivery network, and reassembled by the viewer's player. Each stage of this process adds delay. The sum of those stages is commonly referred to as "end-to-end latency." The '473 patent is directed to delivering live media to viewers with low latency. Consequently, how Defendants measured latency, what values they achieved, how they reduced it, the competitive importance Defendants attached to lowering latency, and the customer-facing materials touting low-latency capability bear directly on infringement and

---

[7]    Nor would BSD's redrafted RFA narrow the case. CloudFront is not an accused instrumentality; it appears in BSD's infringement contentions only tangentially, in block quotes. BSD addresses specific components unrelated to CloudFront in each instance where it appears, and BSD added emphasis to different portions of the block quote in each instance, revealing that CloudFront is only included to complete the block quote. *See, e.g.,* **Ex. 9** (BSD's Infringement Contentions) at A-6, A-38, A-62, A-99, A-109, C-7, C-40, C-45, C-49, C-57, C-60, C-61, C-65, C-70, C-96, C-99, C-100, C-105, C-106, C-109. The parties further stipulated that claim 1 "does not require a client computer to actually download the sequence of files." *See, e.g.*, Dkt. No. 93. Nor does BSD rely on a specific CDN for claim 2. Rather, BSD points to MediaLive, MediaPackage, and Elemental Live as sending data, and client computers as receiving data. Defendants do not dispute that the data can pass through a CDN, but the CDN is not required by the claim limitation nor relied on by BSD to meet that claim limitation.

[8]    Defendants' position to the issue in Section II was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026. *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

damages.  A number of BSD's RFPs are directed to latency.  *See, e.g.*, RFP Nos. 142-146, 153-155, 180-181.  Defendants' document production with respect to its efforts to reduce latency is deficient in ways that suggest the search behind it was not reasonably thorough.  Accordingly, BSD respectfully requests the Court compel Defendants to produce all documents related to their efforts to reduce latency and provide an accounting of their search for responsive documents.

***Defendants Failed to Produce Relevant Documents That Are Currently Publicly Available on Defendants' Website****.*

First, Defendants failed to produce their copies of responsive documents that are (1) publicly available on Amazon's own website, (2) authored by Defendants' own employees, and (3) that Defendants themselves cited in their responses to BSD's Interrogatories.  The four-part series "How to Compete with Broadcast Latency Using Current Adaptive Bitrate Technologies," is an AWS Media blog published between May and June 2018, and authored by a current Amazon employee that addresses the accused latency-reduction functionality.  An AWS-produced email references a customer discussion about implementing the strategies described therein (AWS_0075327; **Ex. 10**), and Defendants' April 9, 2026 Interrogatory Responses (**Ex. 11** (Amazon), **Ex. 12** (AWS), **Ex. 13** (Twitch)) cite documents discussing the series (TWITCH_0006642 (**Ex. 14**), TWITCH_0006639 (**Ex. 15**), and TWITCH_0007159 (**Ex. 16**)). Yet, Defendants have failed to produce their copies of the underlying articles.[9]

Rather than producing the articles from their own repositories or from the custodial files of the author, Nicolas Weil (a current Amazon employee), Defendants produced non-searchable,

---

[9]     Defendants assert that "Mr. Weil's blog posts are not clearly responsive to any of the RFPs BSD asserts are directed to latency, and BSD does not identify any specific request to which the blog posts are responsive." *See* Section II(B) *infra*.  In addition to the above-identified RFPs, the blog posts are responsive to RFP Nos. 41 ("All documents published or created before March 24, 2019 and relied upon to draft the article 'Part 1: How to Compete with Broadcast Latency Using Current Adaptive Bitrate Technologies,' as described here: https://aws.amazon.com/blogs/media/part-4-how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies/."), 42 ("All documents published or created before March 24, 2019 and relied upon to draft the article 'Part 2: How to Compete with Broadcast Latency Using Current Adaptive Bitrate Technologies,' as described here: https://aws.amazon.com/blogs/media/how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies-part-2/."), 43 ("All documents published or created before March 24, 2019 and relied upon to draft the article 'Part 4: How to compete with broadcast latency using current adaptive bitrate technologies,' as described here: https://aws.amazon.com/blogs/media/part-4-how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies/."), 48 ("All documents that use the phrase 'real time,' 'realtime' or 'real-time' in the context of video streaming, excluding instances where that phrase is part of RTMP or RTP."), 49 ("All articles, publications, or presentations relating to live streaming over HLS or MPEG-DASH."), and 98 ("All documents from March 24, 2017 to March 24, 2019 discussing or referring to the benefit of having low-latency with respect to live streaming."), and 99 ("All documents from March 24, 2017 to March 24, 2019 discussing or referring to the disadvantage of having high-latency with respect to live streaming.").

black-and-white screenshots captured by Defendants' counsel on May 5, 2026 from a third-party (the Internet Archive's Wayback Machine), portions of which contain text obscured by messages from the screen capturer's browser. They did so even though the blog remains live on the AWS website right now.[10] Had Defendants searched Mr. Weil's custodial files or the repository in which the finished articles are maintained, they could have produced their own business records. Their failure to do so indicates that those sources were never searched.

This point is underscored by what Defendants *have* produced from their own repositories and custodians. Defendants produced internal drafts of Part 4 of the article (AWS_0079142 (**Ex. 17**); AWS_0079147 (**Ex. 18**)), and a version of Part 2 (AWS_0079131; **Ex. 19**) that uses different figures and language than either the published article or the produced Wayback Machine screenshots. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ (AWS_0075327; **Ex. 5**). However, Defendants have not produced the actual Amazon business records relating to these posts: the final published versions as maintained in Defendants' systems, other drafts and revisions, the editorial and approval communications, the distribution records, or materials reflecting discussions with customers regarding how to reduce latency. The drafts show that responsive materials exist within Defendants' files. But the absence of the corresponding business records, paired with Defendants' resort to a public archive and a failure to produce any custodial documents from the blog's author, suggests that entire categories of repositories were never searched and, if they were, that the searches were perfunctory and incomplete.

### *Defendants' Documents Identify Repositories That Went Unsearched.*

Second, Defendants assert that they conducted a reasonable search because responsive materials reside in "central repositories" that reflect the work of an entire group, rather than in individual custodial files. Dkt. No. 200 at 6. Defendants claim that they searched custodial files but have not identified which custodians were searched. Further, Defendants' documents identify sources that are the kind of shared, group-level repository Defendants assert contain responsive files but Defendants' metadata fails to identify documents originating from these repositories. As an example ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants' production contains virtually nothing identifiable as having originated from any of these sources. Defendants' latest production also discloses a file sharing system called "Jive," but, except for a handful of documents, it appears that the repository was not thoroughly searched. Defendants cannot simultaneously argue that shared group

---

[10]    *See, e.g.*, https://aws.amazon.com/blogs/media/how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies-part-1; https://aws.amazon.com/blogs/media/how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies-part-2; https://aws.amazon.com/blogs/media/part-3-how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies; https://aws.amazon.com/blogs/media/part-4-how-to-compete-with-broadcast-latency-using-current-adaptive-bitrate-technologies.

repositories are the best place to find responsive documents and fail to search the shared group repositories that their own files name.[11]

Defendants argue that by virtue of the word "latency" appearing in a certain number of produced documents evidences that the search was reasonable and thorough. Notably, Defendants do not assert that the databases identified above—including the internal wikis, Google Docs, Jive, etc.—have been searched. Of the 1,000 documents cited by Defendants, approximately 500 are copies and drafts of the same API user guides which make passing references to latency. Further, the question is not how many documents happen to contain the word "latency," but whether Defendants searched the specific repositories their own files identify as housing responsive material. A raw hit count says nothing about whether the internal wikis, the Jive file-sharing system, or the shared Google Docs referenced in Defendants' own documents were ever searched. Indeed, that nearly a thousand documents mention latency only underscores that latency was plainly a significant subject within Defendants' business, yet their production contains virtually nothing identifiable as originating from the very repositories where their documents indicate responsive materials reside and is rife with partial drafts and missing final versions of documents.

### *Defendants' Latency-Related Interrogatories Responses are Insufficient*.

AWS and Twitch's Responses to Interrogatory No. 3—which asks Defendants to "[i]dentify any knowledge of, ***and*** discussions You had with any entity related to Amazon" concerning efforts to lower latency—point to the same three documents (TWITCH_0006642, TWITCH_0006639, TWITCH_0007159) which themselves reference underlying documents, including the Weil-authored blog series, that were never produced. *See* **Ex. 12** (AWS) at 4 (Interrogatory No. 3) (emphasis added);[12] **Ex. 13** (Twitch) at 4-5 (Interrogatory No. 3); **Ex. 16** (TWITCH_0007159) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ A party cannot designate a document as responsive in a sworn interrogatory answer under Rule 33 and then withhold documents within the family of the cited document. *See* Fed. R. Civ.

---

[11] Defendants' attempt to compare their lack of sufficient metadata to the metadata available for BSD's documents is unavailing. Nearly 1,000 documents produced by BSD in this case came from BSD's predecessor, Emblaze Ltd., and were produced from the files of Emblaze's former counsel. Approximately 2,000 other documents comprise materials from the *Apple* and *Microsoft* litgiations. Further, a significant amount of BSD's document production is drawn from publicly available sources such as the '473 patent, its prosuection history, prior art references, articles regarding the history and public disclosure of the patented technology, and public articles regarding Defendants and the Accused Instrumentalities. Consequently, many of BSD's files do not have BSD custodians and, thus, identify no custodian or identify Emblaze and/or BSD's counsel. In contrast, Defendants' documents are internal business-course collections and should reflect the source from which they were collected, especially so since Defendants maintain that all documents reside in a single repository.

[12] Defendants' suggestion that this interrogatory is somehow limited to discussions with entities related to Amazon intentionally misreads the plain language of the interrogatory and ignores both punctuation and word use. *See* **Ex. 12** at 4 ("Identify **[1]** *any knowledge of, and* **[2]** *discussions You had…*") (emphasis added).

13

P. 33(d), 34.  Defendants have repeatedly claimed that they have no knowledge about latency, yet their documents show reference extensive experiments that require summary digests.  *See* **Ex. 16** (TWITCH_0007159).  Defendants separately failed to identify the personnel most knowledgeable about these latency reduction efforts, as that interrogatory also required.

Taken together, these deficiencies establish that Defendants' search was not reasonable, and BSD should be afforded an accounting of the contours of Defendants' search.  A party may not insulate its production from scrutiny merely by asserting that its search was reasonable.  Counsel's discovery obligations require a reasonable inquiry and, where the requesting party makes a particularized showing that the production is deficient, courts have ordered the producing party to disclose the methodology it contends makes its production reasonable.  *See Baranco v. Ford Motor Co.*, No. 17-cv-03580-EMC, 2018 WL 9869540, at *1 (N.D. Cal. Apr. 10, 2018) (ordering defendant to "disclose its proposed search methodology, including the identity of its custodians"); *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 135 (S.D.N.Y. 2009) ("[T]he party selecting the [search] methodology must be prepared to explain the rationale for the method chosen to the court, demonstrate that it is appropriate for the task, and show that it was properly implemented.") (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 260, 262 (D. Md. May 29, 2008)); *S2 Automation LLC v. Micron Tech., Inc.*, No. CIV 11-0884 JB/WDS, 2012 WL 3656454, at *32 (D.N.M. Aug. 9, 2012) ("Without some information about the search strategy [the responding party] used to provide responsive documents to requests for production, neither the Court nor [the party seeking discovery] can have a full understanding of the adequacy of [the] search strategy.").  The party resisting discovery, moreover, bears the burden of justifying the limits of its search.  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied.").

### *Defendants Improperly Claim That They Cannot Prepare a Witness to Testify About Certain Latency Related Topics*.

Finally, Defendants have refused to designate a witness regarding certain 30(b)(6) topics related to latency.  BSD's 30(b)(6) Topic No. 10 to AWS (Topic No. 9 to Twitch) seeks testimony regarding the quantification of end-to-end latency the Accused Instrumentalities actually achieved and the configurations required to achieve it; AWS Topic No. 20 (Twitch Topic No. 19) seeks the business value Defendants attached to lower latency; and AWS Topic No. 33 (Twitch Topic No. 32) seeks Defendants' studies and data on consumer perception of latency.  **Ex. 25** (30(b)(6) Notice to AWS) at 5, 7, 10; **Ex. 26** (30(b)(6) Notice to Twitch) at 4-5, 7, 9.  Both AWS and Twitch responded to all three Topics directed to each of them that they "cannot properly prepare and produce a witness to testify about this Topic in its current form."  **Ex. 28** (AWS) at 11-12, 20-21, 33; **Ex. 29** (Twitch) at 10-11, 18-19, 31-32.  Rule 30(b)(6) requires a corporation to prepare a designee on matters reasonably available to it, from documents, present employees, or past employees.  The latency information these Topics seek is plainly available.  As discussed above, Defendants' own employee, Nicolas Weil, authored a published series on reducing latency, Defendants' own documents reference ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  Defendants thus possess the latency measurements,

14

configurations, and analyses these Topics address.

Defendants claim that they cannot prepare a witness regarding the "incremental business value of achieving lower latency" because "Defendants take the position that the accused configurations did not in fact achieve lower latency." BSD's request is not limited to any specific configurations; it is to the general topic of "[t]he incremental business value of achieving lower latency or improved scalability in the Accused Instrumentalities when using HLS or MPEG-DASH." **Ex. 25** (30(b)(6) Notice to AWS) at 7. Defendants are reading limitations into the deposition topic in order to claim an inability to prepare a witness.

Defendants further assert that they cannot prepare a witness on studies related to consumer perception of latency because the studies identified above do not show "whether Defendants conducted consumer research." Defendants are again reading limitations into the deposition topic. The topic is not limited to consumer research but, rather, to studies about consumer perception of latency. How and whether a consumer can perceive latency is not limited to consumer research. Further, to the extent that Defendants have not conducted any consumer research, their witness can testify to such and, thus, bind Defendants to those statements. *See* Section VIII(A) *infra*.

A boilerplate assertion that a witness "cannot" be prepared does not discharge that obligation. If, after a reasonable inquiry, Defendants lack information BSD seeks, a prepared witness must say so on the record; counsel may not decline designation in its place. *See* Section VIII(A) *infra*. If Defendants believe a topic is overbroad, its remedy is to seek a protective order, not to refuse unilaterally. *Id.* The parties have conferred, and Defendants have identified no substantiated basis for refusing to prepare a witness on topics central to the latency issues in this case.

BSD therefore respectfully requests that the Court order Defendants to: (1) produce all documents concerning the measurement of, and efforts to reduce, latency, including at minimum Defendants' copies of the publicly available articles in the "How to Compete with Broadcast Latency" series and the underlying materials referenced in Defendants' interrogatory responses; (2) instruct Defendants to prepare a witness knowledgeable about BSD's latency-related 30(b)(6) Topics; and (3) provide a written accounting of the search conducted, identifying (a) the repositories searched and not searched; (b) the custodians whose files were searched; (c) the search terms applied; and (d) the date ranges used.

### B. Defendants' Position

BSD's claim that Defendants failed to produce documents responsive to its latency-related RFPs is false.[13] Defendants have conducted multiple directed searches related to identifying documents

---

[13] BSD's characterization that the '473 patent is "directed to delivering live media to viewers with low latency" is misleading. What BSD characterizes as the inventive aspect of the '473 patent regularly changes depending on the context. For example, in its Complaint, BSD claims that the chief benefit of the '473 patent was to "eliminate[] the need for [] cost prohibitive equipment," such as "expensive dedicated streaming media servers," for livestreaming by using conventional HTTP servers. Dkt. No. 1, at ¶2. In its claim construction brief, BSD claims that the '473 patent "forms the basis of modern adaptive multi-bitrate ("ABR") technology." Dkt. No. 83 at 2. And in

discussing latency, providing latency testing results, determining whether consumer surveys implicated latency, as well as keyword searches. And Defendants have produced responsive documents resulting from those searches. As reflected by the produced documents, a search of Defendants' productions for the term "latency" returns 566 documents from AWS and 429 documents from Twitch—a combined production of nearly 1,000 documents on the subject BSD claims Defendants have not addressed.

BSD's position is further undermined by the parties' meet and confers. In raising latency in this letter, BSD seeks to resurrect an issue it abandoned months ago. BSD served the RFPs it lists as exemplary in December 2025. The parties met and conferred on Defendants' document production in March 2026, during which BSD raised that Defendants' production of latency-related documents was insufficient. Defendants explained that they had already conducted an extensive search and produced responsive, relevant documents directly related to latency. While Defendants were doubtful they would locate additional documents related to latency given the previous searches, Defendants committed to look into it further given that the documents were older in nature, and many of the individuals involved in their creation had since left the company. BSD did not raise the general topic of latency again until this letter. But the arguments BSD makes are new.

BSD relies on issues never before raised to support a conclusion that Defendants failed to conduct a reasonable search. BSD is incorrect and the supposed deficiencies it points to do not support its conclusion.

**The Supposed Lack of Production Related to Mr. Weil's Blog Post Does Not Demonstrate Defendants' Productions Were Deficient**

BSD points to a supposed absence of Mr. Weil's 4-part blog series from Defendants' productions to suggest a broader deficiency. This argument is meritless. As an initial matter, BSD's blog-post argument relates solely to AWS; it provides no basis to draw any inference regarding the adequacy of the other Defendants' productions. BSD's argument further reflects its own failure to pursue these documents through available discovery mechanisms rather than any deficiency in Defendants' productions. Mr. Weil's blog posts are not clearly responsive to any of the RFPs BSD asserts are directed to latency.[14] BSD cannot manufacture a production deficiency by sandbagging Defendants on an issue it waited until the very end of discovery to raise.

Moreover, while BSD may take issue with the format, it acknowledges that AWS did in fact produce the 4-part blog series. Further, as BSD points out, BSD itself also produced the blog series. BSD claims that AWS should have produced documents related to the blog, including "the final published versions as maintained in Defendants' systems, other drafts and revisions, the editorial and approval communications, the distribution records, or materials reflecting discussions with customers regarding how to reduce latency." But BSD does not explain how these materials are

---

its Second Amended Damages Contentions, BSD further claims that the '473 patent "enabl[es] scalable streaming to large numbers of viewers." **Ex. 31** (2nd Am. Dam. Contentions at 2).

[14] BSD includes a footnote in which it identifies additional RFPs for which it asserts the 4-part blog is responsive. Four of those requests from 2023 explicitly reference the blog and seek documents relied on to draft the blog. But, despite having plenty of opportunity to do so, BSD failed to follow up on those RFPs before raising the issue in this letter.

relevant, identify any RFP to which they are responsive, or explain how the production of these materials is proportional to the needs of the case.

BSD further argues that because Defendants produced draft versions of certain parts of the article but not the final published versions from internal systems, entire repositories must never have been searched. That assertion is unsupported. Defendants' production of drafts establishes that they searched relevant repositories and produced what they found. The absence of a particular version of a document does not prove that the search was incomplete, particularly given that the blog published eight years ago.

BSD's position is further undermined by the fact that BSD itself does not appear to have considered Mr. Weil a key individual. Despite serving a Rule 30(b)(1) deposition notice on Mr. Weil and propounding 18 sets of email RFPs throughout this litigation, BSD never sought Mr. Weil's emails.

BSD has not demonstrated that AWS's production is deficient with respect to this single issue, much less that any such deficiency supports an inference that Defendants' productions are globally inadequate.

**Defendants Conducted Reasonable Searches of Repositories**

BSD's argument that Defendants failed to search shared group repositories is incorrect. Defendants searched all repositories that, based on their investigation, were reasonably likely to include responsive materials. For Twitch, this included its wiki pages, Google Drive, source code repositories, various dashboards and databases, and the files of individual custodians. In the case of AWS, this included wiki pages, Confluence, WorkDocs, Quip, source code repositories, as well as the files of individual custodians. BSD also raises Jive, but fails to mention that it was deprecated in or around 2015—eight years before BSD filed its complaint. The fact of the matter is that the damages period in this case ended more than 7 years ago. Defendants have searched extensively, but it is not surprising that the remaining documentation is limited. And despite its gripes over the quantity and quality of documents produced, BSD has failed to so much as review Defendants' source code, which is the most relevant evidence in this case.

BSD complains that Defendants' productions do not containing identifying information reflecting these repositories were searched. This is unsurprising given that most of the central repositories are cloud based, which can make it difficult to maintain metadata.[15]

---

[15] Defendants take their ESI obligations seriously and attempted to maintain metadata to the extent possible. BSD's own production reflects the difficulty of maintaining metadata for all documents. A review of BSD's production index reveals: 761 of BSD's produced documents identify no custodian in the metadata; 865 documents have no meaningful file path or source information; BSD's former counsel, Armstrong Teasdale, is listed as the custodian for 2,201 of BSD's produced documents; BSD's current counsel, Villegas & Cefo, is listed as the custodian for 129 documents; Moshe Dgani,  former BSD employee and current consultant, is listed as the custodian for 79 documents, many of which are documents from the *Apple* litigation; and only **17 documents** out of BSD's production of 3,207 documents list BSD, BSD Crown, or Emblaze as the custodian. This shows the vast majority of BSD's own production is attributed not to any BSD employee, officer,

17

BSD first complained that Defendants failed to conduct a reasonable search of custodial documents and now claims Defendants failed to search central document repositories. It is unclear where BSD believes the documents Defendants produced came from. Defendants conducted a reasonable search—they worked with key witnesses to identify and collect relevant documents, primarily from central repositories, performed keyword searches of central repositories, and performed keyword searches across custodial files for dozens of individuals.

Defendants searched relevant internal repositories, produced responsive documents from those repositories, and maintain that their searches were both thorough and reasonable. BSD's sweeping and unsupported assertion that entire categories of repositories went unsearched is speculative and does not justify the extraordinary relief it seeks.

**Defendants' Interrogatory Responses are Adequate**

BSD inaccurately recites the language of Interrogatory No. 3 and misrepresents Defendants' statements during meet and confers.

BSD's initial draft of this argument mischaracterized the information sought by Interrogatory No. 3. BSD has corrected that and makes a new argument related to knowledge in a footnote. The shifting sands approach to BSD's arguments underscores the difficulties Defendants have encountered in this case.[16] The interrogatory is directed to discussions with entities related to Amazon. AWS and Twitch are both Amazon entities. It is therefore not only logical but expected that AWS and Twitch would identify the same documents evidencing discussions between their respective employees. AWS responded that it "is aware of periodic high-level conversations regarding latency in the Accused Instrumentalities between AWS and Twitch employees during the Damages Period," citing TWITCH_0006642, TWITCH_0006639, and TWITCH_0007159. Twitch similarly responded that it "is aware of periodic high-level conversations regarding latency in the Accused Instrumentalities between Twitch and AWS employees during the Damages Period," citing the same three documents. BSD treats the overlap in cited documents as suspicious, but it is not—it is the natural result of the interrogatory's scope.

BSD argues that because TWITCH_0007159 references other documents, Defendants were obligated to produce those documents as part of a document "family." But citing a document in an interrogatory response under Rule 33(d) does not convert every document referenced within that cited document into a document that must be located and produced. Defendants' obligation is to

---

or business record custodian, but to outside litigation counsel.

[16] BSD's April 29 deficiency letter on this Interrogatory emphasizes that it was seeking the discussions AWS or Twitch had with other Amazon entities, including claiming that "[a]ny discussions relating to lowering latency in Defendants' live streaming products is discoverable" and asserting the responses must be amended "to identify the periodic discussions between AWS and Twitch and to identify any other discussions either entity had with other Amazon entities." The parties met and conferred on May 11, and BSD indicated it would take this issue back to see if it could further narrow the scope of its request. Defendants have heard nothing further from BSD. Importantly, the letter does not ask that Defendants' supplement their responses to identify their knowledge of latency, nor was this raised during the meet and confer. So, BSD has yet again changed its position on the information it seeks from Defendants in this letter.

produce documents responsive to BSD's RFPs, not every document that a responsive document happens to reference. If BSD believed those referenced documents were independently responsive to its requests, it was free to identify the specific RFPs at issue and/or meet and confer with Defendants to request production of the referenced documents. BSD did not do so. Defendants produced responsive documents located after a reasonable search.

BSD's argument that Defendants "have repeatedly claimed that they have no knowledge about latency" is abjectly false. As raised above, Defendants produced nearly 1,000 documents referencing latency. Defendants' interrogatory responses also undermine this statement. For example, Twitch's response to BSD's Interrogatory No. 19 describes in detail its latency reduction efforts across its entire streaming pipeline, including specific data from a 2018 internal study. BSD can, and already has, asked questions directed to latency of the deposition witnesses. Defendants have not represented a lack of knowledge about latency. Rather, AWS has indicated it does not know customer configurations for livestreaming and does not log customer glass-to-glass latency.

BSD seeks to compel Defendants to disclose their search methodology[17] on the theory that Defendants' production is deficient. BSD has not made the particularized showing that would justify such relief. The cases BSD cites require a specific, evidentiary showing that the search was inadequate, not a generalized complaint that the same documents appear in two related Defendants' responses, or that a cited document references other documents. Defendants conducted a reasonable search of relevant central repositories and custodial files, produced nearly 1,000 documents hitting on the term "latency" alone, and responded to Interrogatory No. 3 consistent with the interrogatory's actual text. BSD's dissatisfaction with those responses does not meet the threshold for an order compelling an accounting of Defendants' search methodology.

**Defendants Did Not Refuse to Designate a Witness on Latency Related 30(b)(6) Topics**

BSD mischaracterizes Defendants' objections to BSD's 30(b)(6) topics and the parties meet and confers. Defendants did not refuse to designate witnesses on these Topics. Defendants identified specific, substantiated reasons why the topics as written cannot support a meaningful corporate witness designation, and expressly offered to work with BSD to define a workable scope. That offer is explicit in the responses for AWS and Twitch.

BSD's request for relief on these topics ignores the parties' meet and confer and misrepresents the record. Defendants respectfully request that the Court refuse BSD's request.

---

[17] BSD has repeatedly refused to disclose any details related to its own search methodology, including the sources it searched, the steps it took to determine the BSD servers had been disposed of, or its efforts to search for and produce *Apple* litigation materials. Even more problematic, BSD has intentionally withheld relevant information, including the fact that the vast majority of *Apple* litigation materials were in the possession of another law firm and that BSD was required to seek third-party approval for the production of such materials from more than Apple. Only after Defendants sent BSD this letter on June 5 did BSD reach out with information related to the Apple file in Cozen O'Connor's possession. There are many other instances where BSD has intentionally concealed information from Defendants, provided contradictory explanations, or offered misleading and incomplete information.

19

*Defendants did not refuse to designate a witness on AWS Topic No. 10 / Twitch Topic No. 9*

AWS Topic No. 10 / Twitch Topic No. 9 requests:

> The lowest achievable, mean, average, highest, and any other quantification of total end-to-end latency of the Accused Instrumentality, including: (a) the specific configuration settings required to achieve such latency (including segment duration, chunk size, buffer depth, player configuration, packaging mode, and CDN configuration); (b) whether such configuration was commercially deployed, offered to customers, or technically available; (c) the engineering effort required to implement such configuration; and (d) any tradeoffs associated with achieving such latency, including effects on scalability, stability, quality, cost, or monetization.

**Ex. 25** at 5; **Ex. 26** at 4-5. Under Rule 36 (b)(6), BSD must identify its topics with reasonable particularity. Fed. R. Civ. P. 30(b)(6). On its face, these topics are impermissibly broad and Twitch and AWS cannot reasonably prepare a witness as to the full scope of these topics. *See City of Las Cruces v. United States* ("omnibus phrases like 'related to' violate the particularity requirement since they provide no 'basis upon which an individual or entity can reasonably determine what information may or may not be responsive.'" (internal citation omitted)); Trustees of Boston Univ. v. Everlight Elecs. Co., Nos. 12-cv-11935-PBS, 12-cv-12326-PBS, 12-cv-12330-PBS, 2014 WL 5786492, at *3 (D. Mass. Sept. 24, 2014) ("[T]opics [that] include the phrase 'including but not limited to,' ... fail[ ] to comply with the reasonable particularity requirement of Rule 30(b)(6).").

Unsurprisingly, AWS and Twitch stated they "cannot properly prepare and produce a witness to testify about this Topic in its current form" and they are "willing to meet and confer regarding an appropriate scope." That is a scope objection, not a refusal to designate.

Defendant's objections to this topic are substantiated. The topics are multi-part and sweeping, covering all latency quantifications across every configuration setting, commercial deployment status, engineering effort, and all tradeoffs including scalability, stability, quality, cost, and monetization. The topics are also vague and ambiguous or contain undefined terms for which BSD offered no reasonable definition or scope.

The parties met and conferred in good faith. Defendants committed to designate an AWS witness to speak to configuration and parameters available for the accused Elemental products and services, and the impact those parameters have on latency. Regarding AWS customer configurations, Defendants made clear that AWS did not track customer configurations for livestreaming and that AWS would designate a witness to confirm that fact, which is what BSD requested in the meet and confer. For Twitch, Defendants confirmed they can address the transition from RTMP to HLS and the implementation of HTTP Chunked Encoding.

BSD's request to force AWS and Twitch to designate and prepare a witness as to the full scope of this topic should be rejected.

*Defendants did not refuse to designate a witness on AWS Topic No. 20 / Twitch Topic No. 19*

Defendant's objections to these topics are valid. AWS Topic No. 20 / Twitch Topic No. 19 seeks:

20

> The incremental business value of achieving lower latency or improved scalability in the Accused Instrumentalities when using HLS or MPEG-DASH, including: (a) any analyses, studies, or assessments comparing different latency levels and their impact on user engagement, retention, or growth; (b) any evaluation of how latency affected advertising revenue, subscription revenue, conversion rates, or other monetization metrics; (c) any comparison of low-latency performance to competitors' streaming services; (d) any internal determination of latency thresholds considered commercially important; and (e) any tradeoffs between reducing latency and other business objectives, including cost, scalability, reliability, or content quality.

**Ex. 25** at 7; **Ex. 26** at 7. As with AWS Topic No. 10 / Twitch Topic No. 9, this topic is impermissibly broad. In fact, each of the separate subcategories is sufficiently distinct to qualify as a separate topic. So, rather than identifying a single topic with reasonable particularity, this topic is directed to at least six different concepts.

This topic also conflates two distinct and unrelated concepts: latency reduction and improved scalability. It further asks for all analyses, studies, evaluations, assessments, comparisons, internal determinations, and tradeoffs between latency and other business objectives, all without defining the term "incremental business value." During a meet and confer on this topic, Defendants asked BSD directly what it was looking for with regard to latency and scalability. BSD's counsel responded it wants "both." BSD's answer is the problem, not Defendants' objection. Lower latency and improved scalability are not the same thing and do not go hand in hand. A topic that seeks everything about two unconnected metrics provides no meaningful guidance for witness preparation.

The topic also contains a disputed factual issue. AWS and Twitch objected that the topic assumes Defendants achieved lower latency through the accused configurations, which Defendants dispute. A corporate witness cannot testify to the "incremental business value of achieving lower latency" when Defendants take the position that the accused configurations did not in fact achieve lower latency. BSD's argument that this topic is not limited to any specific configuration is contradicted by its next sentence and the topic itself, which is limited to use of HLS or MPEG-DASH. But use of those standards did not reduce latency. Defendants are not reading in a limitation; they are reading the topic as drafted.

Throughout its argument BSD also ignores the fact that AWS and Twitch agreed to designate witnesses on the impact of reducing latency during the relevant period and, to the extent they exist, any consumer studies by Twitch or AWS or of which they were aware related to the consumer impact of latency. Defendants cannot, however, reasonably prepare a corporate witness to testify as to the full scope of this topic. BSD's request related to this topic as written should be denied.

*Defendants did not refuse to designate a witness on AWS Topic No. 33 / Twitch Topic No. 32*

AWS Topic No. 33 / Twitch Topic No. 32 requests:

> Your studies, projections, surveys, and data regarding consumer perception of latency or scalability of the Accused Instrumentalities.

21

BSD's inclusion of and position on this topic blatantly ignores or intentionally omits the parties' meet and confer efforts. As with the other topics, AWS and Twitch responded they could not prepare witnesses as the topics were written and offered to meet with BSD to discuss a narrowed scope.

The topic seeks every study, projection, survey, and data point on consumer perception of both latency and scalability, without a time limitation. Defendants objected that the terms "projections" and "data" regarding "consumer perception" are vague and the topic fails to describe what it seeks with reasonable particularity. Despite this, AWS and Twitch interpreted the topic in good faith and investigated responsive materials.

At the meet and confer, Defendants confirmed (1) Twitch produced latency studies and will designate a witness to testify about them; (2) AWS already offered a witness on latency testing; and (3) for both Defendants, after reasonable investigation, they are unaware of scalability studies, or psychological research on latency perception. Defendants further offered BSD the option to close out those sub-topics on that basis. BSD did not object to Defendants' proposal.

BSD now points to internal engineering documents such as an experiment metrics digest and documents tracking operational latency thresholds as evidence that Defendants must have responsive consumer perception materials. That argument fails. Internal technical experiments measuring end-to-end latency in a streaming pipeline are not consumer perception studies. The existence of engineering metrics say nothing about whether Defendants conducted consumer research or have studies about consumer perception of latency.

Rule 30(b)(6) requires preparation on matters reasonably available to the corporation. Where information does not exist after a reasonable inquiry, a prepared witness confirms its absence. Defendants offered that. BSD's request for an order compelling Defendants to designate a witness to testify to more on this topic is not warranted and should be denied.

## III.    ORDER COMPELLING DEFENDANTS TO PRODUCE FOUNDATIONAL DOCUMENTS[18]

### A.  BSD's Position

Defendants develop new products through a process called "Working Backwards," the central artifact of which is a document known as a "PR/FAQ" or "PRFAQ," which is a mock press release paired with a list of frequently asked questions, written from a customer's perspective before the product is built.[19]  The PR/FAQ is the "principal tool" of a process that, since 2004, has generated "most of Amazon's major products and initiatives."  *Id*.  The PR/FAQ is iterative and ongoing.  It is a "living document" that, even "[o]nce it is approved by the leadership team…will almost certainly still be edited and changed."  *Id.*  For the Accused Instrumentalities, the PR/FAQs are foundational evidence of the business rationale, intended functionality, and anticipated

---

[18]    Defendants' position to the issue in Section III was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

[19]    *See, e.g.*,  https://www.aboutamazon.com/news/workplace/an-insider-look-at-amazons-culture-and-processes.

capabilities of the accused live-streaming services.  Accordingly, they are squarely relevant to BSD's infringement and damages theories.  The PR/FAQ, however, is not the only foundational narrative Defendants generate in this process. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[20]

Defendants' production of these foundational documents is incomplete.  For AWS Elemental MediaLive, Defendants produced only intermittent drafts of the PR/FAQ (*see, e.g.*, AWS_0072250 (**Ex. 32**), AWS_0072335 (**Ex. 33**), AWS_0072339 (**Ex. 34**), AWS_0072343 (**Ex. 35**)) but no final version.  For AWS Elemental MediaPackage, Defendants produced a single version (AWS_0079114, version 31 (**Ex. 36**)).[21]  The metadata for these documents identifies Sam Blackman as their "Author."  Mr. Blackman, a co-founder of Elemental, passed away in August 2017.  At least the Elemental MediaPackage document continued to be revised by others after Mr. Blackman's passing.  Considering the value that Defendants place internally on PR/FAQs and that Defendants possess numbered drafts at least through versions 16 and 31, additional responsive foundational documents exist and have not been produced.  Additionally, Defendants have not produced ███████████████████████████████████████████████████████████

Defendants defense to BSD's request is to argue that "much of what BSD seeks simply does not exist" because Elemental and Twitch did not follow the "Working Backwards" approach.  This is directly contradicted by the fact that these documents plainly do exist by virtue of the drafts—which were authored, revised and discussed well after Amazon's acquisition of Elemental and Twitch—that have already been produced.  If *some* drafts exist and can be produced, then Defendants have clearly generated such documents despite the acquisition of Elemental and Twitch.  Consequently, other drafts, related documents and communications, and importantly the final versions of these in the "Working Backwards" development ecosystem plainly exist and should be produced.

BSD requests that the Court order Defendants to produce the final PR/FAQs and all other draft versions for each Accused Instrumentality, together with any related "Working Backwards" documents ██████████████████████████, including narrative memoranda concerning the Accused Instrumentalities and communications concerning the same.  BSD also requests that the Court instruct Defendants to produce native versions of any tables and/or spreadsheets within these documents.  To the extent Defendants are unable to produce additional responsive documents, BSD

---

[20]    *See, e.g.*, https://www.sixpagermemo.com/blog/jeff-bezos-lex-fridman-six-page-memo (quoting excerpts from an interview with J. Bezos discussing that "a typical meeting starts with a six-page, narratively structured memo"); https://amazonchronicles.substack.com/p/working-backwards-dave-limp-on-amazons (quoting former Amazon SVP D. Limp discussing six-page narratives for "any new product inside of Amazon"); https://workingbackwards.com/concepts/amazon-operating-cadence.

[21]    During the parties' meet and confer, Defendants represented that another draft had been produced, but BSD has thus far been unable to locate it.

requests that the Court order Defendants to provide a written accounting of the search conducted, identifying (a) the repositories searched and not searched; (b) the custodians whose files were searched; (c) the search terms applied; and (d) the date ranges used.

### B.    Defendants' Position

This is not a matter of Defendants refusing to search for documents; rather, much of what BSD seeks simply does not exist. Indeed, BSD disregards Defendants' repeated explanation that: (1) Elemental and Twitch were acquired and therefore did not follow the "Working Backwards" approach described above; and (2) Twitch and AWS are independent subsidiaries with different documentation approaches and repositories.

Elemental was founded in 2006, it launched Elemental Live and Elemental Delta in 2010 and 2014, respectively, and was acquired by AWS in 2015. Similarly, Twitch was founded in 2011 as a spin-off of Justin.tv. It was acquired in 2014. Unsurprisingly, then, there are no PRFAQs for Twitch or Elemental Live and Elemental Delta.

MediaLive and MediaPackage launched in November 2017, after the Elemental acquisition by AWS. Defendants located and produced PRFAQs for these products. Yet, BSD fails to justify the burden associated with searching for every possible version of the PRFAQs for MediaLive and MediaPackage or to demonstrate that such a search would be proportional to the needs of the case. Defendants will continue to search for additional PRFAQs for these products and produce what they locate following a reasonable search, but Defendants cannot commit that they will find additional versions, let alone every version. Similarly, Defendants continue to search for ███████ ███████ for Twitch and AWS Elemental. A reasonable search has not identified any of the other categories of documents BSD seeks.

BSD's unrelated request that Defendants produce native spreadsheets corresponding to tables included in produced documents should be rejected. The ESI protocol does not require what BSD seeks. Rather, the ESI protocol requires the native production of spreadsheets deemed relevant following a reasonable search for responsive documents. BSD's request is fundamentally different and significantly more burdensome—it asks Defendants to locate spreadsheets from nearly a decade ago that correspond to tables embedded in other documents. No reliable method exists to search for or identify such spreadsheets, and the effort required would be wholly disproportionate to any conceivable benefit. BSD has never raised this request with Defendants, nor has it been the subject of any meet and confer. Defendants are aware of the request only because BSD made the same request in a separate case it brought against Amazon, where the court rejected it.

BSD also seeks to compel disclosure of Defendants' search methodology in the event no additional documents are located. BSD has not made the particularized showing that would justify such relief. BSD's dissatisfaction that Twitch and Elemental do not have "Working Backwards" documents—despite Defendants' reasonable explanation for their absence—does not meet the threshold for an order compelling an accounting of Defendants' search methodology.

24

## IV.    ORDER COMPELLING DOCUMENTS, INTERROGATORY RESPONSES, AND TESTIMONY REGARDING FINANCIAL INFORMATION RELATED TO THE ACCUSED INSTRUMENTALITIES' ANCILLARY PRODUCTS[22]

### A.  BSD's Position

The Accused Instrumentalities in this case have been defined to include: AWS Elemental MediaLive (implementing HTTP Live Streaming ("HLS") and/or Dynamic Adaptive Streaming over HTTP ("MPEG-DASH")) ("MediaLive"), AWS Elemental Live (implementing HLS and/or MPEG-DASH) ("Elemental Live"), AWS Elemental MediaPackage (implementing HLS and/or MPEG-DASH) ("MediaPackage"), AWS Elemental Delta (implementing HLS and/or MPEG-DASH) ("Elemental Delta"), and the Twitch live-video streaming system (implementing HLS) ("Twitch LVS").  *See* **Ex. 9** (BSD Infringement Contentions) at 3.  It is undisputed that financial information related to the Accused Instrumentalities is relevant to BSD's damages claim.  But discovery related to BSD's damages claim is not limited to only these Accused Instrumentalities.

Section 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  "The *Georgia-Pacific* factors are used in the 'hypothetical negotiation' approach to determining a reasonable royalty."  *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 3870256, at *3 (N.D. Cal. Aug. 6, 2014).  *Georgia-Pacific* factor six examines "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

Here, BSD has identified the Accused Instrumentalities as being used to promote sales of, generate sales of, or be a primary factor in the successful sale of certain non-infringing items offered by Defendants.  Specifically, BSD has repeatedly identified revenue generated by Twitch Prime, Amazon Prime, Prime Video live, Amazon Live, AWS Elemental MediaConvert ("MediaConvert"), AWS Elemental MediaStore ("MediaStore"), AWS Elemental MediaTailor ("MediaTailor"), AWS Elemental Kinesis Video Streams ("Kinesis VS"), AWS Elemental MediaConnect ("MediaConnect"), AWS Elemental Appliances & Software, Conductor Live, Statmux, Elemental Link, Amazon CloudFront ("CloudFront"), Twitch.tv, Prime Gaming, Twitch Turbo, and/or Twitch Tier 1, 2, and 3 subscription accounts as potentially being convoyed sales.[23]

---

[22]    Defendants' position to the issue in Section IV was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

[23]    Defendants complain that BSD is seeking discovery "into at least 15 products not accused of infringement in this case without demonstrating that any of them qualify as a functional unit."  First, BSD **_has_** demonstrated that they qualify as a "functional unit."  Second, confidential information describing the relationships between the Accused Instrumentalities and the identified ancillary products lies solely with Defendants; there is only limited public information regarding the extent of the relationship, if any, between these products and the Accused Instrumentalities.  That is exactly why BSD has propounded discovery requests such as Amazon RFP No. 47: "Documents sufficient to identify all products or services that are ancillary to or correlated with

*See, e.g.*, Complaint (Dkt. No. 1) at ¶¶ 57 (alleging infringement by the AWS Elemental Media Services group of products), 72 (Twitch Prime), 79 (Prime Video live and Amazon Live); Dkt. No. 1-2 (Complaint Ex. 2 – Amazon HLS Evidence of Use Chart) at 2 (Amazon Prime Video), 3 (AWS Elemental Media Services includes MediaLive and MediaPackage, as well as MediaConvert, MediaStore, MediaTailor, and Kinesis VS), 22 (Elemental Live and MediaLive are used with MediaStore and CloudFront); Dkt. No. 1-16 (Complaint Ex. 16 – Twitch Prime article); Dkt. No. 1-19 (Complaint Ex. 19 – AWS Media Services family of services); **Ex. 37** (11/4/25 BSD Amended Damages Contentions) at 25 ("Amazon supports open formats such as HLS and DASH precisely because those standards increase demand for its commercial offerings, including AWS Elemental MediaLive and CloudFront CDN."), 31 (Twitch.tv, Twitch Prime, Prime Gaming, Twitch Turbo, and Twitch Tier 1, 2, and 3 subscription accounts); **Ex. 31** (5/13/26 BSD 2d Amended Damages Contentions) at 4 (Twitch Prime, Amazon Prime, and Prime Video), 15 ("Amazon CloudFront, tightly integrated with AWS services…") (citation omitted), 17 (CloudFront), 31 ("AWS generates revenue under its Media Services category by building on-demand video workflows for its clients, with each workflow relying on one or more AWS Media Services. These services are priced primarily on a usage basis, allowing AWS to monetize video ingestion, processing, packaging, delivery, storage, and other features across the video lifecycle."), 32 (MediaConnect and MediaConvert), 33 (MediaStore, MediaTailor, AWS Elemental Appliances & Software, Conductor Live, Statmux, Elemental Link).

Defendants' products are intricately linked, and Amazon is well-known for using a "land-to-expand" framework for its web services products. *See, e.g.*, Kiran Patel, *FAQs about live streaming on AWS: How much does live streaming cost on AWS?*, AWS for M&E Blog (May 20, 2019).[24] For example, AWS publishes a "FAQ" about pricing that takes the reader through all the steps of successfully live streaming a video. First, one must encode content with MediaLive and MediaPackage. *Id.* The total cost of this is relatively low in the example given—only $10.20 per hour. *Id.* "If no one was watching the channel, we could stop here with our pricing. But that's not practical, so now we have to move on to the areas that require estimations." *Id.* To do this, the user must use a CDN like CloudFront for distribution, which in the example given is estimated to be $747.07 per hour. *Id.* If the user wants to monetize the channel (*i.e.*, insert advertisements), then they must use MediaTailor, which in the example adds another $105.00 per hour to the cost. Of the total cost of this example published by AWS, the revenue from the Accused Instrumentalities (*i.e.*, MediaLive and MediaPackage) only amounts to approximately 1.18% of the overall revenue. The remainder is attributed to Defendants' ancillary products (*i.e.*, CloudFront and MediaTailor), whose use is **_mandatory_** for the content to be able to be viewed by the public.[25] Thus, the Accused Instrumentalities and Defendants' ancillary products act as a "functional unit"—one or more ancillary product must be used with the Accused Instrumentalities for live streaming

---

the operation of the Accused Products…" **Ex. 42** at 5.

[24] Available at: https://aws.amazon.com/blogs/media/frequently-asked-questions-about-the-cost-of-live-streaming/.

[25] Just because CloudFront or MediaTailor, for example, can be used as standalone products does not mean that the Accused Instrumentalities can be used without being used in conjunction with CloudFront or MediaTailor. A video game console does not have to be used with a specific video game (or even used for video games at all), but a video game cannot be used without the video game console.

to reach an intended audience.

BSD has demonstrated a reasonable link between the Accused Instrumentalities and the ancillary products that it seeks further discovery about in order to support its damages theory. This showing is sufficient to support a determination that information related to the ancillary products is relevant to this action and, therefore, discoverable. *See, e.g.*, *Cellulose Material Solns, LLC v. SC Marketing Grp., Inc.*, No. 22-cv-03141-LB, 2023 WL 5184134, at \*6 (N.D. Cal. Aug. 11, 2023) ("[T]hese are packaging products related to sales of packaging insulation….[T]he request for the product information here is reasonably calculated to lead to admissible evidence.") (citation omitted); Order Regarding Joint Discovery Letter Brief (Dkt. No. 120), *Aylus Networks, Inc. v. Apple Inc.*, Case No. 13-cv-04700-EMC (KAW) (N.D. Cal. Apr. 9, 2015) (attached hereto as **Ex. 38**) at 2-3 ("To the extent that Airplay, no matter how small its role, draws more consumers to purchase video content/video games through the iTunes store so that they can, through their iPod Touch, iPad, or iPhone, direct that content to an accused AppleTV for display on a home television screen, those sales could shape the reasonable royalty analysis.") (citations omitted). Accordingly, BSD has propagated several discovery requests directed to these ancillary products, including but not limited to:[26]

- Amazon RFP Nos. 14 (**Ex. 39** (2d RFPs to Amazon) at 4), 26 (*id.* at 6), 47 (**Ex. 42** (3d RFPs to Amazon) at 5), 51 (*id.*), 102 (**Ex. 45** (4th RFPs to Amazon) at 5); 103 (*id.*), 130 (**Ex. 48** (5th RFPs to Amazon) at 8), 147 (*id.* at 11), 150 (*id.*), 153 (*id.* at 12), 167 (*id.* at 14), and 177-183 (*id.* at 15-16);
- AWS RFP Nos. 13 (**Ex. 40** (2d RFPs to AWS) at 4), 25 (*id.* at 6), 58 (**Ex. 43** (3d RFPs to AWS) at 5); 62 (*id.*), 113 (**Ex. 46** (4th RFPs to AWS) at 5), 114 (*id.*), 141 (**Ex. 49** (5th RFPs to AWS) at 8), 158 (*id.* at 11), 161 (*id.*), 164 (*id.* at 12), 178 (*id.* at 14), and 188-194 (*id.* at 15-16);
- Twitch RFP Nos. 14 (**Ex. 41** (2d RFPs to Twitch) at 4), 24 (*id.* at 6), 46 (**Ex. 44** (3d RFPs to Twitch) at 5), 50 (*id.*), 101 (**Ex. 47** (4th RFPs to Twitch) at 5), 102 (*id.*), and 103 (*id.*);
- Amazon Interrogatory No. 13 (**Ex. 50** (Amended 4th Rogs to Amazon) at 4);
- AWS Interrogatory No. 20 (**Ex. 51** (Amended 4th Rogs to AWS) at 6);
- Twitch Interrogatory No. 20 (**Ex. 52** (Amended 4th Rogs to Twitch) at 5-6);
- Amazon Rule 30(b)(6) Topic No. 7, 10, 12, and 27 (**Ex. 24** (30(b)(6) Notice to Amazon) at 8);
- AWS Rule 30(b)(6) Topic No. 7, 10, 15, 16, 19 and 32 (**Ex. 25** (30(b)(6) Notice to AWS) at 4, 9);
- Twitch Rule 30(b)(6) Topic Nos. 6, 9, 14, 15, 18 and 31 (**Ex. 26** (30(b)(6) Notice

---

[26] Defendants claim that BSD is seeking "to compel discovery on requests that have nothing to do with ancillary products or for which ancillary products are not implicated." *See* Section IV(B) *infra*. This is plainly false. For example, Amazon RFP Nos. 14 and 26, AWS RFP Nos. 13 and 15, and Twitch RFP No. 14 ask for documents related to "the Accused Products, *__or services You provide using any of the Accused Products.__*" As demonstrated in the text above, Defendants' distribution and monetization services use the encoded content produced by the Accused Products. Thus, products such as CloudFront and MediaTailor fall squarely within the scope of these RFPs.

to Twitch) at 4, 9); and

- AWS RFA No. 6 (**Ex. 7** at 5).

Defendants, however, have steadfastly refused to provide information related to Defendants' ancillary products on the grounds that those products are not themselves the accused products in this case.[27] *See, e.g.*, **Ex. 53** (Twitch Corrected Resp. 2d RFPs) at 8-9 (RFP No. 14) ("Twitch objects to the extent that this request seeks information on products not alleged to infringe the asserted patent.…Subject to and without waiving the foregoing general and specific objections, Twitch will produce documents sufficient to show the sales, revenue, cost, and profits for accused instrumentalities identified by BSD…"); **Ex. 54** (AWS Resp. 3d RFPs) at 11-12 (RFP No. 58) (refusing to produce documents), 14 (RFP No. 62) (same); **Ex. 55** (Amazon Resp. 4th RFPs) at 9-10 (RFP Nos. 102 and 103) (refusing to produce documents); **Ex. 12** (AWS Resp. 3d and 4th Rogs) at 21-22 (Interrogatory No. 20) ("AWS further objects on this basis because AWS CloudFront is not an Accused Instrumentality."); **Ex. 13** (Twitch Resp. 3d and 4th Rogs) at 20-21 (Interrogatory No. 20) ("Twitch will limit its response to the Accused Twitch Instrumentality.").

Defendants' position is directly contrary to the law. *See Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-cv-2226 SI (KAW), 2013 WL 707914, at *4 (N.D. Cal. Feb. 26, 2013) ("Plaintiff is therefore entitled to discovery regarding the use Defendants have made of the display controller drive scheme, the value of that use, and the resulting commercial success and popularity of the E-Readers. The money that Defendants make on both content and accessories sold with their E-Readers is probative of the value of Defendant's use of the display controller scheme, as well as the commercial success and popularity of the EReaders.").

Moreover, the cases that Defendants cite are inapposite. For example, in *Uniloc 2017 LLC v. Apple, Inc.*, No. 19-cv-01904-WHO, 2019 WL 8810168, at *10 (N.D. Cal. Dec. 16, 2019) and *Bender v. Maxim Integrated Prods, Inc*., No. C 09-01152 SI, 2010 WL 1135762, at *2 (N.D. Cal. Mar. 22, 2010), the courts were concerned with what the scope of discovery would be with respect to technical documentation ***regarding the accused products themselves***. The idea was to avoid fishing expeditions of highly confidential information when it was uncertain whether the plaintiff even had a potential infringement argument. The situation here is completely different. There is no dispute over whether BSD should be allowed to proceed with technical discovery on the Accused Instrumentalities; Defendants have already produced such technical documents. What BSD is requesting through the above-identified discovery requests is something completely different: ***damages-related information related to ancillary products***.

BSD respectfully requests that the Court compel Defendants to provide information regarding financial information related to non-accused products associated with the Accused Instrumentalities.[28] These ancillary products include, but are not limited to, Twitch Prime, Amazon

---

[27]   BSD has repeatedly requested information regarding the ancillary products since at least June 16, 2023, when the Second Set of Interrogatories was served on each of the Defendants. Hence, they have known about this issue for approximately two years and the majority of ancillary products were listed in the Complaint. Any claim by Defendants that "BSD remained silent" on this issue is disingenuous.

[28]   Defendants claim that producing the requested information "would require months," but

28

Prime, Prime Video live, Amazon Live, MediaConvert, MediaStore, MediaTailor, Kinesis VS, MediaConnect, AWS Elemental Appliances & Software, Conductor Live, Statmux, Elemental Link, CloudFront, Twitch.tv, Prime Gaming, Twitch Turbo, and Twitch Tier 1, 2, and 3 subscription accounts.  Specifically, BSD respectfully requests that the Court compel Defendants to:

- produce all relevant documents in response to Amazon RFP Nos. 14, 26, 47, 51, 102, 103, and 153; AWS RFP Nos. 13, 25, 58, 62, 113, 114, and 164; and Twitch RFP Nos. 14, 24, 46, 50, 101, 102, and 103;
- fully and adequately respond to Amazon Interrogatory No. 13; AWS Interrogatory No. 20; and Twitch Interrogatory No. 20;
- designate and prepare a Rule 30(b)(6) witness to provide testimony with respect to the full scope of Amazon Topic No. 27; AWS Topic No. 32; and Twitch Topic No. 31 as they were originally drafted; and
- transparently and truthfully respond to AWS RFA No. 6.

### B. Defendants' Position

BSD's request to seek discovery on unaccused, independent products[29] is inconsistent with the Patent Local Rules and general principles of patent damages case law, disproportionately burdensome, and untimely.

First, in this judicial district, the infringement contentions are supposed to establish the scope of discovery. *See Uniloc 2017 LLC v. Apple, Inc.*, No. 19-cv-01904-WHO, 2019 WL 8810168, at *10 (N.D. Cal. Dec. 16, 2019). Discovery is generally not permitted into products unless they have been identified in the infringement contentions. *Bender v. Maxim Integrated Prods, Inc.*, No. C 09-01152 SI, 2010 WL 1135762, at *2 (N.D. Cal. Mar. 22, 2010). Moreover, a reasonable royalty "must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citation omitted). While so-called convoyed sales may be an exception to this rule in limited circumstances, that is subject to narrow limits. Sale of a nonpatented product only qualifies as a convoyed sale "if both the patented and unpatented products together were considered to be components of a single assembly

---

they have offered no explanation for such a statement.  The bulk of what BSD has requested regarding the ancillary products is financial information that should be readily accessible in Defendants' financial management records.  The idea that it "would require months" to obtain this data is nonsensical.

[29] In its ancillary product argument, BSD also seeks to compel discovery on requests that have nothing to do with ancillary products or for which ancillary products are not implicated. For example, Amazon RFP Nos. 14 and 26, AWS RFP Nos. 13 and 15, and Twitch RFP Nos. 14 and 26 relate exclusively to the accused products and do not implicate ancillary products. BSD's assertion that these requests do relate to ancillary products because they includes language directed to "services You provide using any of the Accused Products" is incorrect. None of the supposed ancillary products use the accused instrumentalities. Rather, they may be used in conjunction with, but not use. Similarly, the interrogatories at issue seek direct and indirect revenue of the accused instrumentalities and do not implicate ancillary products, as that is not revenue attributable to ancillary products. Finally, AWS RFA No. 6 is addressed above.

or parts of a complete machine, or they together constituted a functional unit." *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008). The quintessential example of a convoyed sale is selling replacement blades for a razor.

Contrary to this limited exception, BSD seeks discovery into at least 15 products not accused of infringement in this case without demonstrating that any of them qualify as a functional unit. The volume of products and services for which BSD seeks discovery undermines its request because it stretches credibility that 15 products or services are a single assembly or constitute a functional unit. Rather than analyzing this, BSD appears to have attempted to identify any product or service that is in any way connected to the accused instrumentalities, no matter how remote, and now seeks revenue of those products. Many of these products or services have never even been the subject of a meet and confer.

The cases BSD relies on actually illustrate the fallacy of BSD's request. In each of the cited cases, the unaccused products or services could be viewed as a functional unit with the patented product, as required by the controlling Federal Circuit caselaw. *See, e.g.*, *Cellulose Material Solns, LLC v. SC Marketing Grp., Inc.*, No. 22-cv-03141-LB, 2023 WL 5184134, at *6 (N.D. Cal. Aug. 11, 2023) (commenting that discovery request narrowly tailored to focus on functional units and not directed to all products in a product line); Order Regarding Joint Discovery Letter Brief (Dkt. No. 120), *Aylus Networks, Inc. v. Apple Inc.*, Case No. 13-cv-04700-EMC (KAW) (N.D. Cal. Apr. 9, 2015) (**Ex. 38**) at 2-3 (permitting discovery for content sold on accused devices); *Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-cv-2226 SI (KAW), 2013 WL 707914, at *4 (N.D. Cal. Feb. 26, 2013) (same).

Instead of attempting to narrowly tailor its request, however, BSD has tried to include as many products and services as possible. Most, if not all, of these products and services are sold and can operate independently of the accused instrumentalities, nor are any of the additional products or services required for operation of the accused instrumentalities.[30] For example, MediaTailor is sold "as a standalone service or within a larger video workflow that includes other AWS Media Services." **Ex. 56** (https://aws.amazon.com/mediatailor/faqs/). Not only is MediaTailor a standalone service, it is not required for the operation of the accused instrumentalities. Not a single graphic BSD relies on in its infringement contentions to reflect the configuration and operation of the accused Elemental products and services includes MediaTailor. **Ex. 9** at Exs. A and C. This is consistent with the public information published about MediaLive. Similar to MediaTailor, MediaLive is sold "as a standalone service or within a larger video workflow that includes other AWS Media Services." https://aws.amazon.com/medialive/faqs/; *see also* MediaPackage at https://aws.amazon.com/mediapackage/faqs/ (same). The accused Elemental products and services may also work with CDNs other than CloudFront. *See, e.g.*, MediaPackage at https://aws.amazon.com/mediapackage/faqs/ (explaining MediaPackage may be used with non-Amazon CDNs). Thus, BSD's statement that use of MediaTailor and CloudFront "is ***mandatory*** for the content to be able to be viewed by the public" is false.[31] As a further example,

---

[30] It is unclear what distinction BSD makes between Twitch and Twitch.tv as Twitch.tv is the website address for Twitch. Similarly, Twitch Turbo and the Twitch subscriptions are included in the revenue produced for Twitch.

[31] The fact this information is publicly available also undermines BSD's assertion in its footnote that the information for demonstrating products or services qualify as a functional unit "lies solely

MediaConvert and MediaStore support video-on-demand, not livestreaming. Elemental Link launched in 2020, after the damages period. Consequently, BSD has failed to demonstrate that any of these additional products and services are sufficiently related to the accused instrumentalities to be considered a functional unit.

Next, BSD also cannot show that the need for this discovery is proportional to the burden of providing it. Locating and producing the requested information about 15 additional products and services would require months.

Finally, if this issue were so critical, BSD could have and should have raised it sooner. But as it stands, BSD remained silent about the majority of these ancillary products until now, and BSD's request should be denied on that basis as well.

## V.     ORDER COMPELLING DOCUMENTS, INTERROGATORY RESPONSES, AND TESTIMONY REGARDING FINANCIAL PROJECTIONS[32]

### A.  BSD's Position

"A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *Wordtech Sys., Inc. v. Integrated Network Solns., Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010) (citation omitted).  Thus, Defendants' financial projections are relevant to the damages in this action.

BSD has been demanding that Defendants remedy their deficient production of projected financial information since at least November 1, 2023.  *See* **Ex. 57** (11/1/23 Letter from M. Halderman) at 2 (regarding RFP No. 14); *see also* **Ex. 39** (2d RFPs to Amazon) at 4 (Amazon RFP No. 14) ("For the Accused Products, or services You provide using any of the Accused Products, since March 24, 1998 through March 24, 2020, all actual ***and projected financial information***, ***including*** but not limited to, ***revenue***, income, costs, profits and losses.") (emphasis added).  To date, Defendants have only produced one AWS document containing financial projections and one Twitch document containing financial projections.  This is unacceptable.  Clearly, projections at the inception of a program would evolve over time, and BSD is entitled to know how these have changed.

BSD's attempts to obtain this information through alternate routes has been just as unsuccessful as its attempts to get Defendants to comply with its obligations to produce relevant

---

with Defendants; there is only limited public information regarding the interaction between these products and the Accused Instrumentalities" is incorrect and readily disproved. Defendants have published extensive information about the additional products and services and their interoperability with the accused instrumentalities. BSD simply failed to conduct a reasonable search of the information available online before making its assertion and seeking to increase damages by adding revenue from more than 15 additional products and services.

[32]     Defendants' position to the issue in Section V was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

documents.  For example, Interrogatory No. 7 to each of the Defendants requests:

> Describe with particularity any determination of the projected and actual value of each Accused Instrumentality You or Your affiliates own or control, including without limitation: the basis for the determination(s), such as any industry-wide standard used; any experts consulted; any economic, statistic, accounting, or other market analyses undertaken, whether by You or an independent person; the costs, expenses or investments made or incurred in the development of the Accused Instrumentality and any version thereof; and/or any comparison to similar and/or complementary instrumentalities or technologies, whether owned by You or any other person.

**Ex. 11** (Amazon) at 8-9; **Ex. 12** (AWS) at 8-9; **Ex. 13** (Twitch) at 8-9.  Rather than comply with the plain language of the Interrogatory—which requires "the basis for the determination(s)" of any projected valuation, which itself necessarily includes projected revenue—Defendants opted to be too cute by half and purposefully "interpret[ed] this to mean a valuation of one or more Accused Instrumentalities as opposed to any other financial benchmark (*e.g.* actual or projected revenues)…").  **Ex. 11** (Amazon) at 8-9; **Ex. 12** (AWS) at 8-9; **Ex. 13** (Twitch) at 8-9.  Using this overly narrow, unilateral interpretation of Interrogatory No. 7, all three Defendants stated that they are "not aware of any determination of the actual or projected value of the Accused…Instrumentalit[ies]."  **Ex. 11** (Amazon) at 8-9; **Ex. 12** (AWS) at 8-9; **Ex. 13** (Twitch) at 8-9.

Similarly, BSD propagated Rule 30(b)(6) Topics on each of the Defendants directed to obtaining projected financial information for the Accused Instrumentalities and their ancillary products, including projected revenues for each.  *See* **Ex. 27** (Amazon Rule 30(b)(6) Obj.) at 16-17 (Topic No. 15), 17-18 (Topic No. 16); **Ex. 28** (AWS Rule 30(b)(6) Obj.) at 22-23 (Topic No. 22), 23-24 (Topic No. 23); **Ex. 29** (Twitch Rule 30(b)(6) Obj.) at 20-21 (Topic No. 21), 21-22 (Topic No. 22).  Defendants have either refused to designate a witness at all, or have stated that any witness that they produce shall only testify to documents that they have produced.[33]  *See* **Ex. 27** at 17-18; **Ex. 28** at 22-24; **Ex. 29** at 20-22.  During meet-and-confers on the Rule 30(b)(6) Topics, Defendants' counsel further explained that they "do not believe" projected financial information exists and that attempting to prepare a witness on the full scope of these Topics would be impossible.  *See* Section VIII(A) *infra*.

It is clear that, despite the clear relevance of the projected financial information to the claims and defenses in this action, Defendants continue to obstruct BSD's ability to obtain this information.  Consequently, BSD respectfully requests that the Court compel Defendants to:

- produce all relevant documents in response to Amazon RFP Nos. 14, 16 and 26;

---

[33]    Defendants claim that "BSD again misrepresents Defendants' statements from the meet and confer," but their statements below match those that BSD states herein.  For example, "As to AWS Topic No. 22 / Twitch Topic No. 21, Defendants indicated they would designate a witness to testify regarding the ***produced*** financial information."  (emphasis added).

> AWS RFP Nos. 13, 15, and 25; and Twitch RFP Nos. 14, 16, and 24;[34]
>
> - fully and adequately respond to Amazon Interrogatory No. 7, AWS Interrogatory No. 7, and Twitch Interrogatory No. 7; and
> - designate and prepare a Rule 30(b)(6) witness to provide testimony with respect to the full scope of Amazon Topic Nos. 15 and 16, AWS Topic Nos. 22 and 23, and Twitch Topic Nos. 21 and 22, as they were originally drafted.

### B. Defendants' Position

BSD is not entitled to additional discovery on this issue beyond what Defendants have already provided or committed to provide.

BSD includes commentary related to AWS's and Twitch's production of financial projections but its initial draft of this section did not identify an RFP seeking financial projections or make an explicit request compelling the production of additional financial projections.[35] BSD requested financial projections from around the date of the hypothetical negotiation in 2015. After a reasonable search, Defendants produced what they were able to locate from around the 2015 time period.

While Amazon RFP Nos. 13 and 25; AWS RFP Nos. 13 and 25; and Twitch RFP Nos. 14 and 24 include reference to financial projections, that does not change the fact that BSD indicated projections were only relevant to damages and the hypothetical negotiation. Given that the parties agreed that the hypothetical negotiation occurred in 2015, projections after that time are not relevant. Defendants have already conducted a reasonable search for projections from the 2015 time period. The remainder of those requests do not relate to projections and BSD has provided no justification for compelling production of the full scope of those requests. Amazon RFP No. 15, AWS RFP No. 15, and Twitch RFP No. 16 relate to analytics, not financial documents. Analytics is a separate discussion. Prior to the stay, the parties had met and conferred regarding what analytics may be available, but there has been no follow-up discussion since. BSD makes no reference to analytics nor provide any justification related to its request to compel production of this Request directed to analytics.

BSD's dispute related to Interrogatory No. 7 is new—BSD never previously raised it and it has not been the subject of a meet and confer. The plain language of Interrogatory No. 7, which seeks the projected and actual value of each accused instrumentality, demonstrates that Defendants properly responded to it. Valuations are generally not performed on a subset of products or services. It is unsurprising that Defendants were not able to locate a valuation of the accused Elemental products or livestreaming for Twitch. Instead of acknowledging the plain language of the interrogatory that it drafted, BSD claims that Defendants applied an "overly narrow" interpretation and that

---

[34]    This request for relief has been a part of every draft of this joint letter that BSD sent to Defendants.  In the initial version, however, the actual RFP numbers were inadvertently omitted. Defendants could have brought this to BSD's attention immediately, and BSD would have rectified the oversight.  Instead, Defendants waited approximately 67 hours—*i.e.*, 2 days and about 19 hours—before notifying BSD of the error via a single sentence in their initial responses.

[35] In a version of the omnibus joint discovery letter sent at 8:21 pm PT, BSD added three RFPs per Defendant. Defendants have attempted to address these to the best of their ability.

Defendants should have understood that a valuation "necessarily includes projected revenue." But projected revenue appears nowhere in the interrogatory, nor is it reasonably understood as being implicated by its scope. This is reinforced by the fact that BSD included additional subject matter following the main proposition of the interrogatory, and not a single one of the enumerations includes projected revenue. Rather, as with other discovery in dispute, BSD seeks to rewrite its discovery request and then compel compliance with the revised scope. This should be rejected.

Regarding the 30(b)(6) topics, BSD again misrepresents Defendants' statements from the meet and confer.

AWS Topic No. 22 / Twitch Topic No. 21 seeks:[36]

> The actual and projected financial performance of the Accused Instrumentalities during the Damages Period, including revenues; units or quantities licensed, sold, deployed or streamed; costs (e.g., fixed costs, variable costs, cost of goods sold, operating expenses, and infrastructure costs); gross margins and net margins; and profits, including operating profit and net profit, and the methodology used to calculate such figures.

AWS Topic No. 23 / Twitch Topic No. 22 seek:

> The actual and projected revenues, costs, and profits attributable specifically to live streaming using [HLS or MPEG-DASH/HLS] within the Accused Instrumentalities, as distinguished from: (a) video-on-demand services; (b) [non-HLS or non-MPEG-DASH/non-HLS] streaming protocols; (c) ancillary services or bundled offerings; and (d) non-streaming products or services.

As to AWS Topic No. 22 / Twitch Topic No. 21, Defendants indicated they would designate a witness to testify regarding the produced financial information. Defendants further indicated that not all of the financial information sought by the deposition topic was available, including U.S.-specific breakdowns for certain financial information, but that BSD could question the witness on the various financial metrics to close out the topic and confirm that AWS and Twitch did not maintain the financial information as requested. As to AWS Topic No. 23 / Twitch Topic No. 22, Defendants indicated that AWS and Twitch did not break down financial information in the manner sought by the deposition topic. For example, AWS and Twitch do not track financial information by livestreaming using the accused protocols, live versus video-on-demand, or the other breakdowns contained within that Topic. Defendants again indicated that BSD could probe a witness on those issues. It is therefore unclear what additional relief BSD seeks.

As Defendants have reasonably responded to these discovery requests, BSD's request should be rejected.

---

[36] As Amazon indicated in its responses and objections, it has no unique knowledge regarding the actual and projected financial performance of the accused instrumentalities, or the actual or projected revenues, costs, and profits for live streaming using HLS or MPEG-DASH. As a result, Amazon incorporated by reference the testimony of AWS and Twitch on these topics.

## VI. PROTECTIVE ORDER TO PREVENT DEFENDANTS FROM ASKING DEPONENTS ABOUT LITIGATION-RELATED FUNDING INFORMATION[37]

### A. BSD's Position

It is no secret that BSD has obtained litigation financing with respect to this action. *See* Dkt. No. 163 (disclosing Deminor Legal Investments SARL ("Deminor") as having an interest in the subject matter of this controversy). Revised Local Rule 3-15 requires disclosure of any "individual or entity (other than a party or its counsel of record) that provides funding for the litigation and that has a financial interest in the outcome of the litigation" (L.R. 3-15(b)(2)), and BSD has complied with that disclosure requirement. But the disclosure of the identity of a litigation funder does **_not_** require disclosure of the terms of the relationship between a litigant and its funder. L.R. 3-15(b)(2) ("Disclosure of the existence of a litigation funding agreement does **_not_** require the disclosure of the agreement itself absent court order.") (emphasis added).

Nonetheless, Defendants have indicated that they intend to probe BSD's Rule 30(b)(6) witness(es) for information regarding the exact nature of BSD's relationship with Deminor, including the terms of the agreement between BSD and Deminor. *See, e.g.*, **Ex. 58** (Plaintiff's Rule 30(b)(6) Responses) at 7 (Topic No. 5 – "All persons or entities who hold or have held any interest in the outcome of this litigation, and the nature of that interest."). It is also highly likely that Defendants will attempt to ask BSD's Rule 30(b)(1) deponents questions related to litigation financing during their upcoming depositions. Indeed, Defendants admit that they intend "to ask basic factual questions and test the bounds of BSD's privilege assertions." *See* Section VI(B) *infra*.

As a result, BSD is compelled to seek a protective order from this Court prohibiting Defendants from asking questions related to litigation financing during the depositions. This request seeks to avoid a foreseeable dispute at Mr. Joseph Williger's Rule 30(b)(1) deposition concerning questions about the history and business terms of third-party financing. Defendants ask the Court to wait until after the dispute inevitably arises before dealing with the matter, but BSD's request is more practical. There is no reason to waste Mr. Williger's time (or counsel's time) with repeated privilege disputes during the deposition when the issue can be resolved ahead of time. Especially when the disputes will be compounded by the fact that there is a ten-hour time difference between Tel Aviv (the witness's location) and San Francisco. It will still be early morning in San Francisco by the end of the business day in Tel Aviv, making it impractical to seek timely relief from the Court.

Rule 26(b) allows for "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," except as "otherwise limited b court order." Fed. R. Civ. P. 26(b)(1). This Court has historically recognized that litigation funding is **_not_** "relevant to any party's claim or defense." *See, e.g., In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. 23-md-03084-CRB (LJC), 2025 WL 2201056, at *1 (N.D. Cal. Aug. 1, 2025) ("Recognizing that courts have reached different conclusion on the subject, this Court is not persuaded that litigation funding 'is relevant to any party's claim or defense' under the circumstances of this litigation.'") (citation omitted); *Haptic, Inc. v. Apple, Inc.*, No. 24-cv-02296, 2025 WL 1569306, at *4-6 (N.D. Cal. June 3, 2025) (litigation funder information not relevant to

---

[37]    Defendants' position to the issue in Section VI was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026. *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

issue of standing, to rebut a "David v. Goliath" theme at trial, or to rebut witness testimony); *NantWorks, LLC v. Niantic, Inc.*, No. 20-cv-06262-LB, 2022 WL 1500011, at *2 (N.D. Cal. May 12, 2022) (denying motion to compel as to interrogatory seeking information about litigation financing); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 WL 118595, at *2 (N.D. Cal. Jan. 7, 2019) ("The Court concludes that Micron is not entitled to the discovery it seeks because it is not relevant.").

Defendants have not identified how litigation funding information might be used, for example, for impeachment, to affect BSD's credibility, or to otherwise lead in any way, directly or indirectly, to evidence that would be relevant or admissible at a trial on the merits. *See In re Uber*, 2025 WL 2201056, at *1 (citations omitted); *NantWorks*, 2022 WL 1500011, at *2 ("And 'fee and litigation funding agreements' are generally discoverable only when there is 'a specific, articulated reason to suspect bias or conflicts of interest.'") (citation omitted). That is because there is no such possible use here. "[C]ourts have declined to order production of litigation funding documents where, as in this instance, the moving party's justifications are based on speculation." *Artist Revenue Advocates, LLC v. West*, No. 2:24-cv-06018-MWC-BFM, 2025 WL 4666265, at * 2 (C.D. Cal. Dec. 4, 2025) (citation omitted); *see also MLC Intell. Prop.*, 2019 WL 118595, at *2 (denying motion to compel discovery related to litigation financing when "Micron's assertions of potential bias and conflicts of interest are speculative").

Finally, even if some material sought by Defendants was relevant (it is not), information related to litigation funding are covered by the work product privilege. *See Haptic*, 2025 WL 1569306, at *7. In particular, documents between BSD and Deminor may include communications involving counsel that was engaged and collaborated with the litigation funder during the preparation of various analyses in anticipation of litigation. "Although these documents were likely created to assist with obtaining litigation funding, '[t]hese internal discussions leave a revealing trail of mental impressions, legal theories, and strategic notes—all created as confidential internal documents or sent under nondisclosure agreements, and so written with vulnerable candor.'" *Id.* at *6 (citation omitted).

For these reasons, information related to litigation financing for this action are not discoverable. BSD thus respectfully requests that the Court enter a protective order prohibiting Defendants from asking any of BSD's Rule 30(b)(1) or Rule 30(b)(6) witnesses questions regarding litigation financing.

### B. Defendants' Position

BSD raises this as a discovery dispute despite the parties having already reached agreement on a narrowed scope for Topic 5 and BSD's designation of Joseph Williger. BSD already agreed to produce a witness on this topic. It cannot now preemptively shield all questions on it through a blanket protective order.

Rule 26(c) authorizes a protective order only upon a showing of good cause. BSD has not made that showing. BSD has not established that every question Defendants may ask on this subject is privileged or irrelevant. Instead, BSD argues in the abstract that litigation funding information is generally not relevant and may be protected by work product privilege. But that is not true—basic facts related to the relationship between BSD and its litigation funder, such as the identity of the

36

parties, the timing of communications, and the general nature of the arrangement, are not privileged. To the extent BSD believes that specific deposition questions implicate privilege or work product protections, BSD's counsel is free to assert objections at the deposition. Any dispute that arises can then be properly resolved by the Court on a question-by-question basis. A blanket protective order, however, would improperly prevent Defendants from testing whether BSD's privilege assertions are valid and whether they extend to the full scope of the subject matter. That determination can only be explored through questioning at the deposition.

BSD's request should be denied. The proper mechanism for BSD to assert privilege objections is at the deposition itself—not through a preemptive order barring an entire subject area from inquiry. Defendants do not intend to make litigation funding a significant focus of any deposition, but they are entitled to ask basic factual questions and test the bounds of BSD's privilege assertions. BSD, as the party seeking the protective order, bears the burden of establishing good cause, and it has failed to do so.

## VII.    PRELIMINARY MATTER REGARDING RULE 30(B)(6) ISSUES[38]

### A.  BSD's Position

The parties have a fundamental disagreement regarding which party bears the burden of raising a dispute regarding the Rule 30(b)(6) depositions with the Court prior to those depositions occurring.  It is BSD's understanding that, absent an agreement to narrow the Topics, Defendants remain obligated under the Federal Rules of Civil Procedure to designate and prepare one or more witnesses to testify on the full scope of the Topics as drafted.  The only way Defendants can avoid this responsibility is to seek a protective order from the Court prior to the scheduled deposition(s). *See McGhee v. North Am. Bancard, LLC*, No. 17-cv-00586-AJB-KSC, 2021 WL 2577159, at *8 (S.D. Cal. June 23, 2021); *see also Strauss v. Rent-A-Center, Inc.*, No. 6:04-cv-1133-Orl-22KRS, 2007 WL 2010780, at *1 (M.D. Fla. July 6, 2007) ("As an initial matter, it is inappropriate for a corporation simply to refuse to designate a witness for a properly noticed Rule 30(b)(6) deposition. Rather, the Federal Rules of Civil Procedure require the party seeking to narrow the scope of the requested discovery to bring a motion for a protective order under Rule 26(c).").

Defendants, however, have informed BSD that it is their belief that, by objecting to Topics, they are no longer obligated to designate and prepare Rule 30(b)(6) witnesses on the Topics as drafted.  Consequently, they refuse to do.  Instead, Defendants have claimed that it is BSD's responsibility to move to compel Defendants to provide testimony.  This position, however, is contrary to well-established principles and practices under the Federal Rules of Civil Procedure. *See DarbeeVisison, Inc. v. C&A Marketing, Inc.*, No. CV 18-0725 AG (SSx), 2019 WL 2902697, at *9 (C.D. Cal. Jan. 28, 2019) (rejecting argument that objections to Rule 30(b)(6) topics were sufficient to avoid the full scope of the disputed topics);  *see also* Fed. R. Civ. P. 37(d)(2) ("A failure described in Rule 37(d)(1)(A) is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for protective order under Rule 26(c).").

---

[38]    Defendants' position to the issue in Section VII was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

37

Consistent with Rule 37(d)(2) and existing precedent (both within this Court and among sister Districts), BSD respectfully requests that the Court clarify that Defendants have the burden of seeking a protective order for any Topic that they believe is overly burdensome.  Otherwise, absent an agreement between the parties narrowing the scope of a Topic, Defendants are expected to designate a Rule 30(b)(6) witness for the full scope of the Topic as drafted.

Notwithstanding the fact that it is not BSD's responsibility to preemptively seek motions to compel Defendants to designate and produce Rule 30(b)(6) witnesses on the full scope of a given Topic, BSD is raising certain issues herein that are of particular importance in order to try to minimize the burden on the Court.  This does not imply any other concession or admission by BSD.

### B.  Defendants' Position

It is unclear what BSD's purpose is in including this dispute. As the parties are required to submit a joint discovery letter, it would have made little sense for Defendants to move for a protective order while BSD simultaneously moved to compel testimony on the disputed topics. As Defendants attempted to explain during the meet and confer, as a practical matter, what matters is that the issue is raised in the joint discovery letter—not which party is the first to present it.

BSD further misrepresents Defendants' position.[39] Defendants did not take the position that merely objecting to a topic obviated any obligation to prepare a witness. Rather, Defendants viewed the objections as a catalyst for a meet and confer, and if the dispute could not be resolved through that process, the parties would then prepare a joint discovery letter to present the issue to the Court.

### VIII.  ORDER COMPELLING DEFENDANTS TO ADEQUATELY PREPARE RULE 30(B)(6) WITNESSES[40]

### A.  BSD's Position

BSD served Rule 30(b)(6) notices on each of the Defendants on February 25, 2026 (collectively, the "Rule 30(b)(6) Notices").  *See* **Ex. 24** (Amazon Rule 30(b)(6) Notice); **Ex. 25** (AWS Rule 30(b)(6) Notice); **Ex. 26** (Twitch Rule 30(b)(6) Notice).  The Rule 30(b)(6) Notices set forth a list of 38 Deposition Topics for Amazon, 44 Deposition Topics for AWS, and 43 Deposition Topics for Twitch (collectively, the "Topics").  *See* **Ex. 24** at 3-10; **Ex. 25** at 3-11; **Ex. 26** at 3-11.  Each of the Topics seeks information relevant to a party's claim or defense in this action, or is reasonably calculated to lead to information that would be relevant or admissible at trial.  BSD also tried to draft the Topics as narrowly as possible to minimize the burden on Defendants.

---

[39] BSD's position is inconsistent with the position it took during negotiations regarding the Rule 30(b)(6) notice served on BSD by Defendants. During those negotiations, BSD took the position that it would not designate witnesses for certain topics and that Defendants would need to move to compel the testimony rather than BSD filing for a protective order.

[40]    Defendants' position to the issue in Section VIII was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

Despite the relevancy of the narrowly tailored Topics, Defendants have repeatedly invoked three grounds as reasons why they will refuse to prepare a Rule 30(b)(6) witness on the full scope of the Topic as drafted: (1) counsel "does not believe" the information exists or the Accused Instrumentality operates in a certain manner; (2) it would be too difficult to prepare a witness to testify on the Topic; and/or (3) the information sought in the Topics "is more appropriately sought through interrogatories, document requests, a stipulation, or other less burdensome means." These objections are not limited to the exemplary Topics identified herein; they are overarching objections invoked for a majority of the Topics. None, however, is a bona fide reason for refusing to prepare a Rule 30(b)(6) witness on the entire scope of the Topics for which they are designated.[41]

Accordingly, for those Topics for which the parties were not able to reach an agreement on a narrowed scope,[42] BSD respectfully requests that the Court compel Defendants to designate and adequately prepare one or more 30(b)(6) witnesses on the full scope of the Topics as noticed. This includes preparing witnesses (1) even if the answer is "we don't know"; (2) without unilaterally limiting the Topics to documents produced; (3) by speaking to past employees, if necessary; and (4) by consulting individual present employees rather than just relying on central repositories of information.

### *Defendants Cannot Unilaterally Limit the Scope of the Topics Because Counsel "Does Not Believe" Certain Information Exists*

Defendants are not permitted to refuse to prepare a Rule 30(b)(6) witness on all or part of a Topic simply because counsel "does not believe" certain information exists or the Accused Instrumentality operates in a certain manner. Yet Defendants' counsel repeatedly made statements like this during the meet and confer process in order to narrow the scope of Topics, including but not limited to: Amazon Topic Nos. 5, 12, 13, 14, 15, 16, 23, 28, 29, and 33; AWS Topic Nos. 3, 10, 11, 12, 15, 16, 17, 19, 20, 21, 22, 23, 27, 28, 29, 33, 34, and 38; and Twitch Topic Nos. 3, 11,

---

[41]    BSD does not bring this issue merely over a dispute of "tone and delivery of language." Defendants' counsel repeatedly made these objections during the meet and confer process, and refused to prepare Rule 30(b)(6) witnesses on the full scope of disputed Topics without first seeking a protective order. When asked at the meet and confer on June 1 as to why BSD's counsel thought Defendants' counsel would adhere to its objections and fail to adequately prepare its corporate designees, there were only two possible answers open to BSD's counsel: (1) that BSD's counsel believed that Defendants' counsel's earlier statements were dishonest and Defendants would, in fact, fully prepare their corporate designees, or (2) that Defendants' counsel's tone and delivery of Defendants' objections underscored Defendants' intent to follow through with their stated course of action. Under those circumstances, of course, BSD's counsel chose to believe the sincerity of Defendants' counsel's earlier statements.

[42]    The parties have spent an inordinate amount of time meeting and conferring in an attempt to narrow the scope of the Topics, as well as the scope of Defendants' Rule 30(b)(6) Topics. This is not because the Topics are overly broad; rather, it is because Defendants have insisted on dissecting every minute aspect of each Topic and trying to get BSD to divulge exactly what it would ask each witness.

14, 18, 19, 20, 21, 22, 26, 27, 28, 32, 33, and 37.[43] AWS Topic No. 35 and Twitch Topic No. 34 provides a good example of this category of Topics. As explained by Defendants (*see* Section VIII(B) *infra*), these topics are "directed to 'market share, competitive landscape and demand for the Accused Instrumentality.'" "Defendants explained the challenges associated with this topic, particularly as it relates to market share." That is, Defendants informed BSD that it did not believe that any information existed regarding market share. As such, Defendants "indicated they would designate a witness regarding the competitive landscape, competitors, and demand for the accused instrumentalities." They would not, however, designate any witness to discuss market share, even if it was simply to say that Defendants did not have that information.

Rule 30(b)(6) requires the noticed party to "prepare their 'Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources.'" *In re Mosaic LLM Litig.*, No. 24-cv-01451-CRB, 2025 WL 3514687, at *3 (N.D. Cal. Dec. 8, 2025) (*quoting Great Am. Ins. Co. of N.Y. v. Vegas Const. Co., Inc.*, 251 F.R.D. 534, 539 (D. Nev. 2008)). "If [the noticed party] is truly without knowledge of the…topics, its 30(b)(6) witness must be prepared to testify as to the efforts made by [the noticing party] to obtain the responsive information and why it was unable to do so." *Eclipse Grp. LLP v. Target Corp.*, No. 15cv1411-JLS (BLM), 2017 WL 2103573, at *11 (S.D. Cal. May 12, 2017) (*citing Klorczyk v. Sears, Roebuck & Co.*, No. 3:13CV257 (JAM), 2015 WL 1600299, at *5 (D. Conn. Apr. 9, 2015) (requiring defendant to designate a Rule 30(b)(6) witness on certain topics, stating that if defendant "genuinely does not have knowledge on these topics, its designated witness should be prepared [to] testify concerning the company's efforts to obtain this information and why it lacks sufficient knowledge to testify.").

If Defendants' Rule 30(b)(6) witness(es) testify at their deposition(s) that Defendants do not know the information after a reasonable inquiry, then that is the answer. But BSD is entitled to ask that question on the record and obtain a "we-don't-know" response binding Defendants in this action.[44] *See HotSpot Therapeutics, Inc. v. Nurix Therapuetics, Inc.*, No. , 2024 WL 233732,

---

[43]    To be clear, for most of the Topics where Defendants have made this objection, Defendants have not completely refused to designate a witness. Rather, Defendants' counsel has made it clear that they would offer witnesses solely as "close out witnesses." The fact that Defendants' counsel is making the representation that the proffered witness will not have any knowledge with respect to some or all of a Topic before any witness preparation has even begun demonstrates Defendants' lack of intent to investigate the information covered by the Topic and adequately prepare the Rule 30(b)(6) witness(es).

[44]    Several of Defendants' Interrogatory Responses have stated that they are not aware of the information sought therein. For example, in response to Interrogatory No. 7 to each Defendant—which asks for information regarding, among other things, any projected financials and/or projected valuations of the Accused Instrumentality—all Defendants have responded that they are "not aware of any determination of the actual or projected value of the Accused Instrumentalities." *See* **Ex. 11** (4/9/26 Amazon Responses to 3rd and 4th Set of Rogs) at 8-9; **Ex. 12** (4/9/26 AWS Responses to 3rd and 4th Set of Rogs) at 8-9; **Ex. 13** (4/9/26 Twitch Responses to 3rd and 4th Set of Rogs) at 8-9. Unlike a "we-don't-know" response in a Rule 30(b)(6) deposition, these Interrogatory Responses are ***not*** binding on Defendants. *See Synopsys, Inc. v. Magma Design Automation, Inc.*, No. C-04-3923 MMC, 2006 WL 825277, at *10 (N.D. Cal. Mar. 30, 2006). This

at \*2 (N.D. Cal. Jan. 22, 2024) ("For topics 53 and 58, HotSpot previews that for portions of those topics, the witness might say 'we didn't do that.'  If so, Nurix is still entitled to sworn testimony to that effect by a prepared witness."); *Eclipse Grp.*, 2017 WL 2103573, at \*11.  BSD is not required to blindly take Defendants' counsel at its word.[45]  *U.S. v. Taylor*, 166 F.R.D. 356, 361-362 (M.D.N.C. 1996) ("The attorney for the corporation is not at liberty to manufacture the corporation's contentions.  Rather, the corporation may designate a person to speak on its behalf…").

### *Defendants Cannot Unilaterally Limit the Scope of the Topics Based on an Unsubstantiated Claim of Undue Burden*

Defendants also cannot refuse to prepare a Rule 30(b)(6) witness on the full scope of a disputed Topic merely because their counsel has made an unsubstantiated claim that the burden is too great.  "[I]t has long been clear that a party claiming that discovery imposes an undue burden must 'allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence."  *Sullivan v. Personalized Media Commc'ns, LLC*, No. 16-mc-80183-MEJ, 2016 WL 5109994, at \*3 (N.D. Cal. Sept. 21, 2016) (*quoting Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, 316 F.R.D. 327, 334 (D. Nev. 2016) (internal citation omitted)).  "'Conclusory or speculative statements of harm, inconvenience, or expense are plainly insufficient.'"  *Id.* (*quoting Nationstar*, 316 F.R.D. at 334 (internal citation omitted)).  Here, Defendants' counsel has stated during meet and confers that at least the following Topics encompass too much information for Defendants to be able to prepare a Rule 30(b)(6) witness: Amazon Topic Nos. 9, 19, 22, 24, and 26; AWS Topic Nos. 3, 9, 10, 11, 12, 14, 15, 16, 19, 22, 26, 29, 31, 34, 35, 38, and 44; and Twitch Topic Nos. 8, 9, 10, 11, 13, 14, 18, 21, 25, 28, 30, 33, 34, 37, and 43.[46]  Aside from Defendants' counsel's bare statements, though, Defendants have not provided BSD with any substantiation of undue burden.

---

makes the Rule 30(b)(6) depositions even more important, as they are necessary to lock Defendants into a position so they cannot offer contrary evidence at a later date.

BSD notes that it may be necessary for BSD to invoke the Court's assistance in compelling Defendants to produce additional discovery if the Rule 30(b)(6) testimony contradicts Interrogatory Responses claiming not to be aware of responsive information.

[45]    Defendants did more than "merely foreshadow[] specific areas of knowledge unlikely to exist" or make "good-faith efforts to minimize disputes."  Section VIII(B) *infra*.  Instead, they spent hours arguing why the Topics were allegedly improper based on counsel's "belief" that information did not exist.  Defendants even provide examples of this: with respect to Twitch Topic No. 13, they state that "[a]fter Defendants' counsel clarified that ingest was only done in RTMP and that compression was not done at ingest, BSD agreed to narrow the scope accordingly."  *Id*.  That is, Defendants admit that BSD was forced to narrow the Topic after Defendants' counsel testified as to how they believed the Accused Instrumentalities operated.  That is exactly the kind of information that BSD is entitled to test through questing of Defendants' corporate designees.

[46]    Again, Defendants have not completely refused to designate a witness for most of these Topics.  Rather, Defendants' counsel has made it clear that they will only prepare a witness on some smaller portion of the scope of the Topic, such as agreements identified by BSD in advance of the deposition.

The standard for "undue burden" is not simply that the noticed party and/or its counsel may have to engage in some (or even a lot of) work to adequately prepare the corporate witness. Indeed, "[a]lthough courts have recognized that '[a]dequately preparing a Rule 30(b)(6) deposition can be burdensome, 'this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business.'"" *Pongsai v. Am. Express Co.*, No. 8:19-cv-01628-DOC (JDEx), 2020 WL 5356711, at *2 (C.D. Cal. June 29, 2020) (citations omitted). "These requirements negate any possibility that an inquiring party will be directed back and forth from one corporate representative to another, vainly searching for a deponent who is able to provide a response which would be binding upon that corporation." *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006).

Thus, "it is not acceptable for an organization to refuse to prepare its designated witness to testify because it deems a topic unwieldy or irrelevant." *McGhee*, 2021 WL 2577159, at *8. For example, Defendants cannot refuse to designate a Rule 30(b)(6) witness in response to all or part of AWS Topic No. 29 (regarding license agreements, negotiations and offers related to live streaming technologies (see **Ex. 28** at 9)) because Defendants believe there is too much information unless BSD specifically identifies individual license agreements it plans to ask about ahead of the deposition.[47] Defendants also cannot unilaterally limit the Topics to documents already produced during discovery.[48] And Defendants cannot unilaterally refuse to designate a Rule 30(b)(6) witness on a Topic until BSD specifies which information within a produced

---

[47] Defendants have made similar statements with respect to the Interrogatories as well. For example, Interrogatory Nos. 15 to AWS and Twitch each ask about information related to costs. *See* **Ex. 12** (4/9/26 AWS Responses to 3rd and 4th Set of Rogs) at 14-15; **Ex. 13** (4/9/26 Twitch Responses to 3rd and 4th Set of Rogs) at 14. Defendants identified some documents pursuant to Rule 33(d) in response to these Interrogatories (*see* **Ex. 12** at 15; **Ex. 13** at 14), but those documents do not provide a detailed description of each of the categories of costs requested, nor do they cover the full time period requested. *See* **Ex. 60** (4/29/26 Letter from E. Rosenbaum) at 8. During subsequent meet-and-confers, Defendants have claimed that they cannot provide the requested cost information unless BSD identifies exactly what costs it wants information about. But it is Defendants, not BSD, that are in the best position to know what costs are associated with the Accused Instrumentalities. Further, even if such information is not kept in the ordinary course of business, Defendants are in the best position to determine which of those costs are associated with which Accused Instrumentality (*e.g.*, Elemental Live, Elemental Delta, MediaLive, MediaPackage). Consequently, BSD also requests that the Court compel AWS and Twitch to provide full and complete responses to Interrogatory Nos. 15.

[48] For example, Defendants' counsel has refused to designate a Rule 30(b)(6) witness for a substantial portion of Topic No. 21 to Twitch (actual and projected financial performance of Accused Instrumentalities (**Ex. 29** at 7)). One stated reason for this refusal is that the produced documents—including, but not limited to, TWITCH_0000285—already contain a significant amount of the information sought by this Topic. Defendants therefore claim that it is unnecessary to also provide a Rule 30(b)(6) deponent. This position directly contradicts the Court's precedent regarding Rule 30(b)(6) depositions. As a general rule, a party "is entitled to live witness testimony regarding documents, and [the noticed party] could not avoid a deposition simply by relying on a document production." *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C 03-5340 JF (RS), 2006 WL 2318803, at *3 (N.D. Cal. Aug. 10, 2006).

document it intends to ask about.[49]

Nor is it acceptable for an organization to refuse to prepare a Rule 30(b)(6) witness because the information lies with individual employees (instead of a central repository) or the individual(s) who had the requested information are no longer employed by the organization.[50] *See, e.g., Mosaic*, 2025 WL 3514687, at *3 ("Defendants must…prepare their 'Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, **_past employees_**, or other sources.'") (citation omitted; emphasis added); *Flodin v. Central Garden &  Pet Co.*, No. 21-cv-01631-JST (DMR), 2024 WL 3387620, at *2 (N.D. Cal. July 11, 2024) ("[I]t is not uncommon for a corporation to no longer employ individuals who have memory of a distant event; such problems 'do not relieve a corporation from preparing its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources.' Even if there is nobody currently employed at Central with personal knowledge of the pet food formulas, Central still has a duty to prepare its Rule 30(b)(6) designee about those formulas.") (citation omitted); *U.S. ex rel. Poehling v. Unitedhealth Grp., Inc.*, No. CV 16-08697 FMO, 2022 WL 19913651, at *2 (C.D. Cal. Nov. 30, 2022) ("United seeks for the government to prepare its witnesses sufficiently to respond to the noticed topics.  To the extent that sufficient preparation involves speaking to employees with pertinent knowledge, then such preparation is called for."); *Louisiana Pacific Corp. v. Money Market 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 486 (N.D. Cal. 2012) (a corporation is "required under Rule 30(b)(6) to educate its witness about actions taken by former employees of the corporation") (citation omitted); *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D. Neb. 1995) ("If no current employee has sufficient knowledge to provide the requested information, the party is obligated to 'prepare [one or more witnesses] so that they may give complete, knowledgeable and binding answers on behalf of the corporation.'") (citation omitted).

### *Defendants Cannot Unilaterally Limit the Scope of the Topics Because Counsel Thinks The Information Should Have Been Sought Through Other Discovery Means*

---

[49]    Another reason Defendants have given for refusing to designate a Rule 30(b)(6) witness for a substantial portion of Topic No. 21 to Twitch (*see* footnote 49 *supra*) is that Defendants' counsel cannot prepare a corporate witness on the large amount of information contained in documents such as TWITCH_0000285.  Thus, Defendants demand to know the specific information within this document that BSD intends to ask about.  Again, this demand directly contradicts existing precedent—BSD is not required to reveal its questions ahead of the deposition. *See Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 367 (N.D. Cal. 2000) ("Rule 30(b)(6) cannot be used to limit what is asked of a designated witness at deposition.") (citation omitted).

[50]    Defendants' attempt to paint BSD as unreasonably requiring Herculean efforts by Defendants to contact all former employees falls flat.  That is not what BSD is suggesting.  But Defendants made it clear on multiple occasions during the meet and confers that they had no plans whatsoever to contact former employees or, in some circumstances, even individual employees, relying instead solely on whatever information is stored in a central repository.  In addition, it is not BSD's responsibility to identify the former employees Defendants must contact in order to fully prepare their corporate designees.  Only Defendants, not BSD, knows the identity of their former employees and what knowledge they may have.

Finally, a party is permitted to any combination of the recognized methods of discovery to obtain information relevant to its case. *See, e.g., Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985). The corollary to this is that an opposing party cannot dictate the particular method of discovery that a party is entitled to use. Yet Defendants have objected to the scope of several of the Topics on the grounds that the information sought is more appropriately obtained through interrogatories. *See, e.g.,* **Ex. 27** (Amazon Rule 30(b)(6) Obj.) at 8 (Topic No. 6); **Ex. 28** (AWS Rule 30(b)(6) Obj.) at 7-8 (Topic No. 6); **Ex. 29** (Twitch Rule 30(b)(6) Obj.) at 10-11 (Topic No. 9).[51] This is an improper objection, and Defendants should not be able to withhold a Rule 30(b)(6) witness or unilaterally narrow the scope of a Topic simply because they would prefer to provide the information a different way. *Louisiana Pacific*, 285 F.R.D. at 486 ("[T]he Federal Rules of Civil Procedure do not permit a party served with a Rule 30(b)(6) deposition notice or subpoena request 'to elect to supply the answers in a written response to an interrogatory' in response to a Rule 30(b)(6) deposition notice or subpoena request.") (citation omitted).

Defendants have not cited a single case that supports its claim that a party can be precluded from seeking Rule 30(b)(6) testimony because the other party—or even the Court—believes the information could also be sought by another discovery mechanism. The cases that are cited by Defendants only explain that, while a corporate designee "need not be subjected to a 'memory contest,'" they must still "be prepared and knowledgeable." *Batiste v. City of Richmond*, No. 22-cv-01188-HSG (RMI), 2023 WL 2951538, at *2 (N.D. Cal. Apr. 14, 2023) (citations omitted). Thus, in Defendants' example of AWS Topic No. 9, a Rule 30(b)(6) witness does not have to be able to recite every result, measurement, or methodology for every test performed during the relevant period related to latency. They would, however, have to have a high-level knowledge of what the tests generally showed, how measurements were generally achieved, and how testing was generally performed.

## B. Defendants' Position

Defendants will prepare their corporate designees on reasonably tailored topics. Unlike other sections of this letter, where BSD identifies specific topics on which it seeks a court order, here BSD merely presents unfounded suspicions that appear to stem from Defendants' efforts during meet and confers to define a clear, reasonable scope for BSD's Rule 30(b)(6) topics. As BSD's counsel stated during the parties' June 1 meet and confer, concerns over "tone and delivery of language during the meet and confers" are the root of BSD's current "dispute."[52]

---

[51] Again, Defendants have not completely refused to designate a witness for these Topics. Rather, Defendants' counsel has made it clear that they will only prepare a witness on some smaller portion of the scope of the Topic.

[52] A review of BSD's topics demonstrate on their face that they are improper and fail to comply with the requirement that BSD describe the scope of the topics with reasonable particularity. The parties spent 8 hours meeting and conferring in an attempt to reach agreement regarding a reasonable scope of the topics. During the June 1 meet and confer, BSD asserted that it believed Defendants would not adequately prepare their witnesses in the abstract and justified this assertion based on "tone and delivery of language during the meet and confers." BSD's footnote attempts to recast this comment to direct it to other portions of this section.

After months of pushing BSD to serve its initial 30(b)(6) topics, on February 25, 2026, BSD served overly broad topics that were not reasonably particular to the issues of this case. The parties then met and conferred to productively narrow the topics, as the Federal Rules and case law require. *See, e.g., Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST (DMR), 2024 WL 3387620, at *2 (N.D. Cal. July 11, 2024). BSD now seeks to reverse any progress made during meet and confers by mischaracterizing the substance of those meetings and offering broad, inaccurate descriptions of Defendants' position. The following points are noteworthy: (1) BSD inaccurately labels Defendants' attempts to narrow topics to be reasonably particularized and clear as "grounds" for "refus[ing] to prepare a Rule 30(b)(6) witness"; (2) Defendants are **not** refusing to put up a witness on the listed topics; and (3) BSD made the same objections to Defendants' 30(b)(6) topics that it now decries as improper.

Despite the hours spent on meet and confers to negotiate topics that comply with the requirement that BSD describe the subject matter of the topics with reasonable particularity, BSD now seeks an order compelling "Defendants to designate and adequately prepare one or more 30(b)(6) witnesses on the full scope of the Topics as noticed." Not only do these overly broad topics increase the likelihood for additional disputes regarding whether witnesses were adequately prepared, it also increases the likelihood BSD will seek to additional deposition hours because it was unable to address the full scope of all topics during the allotted 70 hours.

**BSD Broadly Seeks Information Unlikely To Be Found.**

The accused infringement period began over nine years ago, and BSD seeks knowledge going back years before this. Defendants have not taken the position that they will not reasonably educate a witness, they have merely foreshadowed specific areas of knowledge unlikely to exist. A witness cannot be educated where information no longer exists. Defendants indicated that BSD was welcome to ask the questions of the witness to confirm that no such information exists and close out the issue. Indicating the lack of information was meant to prepare BSD so it did not approach the deposition with a misconception of the information available and minimize potential future disputes about the preparedness of witnesses. A good faith effort, not unlimited searching, is the standard required to educate a witness. *Batiste v. City of Richmond*, 2023 WL 2951538, at *2 (N.D. Cal. 2023). "[I]t is simply impractical to expect Rule 30(b)(6) witnesses to know the intimate details of everything." *Yellow Rose Prods. v. Pandora Media, LLC*, 2024 WL 1832424 (C.D. Cal. Apr. 12, 2024).

BSD's positions in this section of the joint letter underscore Defendants' concern regarding future disputes. BSD states that a witness should be prepared on certain topics "even if the answer is 'we don't know'" yet simultaneously objects to the concept of a witness designated to close out a topic. BSD takes issue with the fact that, during meet and confers, Defendants foreshadowed that certain topics—including customer configurations (AWS Topics 11, 14, 15), proportional breakdowns of video streams (AWS Topic 16), and percentages of streams used by specific CDNs (Twitch Topic 15)—were not tracked during or preceding the damages period.[53] Such topics seek information

---

[53] Regarding BSD's footnote related to Twitch Topic No. 13, the discussion did not relate to a "belief" of counsel. Rather, the topic as phrased is technically incorrect and incomprehensible, so there would be no way to properly prepare a witness on that topic. This is based on documents produced in this case. The topic demonstrates a fundamental misunderstanding related to the

that was either not maintained or is no longer knowable. Despite highlighting areas where information may be scarce at best, Defendants have not refused to provide a witness. Moreover, where Defendants have indicated that they do not believe there is any responsive information, but BSD will close out the witness, Defendants will verify the accuracy of that as part of the prep to the extent they are reasonably able to do so. If there is responsive information, Defendants will ensure the witness is properly educated and revise its designations so BSD is aware of the change. Defendants expect that after a reasonable effort to educate their witnesses,[54] there will be topics for which no responsive information is available, and the witness's role will be to close out those topics accordingly. BSD mischaracterizes this as a refusal to educate witnesses yet turns around and indicates it will accept a "we don't know." In sum, BSD has taken Defendants' good-faith efforts to minimize disputes and recast them as a basis for yet another request to the Court.

BSD presents this issue in broad, catch-all terms and then provides an inaccurate list of topics it believes fall into this category. The disputes and status of the individual topics are described below, with many being wholly unrelated to BSD's characterization of information being withheld because "counsel 'does not believe' the information exists."

Amazon Topic Nos. 12–16, and 28–30: These topics incorporate by reference the responses and corresponding testimony from similar topics directed to Twitch and AWS, as Amazon does not independently possess the requested knowledge. Accordingly, any dispute concerning these Topics should be directed to the corresponding Twitch and AWS Topics.

Amazon Topic No. 23, AWS Topic No. 28, and Twitch Topic No. 27: Defendants understood the parties had reached an agreement on a narrowed scope for these topics, such that if Defendants identified publicly filed financial reports containing IP valuations, a witness would be prepared to testify regarding them. It is unclear whether BSD is reneging on the agreed-upon scope or whether this topic was included in the dispute inadvertently.

AWS Topic 20: Through this single Topic, BSD expects a witnessed to be educated on "The incremental business value of achieving lower latency or improved scalability in the Accused Instrumentalities when using HLS or MPEG-DASH, including: (a) any analyses, studies, or assessments comparing different latency levels and their impact on user engagement, retention, or growth; (b) any evaluation of how latency affected advertising revenue, subscription revenue, conversion rates, or other monetization metrics; (c) any comparison of low-latency performance to competitors' streaming services; (d) any internal determination of latency thresholds considered

---

operation of the accused Twitch instrumentality and suggests a failure by BSD to actually learn the facts of this case and the operation of the accused instrumentalities.

[54] BSD assertion that Defendants intend to rely solely on the information stored in a central repository to educate its witnesses is incorrect. BSD appears to conflate issues. Defendants have indicated that relevant documents stored in central repositories. But Defendants will comply with their obligations to prepare a witness, including discussions with other employees where appropriate. What Defendants have said they will not do is talk to every employee working on the products or services, which is exactly what BSD has suggested is required on multiple occasions. Defendants are also not refusing to talk to former employees if that knowledge no longer exists at the company and the former employee is likely to have it. But Defendants are not going to reach out to former employees in a scorched earth approach to deposition preparation.

commercially important; and (e) any tradeoffs between reducing latency and other business objectives, including cost, scalability, reliability, or content quality." This topic is not reasonably particularized, nor is the scope definitively set, since the enumeration of sub-topics are an undefined list "including" the given examples. Given the multiple subtopics, the parties spent a significant amount of time to reach agreement as to the scope of this topic. It is unclear if BSD intends to undo all of the progress made.

AWS Topic 21 and Twitch Topic 20: These topics are similar to AWS Topic 20: overly broad and not reasonably particularized. AWS Topic 21 reads "Whether any reduction in latency achieved or improved scalability by the Accused Instrumentalities when using HLS or MPEG-DASH had a material impact on revenue, profitability, user growth, user engagement, advertising rates, subscription rates, or competitive position, and if so, the factual basis for that contention, including any data, analysis, or internal evaluations supporting such impact." These are unacceptably broad. Defendants, nonetheless, engaged in an extensive meet and confer and thought it had reached agreement on this topic.

AWS Topic 22 and Twitch Topic 21: This topic reads "The actual and projected financial performance of the Accused Instrumentalities during the Damages Period, including revenues; units or quantities licensed, sold, deployed or streamed; costs (e.g., fixed costs, variable costs, cost of goods sold, operating expenses, and infrastructure costs); gross margins and net margins; and profits, including operating profit and net profit, and the methodology used to calculate such figures." Defendants indicated they would designate a witness to testify regarding the produced financial information. Defendants' further indicated that it is unlikely that information still exists to cover the entirety of such an overly broad topic. Again, that statement was simply expectation-setting, not a refusal to make reasonable efforts to educate a witness.

AWS Topic 23 and Twitch Topic 22: These topics seek "The actual and projected revenues, costs, and profits attributable specifically to live streaming using HLS within the Accused Instrumentality, as distinguished from: (a) video-on demand services; (b) non-HLS streaming protocols; (c) ancillary services or bundled offerings; and (d) non-streaming products or services." Defendants indicated that AWS and Twitch did not break down financial information in the manner sought by the deposition topic. For example, AWS and Twitch do not track financial information by livestreaming using the accused protocols, live versus video-on-demand, or the other breakdowns contained within that Topic. Defendants again indicated that BSD could probe a witness on those issues.

AWS Topic 29 and Twitch Topic 28: The parties' disagreement on these topics is one of over breadth and undue burden, not, as BSD suggests, of representation that such information doesn't exist. Defendants' case support for its position is laid out below in the appropriate section. BSD sought discovery of, and Defendants produced, live streaming agreements. These topics are a bridge too far, seeking not only corporate testimony on each of the agreements and the relevant terms, but also the negotiations and offers behind both the agreements produced, the agreements not produced (as agreed by the parties) and any other negotiation where an agreement was not reached. BSD served no discovery requests on unconsummated agreements, nor did it serve requests on the negotiations behind consummated agreements. The burden it now seeks to place on a witness through this request is unacceptable, and BSD makes no showing of how it would be relevant. Defendants position is that designating a witness on the negotiations for agreements that

47

never came to pass is overly broad, unduly burdensome, and not proportional to the needs to the case. Defendants are willing to designate a witness on the produced agreements.

AWS Topic 27 and Twitch Topic 26: The dispute is the same as above in that BSD seeks negotiations for agreements that were never executed. Defendants cannot reasonably educate a witness regarding these negotiations.

Amazon Topic 5, AWS Topic 3, and Twitch Topic 3: Defendants' expressed concern that the topics required educating a witness on the legal concept of "designing around." BSD had previously taken the clear position that education by counsel is improper. Additionally, each Defendants' response states unequivocally that no efforts to design around were made. Given that knowledge of the '473 patent is a gating item for a possible design around, Defendants indicated they could designate a witness to confirm they did not have notice of the '473 patent. Without notice, Defendants could not and would not design around the asserted patents.

Amazon Topic 25, AWS Topic 29 and Twitch Topic 28: Similarly, these topics relate to agreements and BSD improperly seeks negotiations of unexecuted agreements. Defendants position is the same as with similar topics.

AWS Topics 10, 11, 15, 16 and 17: As addressed in other portions of this letter and countless times before, AWS is not in control of customer configurations. It does not track the proportions of streams that are Live vs. VOD or the protocol used. As discussed below, Defendants will perform a reasonable search for relevant information to educate the witness.

Twitch Topic 11 and AWS Topic 12: Defendants agreed during meet and confer to designate a witness regarding the terms "live," "real time," and "low latency." Defendants believe this is a reasonable narrowing, in particular because the term "near-real time" is not used by Defendants nor is it present in any documentation as an identifiable term. Additionally, Defendants take the position that the topic as written is not reasonably particularized, and requires the confusing result of designating a technical witness required speak on discrepancies between financial documents, marketing documents, and engineering documents.

Twitch Topic 14: Counsel for Defendants represented it was willing to designate a witness to speak on the Twitch player, but given other possible third-party players, it would be impossible to speak to the scope of the topic as written.

Twitch Topic 18 and AWS Topic 19: This topic seeks "The business rationale for developing, implementing, and offering the Accused Instrumentality, including: (a) strategic objectives or business goals associated with offering live streaming; (b) the role of adaptive bitrate streaming in achieving those objectives; (c) consideration of alternative technical architectures or protocols for live streaming, whether implemented or not; (d) evaluation of alternative monetization models or revenue strategies associated with live streaming; (e) competitor analyses relating to live streaming capabilities, including any SWOT or similar analyses; (f) market definition or segmentation analyses relating to live streaming services; (g) any consumer research, user testing, or third-party studies relied upon in connection with live streaming strategy; and (h) assessment of intellectual property risk." On its face, the topic is overly broad and unduly burdensome. The parties spent close to an hour addressing the scope, including the multiple subtopics that could qualify as their

own topics, of this topic for both AWS and Twitch. As it relates to Twitch, the parties agreed that the scope would be directed to the business rationale for transitioning from RTMP to HLS. For AWS, it related to the decision to launch cloud products. BSD was supposed to inform Defendants whether there were any other aspects of the accused functionality that BSD believed was relevant to this topic.

AWS Topic 33 and Twitch Topic 32: Defendants were again unaware there was a remaining dispute on this topic. During meet and confer, Defendants confirmed that, for both Twitch and AWS, all relevant latency testing documents have been produced and a witness would be designated to speak to such. Regarding other studies, Defendants represented that they are unaware of any such documents and a witness would be made to confirm and close out the topics accordingly.

AWS Topic 34 and Twitch Topic 33: BSD clarified that it was seeking information regarding which aspects of the accused instrumentalities drive sales. Defendants indicated they will take it back.

AWS Topic 38 and Twitch Topic 37: Defendants indicated that this overlapped in scope with Twitch Topic 18 and AWS Topic 19, and was subject to the compromise reached on that topic. Defendants also indicated that there may not be information related to each of the standards identified, but BSD could probe that issue.

**Meet And Confers On Topic Scope Are Not "Unsubstantiated Claims"**

BSD's position, from its section title to its cited case law, is designed to obfuscate. First and foremost, despite the misleading section title, Defendants are not refusing to prepare a witness on the ground of undue burden. The dispute, is over the scope of overly broad topics. BSD contends that Defendants have merely offered unsubstantiated claims, but the case law it cites is inapplicable. *See, e.g., Sullivan v. Personalized Media Commc'ns, LLC*, No. 16-mc-80183-MEJ, 2016 WL 5109994, at *3 (N.D. Cal. Sept. 21, 2016) (directed towards burden of quashing a subpoena); *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, 316 F.R.D. 327, 334 (D. Nev. 2016) (directed towards burden of refusing to appear for deposition). Tellingly, BSD quotes *Mcghee* for the proposition that refusing to designate a witness on an overly broad topic is improper, yet ignores the core issue addressed in the immediately following text: the proper course of action is to meet and confer to narrow the scope—exactly what Defendants did here. *McGhee*, 2021 WL 2577159, at *8. Once again, BSD decries the same approach it previously took when it objected to and advocated for a narrower scope of Defendants' Topics 1–6, 8, 10, 11, 13, 14, and 17–19.

To the extent BSD takes the position that the parties' meet and confers included no explanation as to why these topics are overly broad and unduly burdensome, that characterization is a gross misrepresentation of the substance of the parties' discussions. The parties six meet and confers on 30(b)(6) topics, spanning over eight hours, indicates the truth: Defendants counsel was specific and thorough in outlining the issues with BSD's 30(b)(6) topics. Despite BSD's efforts to lump similarly worded topics directed to Defendants Twitch and AWS together, Defendants addressed issues particular to Twitch separate from those applicable to AWS and further enumerated specific concerns on AWS topics based on the different operational concerns of the separate accused products.

**Defendants Will Prepare Their Witnesses With Information Reasonably Available**

BSD's insinuation that Defendants intend to prepare its 30(b)(6) witnesses by only consulting central repositories grossly misrepresents Defendants' position. Defendants will prepare its designees in accordance with Rule 30: on *reasonably tailored* topics with information that is known or *reasonably available* to the organization.

The issue is not *whether* Defendants must make reasonable efforts to prepare their designees, but rather *what* those reasonable efforts require under the circumstances. A corporation must make a good-faith endeavor to prepare its designee, a duty that requires preparation "to the extent reasonably available." *Retiree Support Group of Contra Costa County v. Contra Costa County*, No. 12-cv-00944-JST (MEJ), 2014 WL 7206849 at *3 (N.D. Cal. December 18, 2014). Critically, the standard is one of reasonable availability—not one of unlimited reach.

BSD's expectations, however, have gone well beyond that of "reasonable effort." For example, BSD has expressed an expectation that, at least for AWS Topic No. 11, AWS must track down, coordinate with, and interview all current and former employees potentially having relevant knowledge going back to 2015—more than a decade ago. That is not a "conscientious good-faith endeavor." It is an unbounded and disproportionate undertaking that exceeds what Rule 30 or case law contemplate. BSD has stated a corporation's duty to educate witnesses extends to where "the most knowledgeable people are former employees." Defendants have not disagreed, but there remains no indication there exists, nor has BSD identified, any such former employees.

BSD does not seek readily identifiable information from key former employees. Regarding topics that implicate customer-controlled configurations, including AWS Topic No. 11, it expects Defendants to obtain implementation details set by customers nearly a decade ago. As previously stated, that information, to the extent it still exists, is located with those customers.[55] In another example, when pressed to define the scope of AWS Topic No. 13, a topic with highly technical concepts but without clear contours to the scope, BSD disclosed it expected testimony on "all of the details." BSD seeks to apply a burden to Defendants that ignores reality. Defendants will not conduct an exhaustive investigation spanning over ten years of personnel to attempt to educate a corporate representative on what an individual employee, former or otherwise, *might* have learned regarding the choices of third-party customers. The "reasonably available" standard does not require Herculean efforts to locate and interview every employee who may or may not have the knowledge BSD seeks.

Once again, BSD describes neither the topics nor the disputes with particularity, simply providing a list it believes falls into the second "ground." Defendants addressed their positions on meet and confers above for the following topics: AWS topics 3, 10-12, 15, 16, and 19, and Twitch topics 11, 14, and 18. Here, Defendants stand on their objections that these topics are overly broad rather than reasonably particularized to allow Defendants to adequately prepare a witness on these topics.

Twitch Topic 10: This topic seeks "Your and third-party selection, configuration, adjustment, and

---

[55] BSD is well aware of this, asserting that "without nonparty latency evidence of infringing systems, it will be extremely difficult, if not impossible, for BSD to prove infringement." Dkt. No. 123 at 12-13.

optimization of segment duration, target duration, fragment duration, chunk size, or similar segmentation parameters for the Accused Instrumentality, including: (a) the specific segment or target duration values used and the time periods during which they were used; (b) the engineering, technical, or business rationale for selecting those values; (c) any testing, measurement, or analysis regarding the effect of those values on latency; (d) any modifications to such values over time and the reasons for those modifications; (e) how such segmentation parameters affected total end-to-end latency; and (f) any tradeoffs considered in selecting or modifying those parameters, including effects on scalability, stability, buffering behavior, CDN performance, infrastructure cost, or monetization." On its face, it is overly broad. The parties were largely able to reach agreement except BSD was unable to explain the difference between engineering, technical, and business rationale.

Amazon Topic 26, AWS Topic 31, and Twitch Topic 30: These topics are similar to Amazon Topic 25, AWS Topic 29 and Twitch Topic 28. They are overly broad in that they inappropriately call for education by counsel, as well as legal conclusions and expert testimony. Defendants' position is consistent with that of BSD on similar topics. BSD represented it would identify the relevant facts at issue sufficient to narrow this topic. It has not yet done so.

AWS Topic 34 and Twitch Topic 33: BSD clarified that it was seeking information regarding which aspects of the accused instrumentalities drive sales. Defendants indicated they will take it back.

AWS Topic 22 and Twitch Topic 21: These topics ask for a prepared witness on a wide, unbounded set of financial information. Defendants indicated that a witness would be prepared to the extent information may be reasonably identified, and where information could not, the witness could close out such topics. Witnesses will be prepared to testify to the types of information used in the ordinary course of business and the level of granularity such data gets into. Defendants were under the impression these topics were no longer at issue.

AWS Topic 26: Defendants understand the only outstanding dispute here relates to how many agreements were produced under separate discovery requests.

Twitch Topic 25: As drafted, BSD seek discovery on the more than 100 content creator agreements produced in this case on all "material terms." As Defendants explained, it is unreasonable to expect Twitch to prepare a witness to address each of these agreements and requested that BSD narrow the scope of potential agreements as well as identify the terms for which it seeks testimony. BSD agreed to limit it to 20 agreements and financial terms.

AWS Topic 29 and Twitch Topic 28: BSD objects to these topics under both of its first two "buckets," yet the dispute remains the same. Defendants' position is addressed above.

AWS Topic 35 and Twitch Topic 34: This topic is directed to "market share, competitive landscape and demand for the Accused Instrumentality." Defendants explained the challenges associated with this topic, particularly as it relates to market share, and indicated they would designate a witness regarding the competitive landscape, competitors, and demand for the accused instrumentalities. BSD continues to fundamentally overestimate the scope of information and the level of effort expected for a witness to be "prepared." As discussed, witnesses are not required to perform exhaustive searches of all information.

AWS Topic 38 and Twitch Topic 37: Defendants indicated that this overlapped in scope with Twitch Topic 18 and AWS Topic 19 and was subject to the compromise reached on that topic. Defendants also indicated that there may not be information related to each of the standards identified, but BSD could probe that issue.

AWS Topic 44 and Twitch Topic 43: This topic relates to the bases for any denied RFA. On the meet and confer, Defendants highlighted the impracticality of the topic as written. BSD seeks a witness to explain the basis for every RFA denied irrespective of whether it was based on factual information or a legal conclusion or the burden associated with such a request. Defendants indicated they would be willing to designate a witness on specific RFAs identified by BSD. BSD indicated it understood the problem and would follow up with Defendants to narrow to specific RFAs. Instead, it wraps these topics into its second inaccurate "bucket."

AWS Topic 14: This topic implicates the same dispute as AWS topics 10, 11, 15, 16 and 17.

Twitch Topic 8 and AWS Topic 9: BSD expressed concern on meet and confers that Twitch's response was unclear regarding analyses and assumptions. The parties came to an understanding that Twitch's response included the setup included in the relevant testing. It is unclear whether BSD is reneging on the agreed upon scope or if this topic was added to the dispute inadvertently.

Twitch Topic 9: Defendants understood from meet and confer that the parties had reached agreement on an appropriately narrowed scope for this topic. Defendants had agreed to produce a witness to speak on the lowest *achieved* latency, rather than the lowest achievable. The parties further had agreed that a witness would be designated to only speak hypothetically on the configuration and impact of the player on the system. The parties agreed to narrow the scope generally to the change from RTMP to HLS and then implementation of HTTP Chunked Encoding. It is unclear whether BSD is reneging on the agreed upon scope or if this topic was added to the dispute inadvertently.

Twitch Topic 13: Once again, Defendants understood that the parties had reached an agreement on the scope of Topic 13. After Defendants' counsel clarified that ingest was only done in RTMP and that compression was not done at ingest, BSD agreed to narrow the scope accordingly, stating conclusively "I think that's okay then." It is unclear whether BSD is reneging on the agreed upon scope or if this topic was added to the dispute inadvertently.

**Interrogatories Are The Proper Mechanism To Avoid Duplicative or Burdensome Discovery Requests**

Defendants made proper objections where topics were better addressed by other discovery devices. Where discovery can be obtained from a source less burdensome, e.g., interrogatories, it should be. Fed. R. Civ. P. 26(b)(2)(C). Defendants objected, in accordance with Rule 26, to portions of BSD topics, e.g., AWS Topic 9, as unduly burdening a potential corporate representative when such information was more appropriately sought through less burdensome discovery devices. BSD itself made, then reinstated, similar objections to Defendants' topics.[56] BSD once again overstates

---

[56] BSD objects on this same theory for Topics 12, 13, 14, 22, 23. The same objection was initially made for Topics 7, 10, 20, 21 before designating a witness.

its supporting case law. The court in *Louisiana Pacific* differentiated the topics at issue from topics that are, overly broad and "hardly 'described with reasonable particularity.'" 285 F.R.D. at 487. (*quoting Krasney v. Nationwide Mut. Ins. Co.*, No. 3:06 CV 1164(JBA), 2007 WL 4365677, at *3 (D.Conn. Dec. 11, 2007). It does not stand for the proposition that such an objection is facially improper. As described throughout this letter, BSD drafted topics that are overly broad rather than reasonably particularized; expecting a deponent to be able to cover the unwieldy scope of these topics sets a deponent up for failure.

BSD raises its argument against these objections vaguely, without enumerating towards which specific topics it believes the objection inappropriate. Defendants objected on narrow, proper grounds. To the extent a topic was not duplicative of previously served discovery requests, Defendants agreed to designate a witness.

For example, Twitch Topic 9 states "The lowest achievable, mean, average, highest, and any other quantification of total end-to end latency of the Accused Instrumentality, including: (a) the specific configuration settings required to achieve such latency (including segment duration, chunk size, buffer depth, player configuration, packaging mode, and CDN configuration); (b) whether such configuration was commercially deployed, offered to customers, or technically available; (c) the engineering effort required to implement such configuration; and (d) any tradeoffs associated with achieving such latency, including effects on scalability, stability, quality, cost, or monetization."

Topics such as this are what the mechanism of Rule 26(b)(2)(C) is designed to avoid: overly broad discovery that would place undue burden on a witness. Rule 30(b)(6) witnesses "need not be subject to a 'memory contest.'" *Batiste*, 2023 WL 2951538 at *2 (quoting *Alexander v. F.B.I.*, 186 F.R.D. 137, 143 (D.D.C. 1998). *See also Yellow Rose*, 2024 WL 1832424 at *2 ("[I]t is simply impractical to expect Rule 30(b)(6) witnesses to know the intimate details of everything."). Where, as here, a party submits unreasonably broad deposition topics, the court should find certain responses are better left to less burdensome discovery means.

### IX. ORDER COMPELLING DEFENDANTS TO PROVIDE A RULE 30(B)(6) WITNESS PREPARED TO TESTIFY REGARDING AGREEMENTS, OFFERS AND NEGOTIATIONS[57]

#### A. BSD's Position

BSD has propounded the following Rule 30(b)(6) Topics on the Defendants that seek information related to agreements, offers and/or negotiations:

- "The identification of, and agreements with, third party broadcasters and content providers that utilize the Accused Instrumentalities, including the material terms of those agreements." **Ex. 24** (Amazon) at 7 (Topic No. 19); **Ex. 25** (AWS) at 9 (Topic No. 27); **Ex. 26** (Twitch) at 8 (Topic No. 25).
- "Any patent licenses, settlements, or patent agreements entered into by You for ABR

---

[57]   Defendants' position to the issue in Section IX was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026. *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

technologies utilized in live streaming." **Ex. 24** (Amazon) at 7 (Topic No. 20); **Ex. 26** (Twitch) at 8 (Topic No. 26).

- "The acquisition of all media streaming business (e.g., Elemental), including the business terms associated with such a transaction." **Ex. 24** (Amazon) at 7 (Topic No. 21).
- "The settlement of all patent litigation concerning adaptive multi bit-rate technology where live streaming was one component of such a litigation, including the business terms associated with such a transaction." **Ex. 24** (Amazon) at 7 (Topic No. 22).
- "Your license agreements, negotiations, or offers related to live streaming technologies used in the Accused Instrumentalities, including royalty rates, lump-sum payments, or other terms for similar patents or technologies." **Ex. 24** (Amazon) at 7-8 (Topic No. 24); **Ex. 25** (AWS) at 9 (Topic No. 29); **Ex. 26** (Twitch) at 9 (Topic No. 28).

Each of these Topics is narrowly tailored to information that is relevant to the parties' claims and defenses in this action. "There are a multitude of ways in which…correspondence with third parties related to license negotiations could be relevant to this litigation." *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 582 (N.D. Cal. 2008). For instance, they could be relevant to the issue of damages, especially the reasonable royalty analysis and the determination of whether prior licenses are comparable. *Id.* They can be relevant to show what Defendants believe infringes the Asserted Patent. *Id.* They can potentially reveal evidence of prior art systems that existed prior to the priority date of BSD's patent. *Id.* Or they can possibly contain admissions against interest if Defendants made infringement assertions to third parties in a manner that contradicts their assertions in this action. *Id.* "[A]t a minimum, discovery of licensing/settlement negotiations" or provider agreements/negotiations "is reasonably calculated to lead to relevant, admissible evidence." *Id.* at 583.

Nonetheless, for each of these Topics, Defendants have asserted one or more of the following objections: (1) all information sought is already in produced documents, so a Rule 30(b)(6) deposition is unnecessary; (2) Defendants will only designate a Rule 30(b)(6) witness for agreements, offers, or negotiations if documents related thereto were produced during discovery; (3) Defendants will only designate a Rule 30(b)(6) witness for specific agreements, offers, or negotiations identified by BSD in advance of the deposition; and (4) BSD must identify specific aspects of any agreements, offers, negotiations or the acquisition it plans to ask about.

As discussed above (*see* Section VIII(A) *supra*), none of these are valid reasons for refusing to designate and prepare a Rule 30(b)(6) witness. First, the general rule is that a party "is entitled to live witness testimony regarding documents, and [the noticed party] c[an] not avoid a deposition simply by relying on a document production." *Google*, 2006 WL 2318803, at *3. Moreover, this Court has rejected "arguments that licensing or settlement negotiations themselves are not relevant because the final agreement reflects the culmination of the negotiations and that positions taken by the parties prior to reaching a final agreement are therefore insignificant." *Phoenix*, 254 F.R.D. at 582. This erroneous "position fails to acknowledge that licensing and infringement positions may be taken and discarded or otherwise changed over time based on a myriad of extrinsic factors that could well be relevant to another party accused of infringement." *Id.* Indeed, contrary to their position during the meet and confers, Defendants now claim that they "have not argued that license negotiations and communications are not relevant." Section IX(B) *infra*. Thus, BSD is entitled to inquire into agreements, settlements, licenses, offers, and

54

negotiations with a live witness.

Second, Defendants cannot unilaterally narrow the scope of the Topics to specific agreements, offers, or negotiations, or parts thereof.[58] *See* Section VIII(A) *supra.* Once the Twitch Content License Agreements are removed from the equation (*see* footnote 59 *supra*), Defendants ***admit*** that there are only ***ten*** customer agreements that have been produced: six by AWS and four by Amazon. *See* Section IX(B) *infra*. It is far from unreasonable to expect that Defendants' corporate designees be prepared to testify regarding this small universe of agreements.

Nor can Defendants unilaterally narrow the scope of the Topics by refusing to designate a witness as to negotiations, whether for executed agreements/licenses or agreements/licenses that were not executed, on the grounds that the scope is too broad without offering evidence to support that claim. Defendants do not provide any specific facts indicating, for example, the number of such negotiations, who was involved in such negotiations and whether they are current or former employees, when the negotiations occurred, etc.

Finally, BSD is not required to reveal its specific questions to Defendants before a deposition begins, whether that is by identifying specific documents or aspects within those documents that BSD intends to ask about. Once a corporate witness produces a witness capable of responding to questions in a Rule 30(b)(6) notice, "the scope of the deposition is determined solely by relevance under Rule 26, that is, that the evidence sought may lead to the discovery of admissible evidence." *Detoy*, 196 F.R.D. at 367 (citation omitted). There is no Federal Rule of Civil Procedure nor any case law that BSD is aware of that requires pre-disclosure of questions by the noticing party. Yet that is exactly what Defendants (unreasonably) seek. *See* Section IX(B) *infra* ("Rather, Defendants have asked BSD to ***identify the specific agreements and terms*** on which it wants Defendants' witnesses to be prepared to testify.") (emphasis added); Section X(B) *infra* (Defendants offered to prepare a witness on the topic if BSD identified the specific facts it wanted to ask about."); *id.* ("Defendants again offered to produce a witness if BSD identified the specific factual information it wanted to ask the witness about."); *id.* ("BSD was supposed to go back and identify the specific RFA denials it wants to ask about.").[59]

For all of these reasons, BSD respectfully requests that the Court compel Defendants to

---

[58]    Notwithstanding the fact that BSD is not required to identify specific agreements, offers, or negotiations prior to the deposition, BSD has agreed to narrow the number of Content License Agreements that it may possibly ask Twitch's Rule 30(b)(6) about. Approximately 100 separate Content License Agreements were produced, and BSD agrees to limit its questions to the 20 largest agreements. BSD will send Defendants a list confirming which Content License Agreements it believes fall into this category. BSD further agrees to limit questioning about the Content License Agreements (and their corresponding negotiations) to the Term period, any and all financial terms, and the Twitch services provided.

[59]    Defendants claim that they "have repeatedly expressed that they do not seek BSD's deposition questions, strategy, or the documents it intends to use in deposition prior to the event." Section IX(B) *infra*. Yet, in the same argument, they ***admit*** that they have demanded BSD to identify the "specific agreements" it plans to use in the depositions. Those two statements are irreconcilable.

55

designate and prepare one or more Rule 30(b)(6) witnesses on the full scope of following Rule 30(b)(6) Topics as they were originally noticed (with the one exception set forth in footnote 59 *supra*):

- Amazon – Topics Nos. 19, 20, 21, 22, and 24.
- AWS – Topic Nos. 27 and 29.
- Twitch – Topic Nos. 25, 26, and 28.

### B. Defendants' Position

BSD's request for an order compelling Defendants to prepare a witness on all agreements, offers, licenses, and underlying negotiations associated with each is not reasonable. Defendants agreed to designate a witness regarding the produced licenses and a reasonable number of agreements identified by BSD and the general subject matter or terms that BSD is interested in. Defendants cannot reasonably prepare a witness on all agreements and all terms given that around two hundred agreements were produced in this case. The other sticking point is that BSD seeks negotiations for agreements that were not executed. Defendants cannot reasonably educate a witness on a scope that broad.

Defendants have never represented to BSD that the documents speak for themselves such that a deposition is unnecessary. Rather, Defendants have asked BSD to identify the specific agreements and terms on which it wants Defendants' witnesses to be prepared to testify. Defendants made this request both to adequately prepare the witness and because Defendants have produced a substantial number of agreements in this case. Specifically, Twitch has produced 100 agreements with content creators; AWS has produced six agreements with customers; and Amazon has produced four agreements. Beyond the sheer volume of agreements, many contain bespoke financial terms unique to the specific counterparty. An expectation that a witness testify regarding all of those agreements and all underlying negotiations is extraordinarily broad. Defendants see no reason why BSD cannot narrow the scope of these topics and specify the information it seeks.

BSD's request that Defendants designate witnesses for the full scope of these topics is plainly unreasonable and overbroad. Rule 26(b)(1) requires discovery to be proportional to the needs of the case considering the burden of the proposed discovery relative to its likely benefit. BSD has not explained why it needs a corporate witness to testify on (in Twitch's case) hundreds of agreements, the negotiations related to hundreds of agreements, and negotiations for unexecuted agreements. Nor has BSD served any email discovery directed to licensing, agreements, or negotiations. Defendants produced hundreds of agreements throughout discovery. Not once has BSD identified a specific fact or term in any of the produced agreements that justifies its demand.

The cases BSD cites in support of its position are inapposite. *Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568 (N.D. Cal. 2008) involved specific identified licensing communications between patentee plaintiff and third parties, which the plaintiff objected to producing on the basis the communications were not relevant to the litigation and had no probative value. The Court disagreed and ordered that the documents were "discoverable so long as they are not privileged." *Id*. at 583. BSD has not sought specific licensing communications from Defendants. And Defendants have not argued that license negotiations and communications are not relevant.

*Detoy v. City & Cnty. of San Francisco*, 196 F.R.D. 362 (N.D. Cal. 2000) is a civil action for violation of rights under 42 U.S.C. Section 1983 after a woman was killed by a police officer. BSD relies on the case to support its position that it is not required to reveal specific questions it intends to use in deposition prior to the deposition. Defendants take issue with BSD's argument for two reasons. First, Defendants have repeatedly expressed that they do not seek BSD's deposition questions, strategy, or the documents it intends to use in deposition prior to the event. Defendants have, however, requested BSD provide a reasonably narrow scope for Defendants to adequately prepare witnesses. Second, the language BSD quotes from *Detoy* refers to the general principle that during a 30(b)(6) deposition, if the examining party asks questions beyond the scope of subjects described in the deposition notice, "general deposition rules govern (i.e., Fed.R.Civ.P. 26(b)(1)), so that relevant questions may be asked and no special protection is conferred on a deponent by virtue of the fact that the deposition was noticed under 30(b)(6)." *Id.* at 367.

Finally, BSD cites *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.,* No. C 03-5340 JF (RS), 2006 WL 2318803 (N.D. Cal. Aug. 10, 2006) to support its claim that Defendants refuse to designate and prepare a corporate witness on agreements and licenses produced in this case. But that is not what *Google* is about. In *Google*, the plaintiff produced a spreadsheet with detailed cost information days before the plaintiff's financial corporate witness was deposed. 2006 WL 23188803. At the deposition, the witness was asked detailed mathematical questions it could not answer from memory but indicated the spreadsheet had the answers. *Id*. at *2. Defendant requested another deposition to question the witness with the spreadsheet in hand but a the first transcript showed the questions required "detailed data that a live witness cannot reasonably be expected to provide from memory" and defendant "made no showing that such information is unavailable to it in the spreadsheet or that it needs any other information that only a live witness could provide." *Id*. at *3. The court denied the request as defendant had not identified "with some specificity the nature of the information it believes it cannot obtain from the spreadsheet." *Id*. Again, Defendants *have not* refused to designate and prepare a witness on BSD's topics and **never** stated the documents were sufficient such that Defendants would not sit for deposition on appropriately scoped topics related to them.

As Defendants have repeatedly explained, BSD's topics are overly broad on their face and BSD seeks to further expand these topics by seeking negotiations into agreements that have not been executed. Defendants have offered to designate witnesses under a reasonable scope of the topics for which witnesses may be adequately prepared. This approach should be adopted and BSD's request to require Defendants to designate a witness on the full scope of the noticed topics should be rejected.

## X.    ORDER COMPELLING DEFENDANTS TO PROVIDE A RULE 30(B)(6) WITNESS PREPARED TO TESTIFY REGARDING FACTS UNDERLYING SO-CALLED "LEGAL CONCLUSIONS"[60]

### A.  BSD's Position

Defendants have objected to the following Rule 30(b)(6) Topics on the grounds that they

---

[60]    Defendants' position to the issue in Section X was first provided to BSD at 4:03 p.m. EDT (1:03 p.m. PDT) on June 5, 2026.  *See* **Ex. 3** (4:03 p.m. EDT Email from R. Brewer).

call for legal conclusions and/or expert opinions or conclusions:[61]

- Amazon Topic Nos. 1, 5, 6, 9, 13, 14, 25, 26, 27, and 31;
- AWS Topic Nos. 1, 4, 5, 9, 20, 21, 30, 31, 32, 36, 43, and 44;
- Twitch Topic Nos. 1, 3, 4, 8, 19, 20, 29, 30, 31, 35, 42, and 43.

Defendants mischaracterize the nature of each of these Topics. None of these Topics are intended to act as "contention" topics or to seek legal conclusions from Defendants' Rule 30(b)(6) witnesses.[62] Rather, BSD is solely making factual inquiries into areas relevant to this action and/or obtain the factual bases of Defendants' positions. For example, only Defendants have factual information regarding (1) their knowledge of the '473 Patent at the time the Accused Instrumentalities were developed; (2) to what extent, if at all, those who developed the Accused Instrumentalities took the '473 Patent into account during that development; and (3) whether there was any effort to design the Accused Instrumentalities in a way that it would not look or act like the invention disclosed in the '473 Patent. All of these facts are within the scope of Amazon Topic No. 5, AWS Topic No. 4, and Twitch Topic No. 3.

Similarly, Defendants—not their experts—have the factual information that will form the basis of *Georgia-Pacific* analysis that will be performed by the parties' experts, including but not limited to: (1) the existence of any patent licenses that Defendants may have with third parties relating to live streaming technology or similar technologies; (2) the terms of those agreements, including financial terms, scope, exclusivity, territory, duration, and patents involved; (3) the profitability of the Accused Instrumentalities; and (4) the profitability of any other technology used or contemplated by Defendants for live streaming. These facts are all within the scope of Amazon Topic No. 25, AWS Topic No. 30, and Twitch Topic No. 29.[63]

It cannot be disputed that BSD's expected deposition questions are relevant to the claims and defenses in this action. *See, e.g., Homeland Housewares, LLC v. Sorenson Research and Development Trust*, No. CV 11-3720-GW(JEMx), 2012 WL 12884906, at *6 (C.D. Cal. Oct. 18, 2012) (granting motion to compel Rule 30(b)(6) deposition; "Sorensen's expected deposition

---

[61] Defendants have not completely refused to designate a witness for all of these Topics. Instead, for those, Defendants' counsel has made it clear that they will only prepare a witness on some smaller portion of the scope of the Topic.

[62] To the extent any legal terms are used in the Topics (*e.g.*, "*Georgia-Pacific* factors", "hypothetical negotiation"), they are merely included to help Defendants' counsel prepare Defendants' Rule 30(b)(6) witnesses. BSD does not intend to use legal phrases such as these with the Rule 30(b)(6) witnesses since BSD is not looking for legal conclusions. The inclusion of these legal phrases does not automatically render the Topics invalid. *See MedImmune, LLC v. PDL Biopharma, Inc.*, No. C08-05590 JF (HRL), 2009 WL 5069142, at *2 (N.D. Cal. Dec. 17, 2009) ("The court is unpersuaded that MedImmune's language [words in its deposition notice like 'conception,' 'reduction to practice,' and 'prior art'] automatically requires PDL to attempt an expert opinion or provide legal contentions.").

[63] For brevity, BSD does not provide examples of the factual information sought by each of the above-identified Topics in this Joint Letter, but it can provide further examples at the Court's request.

questions related to the validity of the '460 patent are obviously relevant to the subject matter of this action."). It also cannot be disputed that Defendants are "capable of discussing [their technological] endeavors without relying solely upon expert witnesses and attorneys." *MedImmune*, 2009 WL 5069142, at *2. As such, Defendants should be compelled to produce Rule 30(b)(6) witness(es) on the full scope of the Topics as drafted.

"Rule 36 requests, like those here, are properly directed to a party's position on a fact or the application of law to fact or the party's opinion about a fact or the application of law to fact—and can address ultimate facts that may present a genuine issue for trial." *McKinney/Pearl Restaurant Partners, L.P. v. Metropolitan Life Ins. Co.*, 322 F.R.D. 235, 253 (N.D. Tex. 2016). "[T]here is nothing wrong with [a party] asking for [] information as part of fact discovery, even if [the opposing party] may also have an expert witness on that subject." *HotSpot*, 2024 WL 233732, at *2. "[A] party cannot avoid discovery—whether by an interrogatory, a Rule 36 request, or Federal Rule of Civil Procedure 30(b)(6) deposition testimony—of its own views on a factual matter in dispute (or perhaps, in fact, not in dispute) simply because its view on that matter may be informed by consulting with its retained experts." *Monster Energy Co. v. Vital Pharm., Inc.*, No. 5:18-cv-01882-JGB (SHKx), 2020 WL 6049301, at *6 (C.D. Cal. June 16, 2020) (citation and internal quotation marks omitted).

Since BSD's Topics are directed to underlying facts and not legal conclusions, BSD respectfully requests that the Court compel Defendants to designate and prepare witnesses for the full scope of the above-identified Rule 30(b)(6) Topics as drafted.

### B.    Defendants' Position

As with BSD's other sections related to Defendants' 30(b)(6) responses, BSD's position misrepresents the parties' meet and confers, fails to accurately convey the scope of its topics, and does not acknowledge the progress the parties made through extensive good faith conferrals. BSD's argument is also difficult to square with the positions BSD itself took in response to Defendants' 30(b)(6) notice.

**Defendants Responses to BSD's 30(b)(6) Notice**

Defendants have not refused to provide a witness for BSD's 30(b)(6) topics. Rather, during meet and confers to discuss Defendants' objections to BSD's topics, where BSD was unable to overcome the objections or identify the specific issues that the topic went to, Defendants appropriately narrowed the scope. BSD acknowledges this in its own footnote. *See* above footnote 62, "Defendants have not completely refused to designate a witness for all of these Topics." BSD instead takes issue with Defendants narrowing the scope of its 30(b)(6) topics. For many of the topics BSD identified above, the parties have reached agreement or partial agreement. BSD's narrative is an improper characterization of the parties' discussions.

Defendants have agreed to provide a witness on:

- AWS Topic 1 / Twitch Topic 1 / Amazon Topic 1 which go to the facts supporting each of Defendants' affirmative defenses. AWS and Twitch agreed to designate a witness on the operation of the accused instrumentalities. Amazon incorporates AWS and Twitch's

testimony by reference. At the meet and confer, for Amazon only, the parties agreed to discuss internally whether Amazon needed to provide a witness to testify to its unenforceability defense. BSD was to get back to Defendants with its position but never did.

- AWS Topic 9 / Twitch Topic 8 / Amazon Topic 9 relate to latency testing and measurements. AWS and Twitch agreed to designate a witness on latency testing done and the setup for testing. Amazon incorporates that testimony by reference.

- AWS Topic 21 / Twitch Topic 20 / Amazon Topic 14 cover the economic impact of any reduction in latency from the use of HLS or MPEG-DASH for the accused instrumentalities. AWS and Twitch agreed to designate a witness on any purported impact or benefit from reduced latency during the relevant time period. Defendants explained that Amazon would not have knowledge for this topic outside of what AWS and Twitch provide, which BSD acknowledged and did not disagree with.

- AWS Topic 36 / Twitch Topic 35 / Amazon Topic 31 relate to non-infringing alternatives. AWS and Twitch agreed to designate a witness on streaming protocols other than HLS or MPEG-DASH that were considered for the accused instrumentalities and the reasons for their adoption or rejection. Defendants confirmed that this scope includes why protocols were adopted or not. Amazon incorporates that testimony by reference. In fact, BSD's counsel confirmed at that meet and confer that the parties were aligned on the scope of testimony for the topic.

- AWS Topic 43 / Twitch Topic 42 go to Defendants' email retention policies and timing. AWS and Twitch agreed to designate a witness on its email retention policies, including those in place during this litigation. Defendants did not agree to educate and prepare a witness to speak to the specific dates that the email for each individual identified in the topic was deleted.

Defendants have not argued that BSD cannot seek testimony on facts underlying topics that touch on legal frameworks. Defendants' position is that a 30(b)(6) topic must be narrowed to a reasonable scope so that a witness can be adequately prepared. The cases BSD cites do not strengthen its position.[64] For example, *Homeland Housewares, LLC v. Sorensen Rsch. & Dev.* Tr., No. CV 11-3720-GW(JEMX), 2012 WL 12884906 (C.D. Cal. Oct. 18, 2012) for the uncontroversial position that 30(b)(6) depositions are relevant to the claims and defenses in this action. Defendants have not made statements otherwise.

BSD has not identified the scope of facts it seeks. Defendants have repeatedly pointed out that topics such as "all facts relevant to the *Georgia-Pacific factors*" or "all facts relevant to the hypothetical negotiation date" require BSD to identify the specific facts it actually wants. A witness cannot be prepared on a topic without a clear and manageable scope.

Defendants clarify that the parties agreed to follow up with each other after taking back positions in the initial meet and confer on the following topics:

---

[64] BSD cites *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 322 F.R.D. 235 (N.D. Tex. 2016) and Rule 36 as support but the dispute there focused on document requests and RFAs, not deposition testimony. Moreover, Rule 36 governs Requests for Admission, not deposition testimony.

- AWS Topic 30 / Twitch Topic 29 / Amazon Topic 25 go to the *Georgia-Pacific* factors applied to hypothetical licensing negotiations for patents relating to live streaming technology or technologies similar to the accused instrumentalities. Defendants offered to prepare a witness on the topic if BSD identified the specific facts it wanted to ask about.[65] BSD was to get back to Defendants with those facts. It never did.
- AWS Topic 31 / Twitch Topic 30 / Amazon Topic 26 goes to the facts Defendants contend are relevant to determining the timing and circumstances of any hypothetical license negotiation for the asserted patent. Defendants again offered to produce a witness if BSD identified the specific factual information it wanted to ask the witness about. As with the topic above, BSD was supposed to get back to Defendants regarding the facts it is interested in. BSD did not get back to Defendants.
- AWS Topic 44 / Twitch Topic 43 seeks the bases for each RFA that the Defendant denied in the case. Despite this objectively broad topic, Defendants offered to work through specific RFA denials that BSD was after and explained it was improper for a single corporate deponent to testify as to the bases for all RFA denials, particularly as some of those denials could relate to legal conclusions. Yet again, BSD was supposed to go back and identify the specific RFA denials it wants to ask about. And yet again, BSD did not get back to Defendants.
- AWS Topic 5 / Twitch Topic 4 / Amazon Topic 6 goes to Defendants' knowledge of BSD's declaration involving the '473 patent to a standard setting body. Defendants agreed to take this topic back and investigate if they could designate a witness on the topic.
- AWS Topic 20 / Twitch Topic 19 are addressed above, which sets forth Defendants' position on the scope of testimony for topics that combine latency reduction and scalability.
- AWS Topic 32 / Twitch Topic 31 / Amazon Topic 27 seek testimony regarding ancillary and convoyed sales. This addressed above in the section directed to ancillary products.

For BSD's topic related to design around efforts (AWS Topic 4, Twitch Topic 3, Amazon Topic 5), Defendants agreed to designate witnesses to testify regarding their knowledge of the '473 patent prior to this litigation. Defendants offered this so BSD could confirm that Defendants had no pre-suit knowledge of the patent. If there is no pre-suit knowledge, it could not have been taken into account during development of the accused instrumentalities. BSD has not identified what additional information—beyond confirming the lack of pre-suit knowledge, a witness could provide related to design arounds as it is a legal concept.

BSD's topic 13 to Amazon seeks testimony on the incremental business value or achieving lower latency or improved scalability in the accused instrumentalities with HLS or MPEG-DASH. Defendants explained that Amazon's knowledge on this topic is limited to what AWS and Twitch can provide. As with topic 14 to Amazon, BSD acknowledged that AWS and Twitch are the appropriate sources of testimony for this topic. There is no dispute and BSD's inclusion of the topic here, does not align with its representations at meet and confers.

**BSD's Response to Defendants' 30(b)(6) Notice**

BSD cannot credibly fault Defendants for the objections and narrowing of 30(b)(6) topics, when it took similar positions on analogous topics. For example, BSD refused to produce a witness on

---

[65] Defendants note this is the same standard BSD demanded of Defendants on analogous topics.

Topics 12, 13, and 14 which seek testimony on the features of the HLS and MPEG-DASH standards that BSD contends result in infringement and facts underlying BSD's infringement contentions because those topics "seek[] contention testimony more appropriately addressed, if at all, through a contention interrogatory," with no non-privileged information existing "beyond the scope of expert discovery." **Ex. 31** at 14, 15, 16. BSD similarly refused to designate a witness on Topic 22 which seeks BSD's position on the facts of the timing, parties, and circumstances surrounding the hypothetical negotiation, on the basis that the topic also seeks contention testimony more appropriately addressed through a contention interrogatory. *Id*. at 24. And BSD refused to produce a witness on Topic 23 which seeks testimony on the benefits and drawbacks of unaccused streaming protocols on the basis that no non-privileged information exists "*beyond the scope of expert discovery.*" *Id*. at 25. BSD even narrowed its own response to Topic 21, and refused to testify on the effects of its standards setting body declaration on the grounds it calls "legal contentions from a lay witness, expert testimony, and legal opinion." *Id.* at 23.

BSD's positions reflect the same objections it argues are improper for Defendants to assert. BSD cannot simultaneously invoke objections on expert-testimony and legal conclusions to shield its own witnesses from deposition while it demands Defendants designate witnesses to testify on the same general subjects. Further, as BSD has taken the position it will not designate these topics for 30(b)(6) testimony Defendants understand it is precluded from relying on or designating it after the deposition.

BSD's request for relief from the Court on these 30(b)(6) topics should be denied.

*          *          *

**DEFENDANTS' DISCOVERY DISPUTES**

I.    **DATE CERTAIN FOR PRODUCTION OF INDEX AND *APPLE* LITIGATION MATERIALS**

A.    **Defendants' Position**

The Court has already issued an order on this issue, and BSD has ignored it. Dkt. Nos. 185, 191. On May 15, 2026, the Court ordered BSD to "promptly provide an accounting or index of all the Apple materials in BSD's possession, custody, or control, which includes materials in its former counsel's possession, custody or control," and further ordered BSD to "produce Apple materials for which there is no impediment to production under the Apple protective order." Dkt. No. 191, at 2. There has been no progress since the Court's order. Defendants have yet to receive a single additional document from the *Apple* litigation materials and BSD will not commit to a date certain to provide an index of the *Apple* litigation materials. Defendants request that the Court order BSD to produce the Court-ordered index of the *Apple* litigation file by Friday, June 12, 2026, and to produce all *Apple* litigation materials for which no impediment exists on a rolling basis, beginning immediately.

B.    **BSD's Position**

BSD has been, and is, actively working on, the index the Court ordered on May 15, 2026. So far, the list includes over 2,500 entries, almost all of which have already been produced in this case.  For reference, this list alone exceeds the total number of documents Defendants have

62

produced in this case. Creation of the list is no minor task. That said, BSD's current counsel continues to work with BSD's former counsel to complete the list and identify documents for which no impediment to production exists. BSD's current counsel cannot produce documents that it does not yet have. Given that the Court has already ordered the list be produced, a date certain for the production of the list is unnecessary. However, to the extent a court-ordered date certain is necessary, BSD believes June 19, 2026 is more appropriate. In addition, Defendants should be reciprocally required to complete their deficient document productions and provide supplemental and/or amended responses to Interrogatories and Requests for Admission by the same date.

## II.    BSD'S RESPONSES TO DEFENDANTS' INTERROGATORIES

### A.    Defendants' Position

On April 15, 2026, BSD served supplemental responses to Defendants' Sixth Set of Interrogatories. BSD, however, again failed to provide substantive responses to Defendants' Interrogatory Nos. 35 and 36. **Ex. 61** (BSD's Supp. Responses to Defendants' Sixth Set of Interrogatories).

Defendants' Interrogatory Nos. 35 and 36 seek identification of documents, communications, and relevant source code passages on which BSD intends to rely in support of its Infringement and Damages contentions. The parties discussed Interrogatory Nos. 35 and 36 at the April 30 meet and confer. BSD maintained its contention that the interrogatories are duplicative of the Patent Local Rules and overbroad in that they seek "all documents." BSD's contention that this is duplicative of the Patent Local Rules is incorrect. The Patent Local Rules require early disclosures of theories and help guide the scope of discovery. While the theories must be adequately disclosed, the Patent Local Rules do not require identification or marshalling of all evidence in support of those theories. Nor are the interrogatories overly broad. At this point, near the end of fact discovery, BSD should know what factual evidence it intends to rely on in support of its theories. BSD's contention that responding to such interrogatories would require BSD to "put forth its full case" illustrates the problem—BSD wants to litigate by surprise and Defendants want to understand BSD's theories and support for those theories so they can adequately prepare their defenses.

Interrogatories such as these are appropriate to avoid surprise in expert discovery. *See, e.g.*, *Vasudevan Software, Inc. v. IBM*, No.: C 09-05897 RS (PSG), 2011 WL 13153991, (N.D. Cal. June 15, 2011) (compelling supplemental responses to contentions directed to theories and evidence supporting infringement claims). Since BSD served its infringement contentions nearly three years ago, Defendants have produced thousands of pages of documents and source code. These Interrogatories are not duplicative of the Patent Local Rules. If, as BSD asserts, it "does not intend to rely on any further evidence" for its infringement contentions, then there is no need to respond to these interrogatories and BSD should be limited to the documents and evidence cited in its Patent Local Rule disclosures. If, on the other hand, BSD plans to rely on any of the subsequently produced documents, it should identify those in response to these Interrogatories. Defendants are entitled to understand what evidence from discovery BSD believes supports its positions. Forcing Defendants to guess what evidence BSD will rely on to support its theories is improper. Defendants request that the Court order BSD to serve supplemental responses to these interrogatories by June 18, 2026.

The cases that BSD relies on do not support its argument. For example, the SEC provided substantive responses to the contention interrogatories that the court found sufficient. *S.E.C. v.*

*Berry*, No. C07-04431 RMW HRL, 2011 WL 2441706, at *4 (N.D. Cal. June 15, 2011). Here, BSD has stonewalled and refused to provide anything in response to these interrogatories. *Haggarty* is even more on point. In *Haggarty*, Defendant served contention interrogatories seeking all facts supporting Plaintiffs' allegations and to "identify all documents that contain or refer to any fact(s)" supporting Plaintiffs' allegations. *Haggarty v. Wells Fargo Bank, N.A.*, No. 10-2416 CRB JSC, 2012 WL 4113341, at *3-4 (N.D. Cal. Sept. 18, 2012). The court found Plaintiffs' response preserving the right to rely on all facts in the record and improper and ordered Plaintiffs to supplement identifying all material documents and facts. *Id.* As in *Haggerty*, BSD should have to respond to these interrogatories identifying all material documents upon which it intends to rely in support of its infringement allegations (Interrogatory No. 35) and damages theories (Interrogatory No. 36).

### B.    BSD's Position

Defendants misrepresent BSD's objections to Interrogatory Nos. 35 and 36.    These contention interrogatories are overbroad in that they seek "***all*** documents" that support BSD's infringement and damages contentions.  *See Haggarty v. Wells Fargo Bank, N.A.*, No. 10-2416 CRB JSC, 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While contention interrogatories are permitted, they 'are often overly broad and unduly burdensome when they require a party to state 'every fact' or 'all facts' supporting identified allegations or defenses.'") (collecting cases); "); *S.E.C. v. Berry*, No. C07-04431 RMW HRL, 2011 WL 2441706, at *4 (N.D. Cal. June 15, 2011) ("Contention interrogatories asking for 'each and *every* fact,' or application of law to fact, that supports particular allegations in an opposing pleading may be held overly broad and unduly burdensome.") (*citing* WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIALL § 11:1682 (The Rutter Group 2010) (emphasis in original)).

Notably, pursuant to Patent Local Rules 3-2 and 3-9, BSD already served its contentions and support.  As those contentions have been served, BSD does not intend to rely on any further evidence for those contentions.  *See Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 945 (N.D. Cal. 2018) ("Patent Local Rule 3 requires patent disclosures early in a case and streamlines discovery by replacing the series of interrogatories that parties would likely have propounded without it.") (*quoting ASUS Computer Int'l v. Round Rock Research, LLC*, No. 12-CV-02099-JST, 2014 WL 1463609, at *1 (N.D. Cal. Apr. 11, 2014)); *Network Caching Tech. LLC v. Novell Inc.*, No. C-01-2079-VRW, 2002 WL 32126128, at *4 (N.D. Cal. Aug. 13, 2002) ("Patent LR 3–1 therefore takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery."). Defendants' now ask BSD to identify ***every*** piece of evidence BSD now has that supports the contentions.  That request is clearly overbroad.  It is not narrowed to any specific contention or aspect of BSD's contentions.  BSD is not required at this stage to provide Defendants with its list of trial exhibits or to limit what documents its experts may consult when drafting their expert reports. Yet that is exactly what Defendants seek.  That is inappropriate.  BSD remains willing to respond to a narrowed request that is not duplicative of the Patent Rule disclosures or of similar Interrogatories already propounded by Defendants.

### III.    DELAYED PRODUCTION OF PRIVILEGE LOG FOR EMAILS BSD WITHHELD

#### A.    Defendants' Position

A month after BSD agreed to provide a privilege log for emails withheld from the emails of Moshe Dgani and Yossi Williger, it has yet to be provided and BSD is proposing to proceed with the deposition of Mr. Williger on June 14 or 15. After many requests, on June 1, BSD committed to provide the privilege log by June 8. Any further delay prejudices Defendants' ability to take the deposition of Mr. Williger as there will be inadequate time to review the privilege log in advance of the deposition. Given the timing of this letter, Defendants request an order that BSD must provide a complete privilege log for the emails of Messrs. Dgani and Williger by June 8.

In its response, BSD fails to acknowledge the deposition of Mr. Williger or confirm its commitment to provide a privilege log by June 8. Instead, it complains of the "undue burden" from reviewing 1000 documents over a month—Defendants meanwhile have reviewed about 10,000 documents in the same period to comply with its discovery obligations. BSD also includes an irrelevant strawman argument to distract from the fact that BSD probably only recently began working with its vendor. BSD claims to have been working diligently, but provides no information regarding the timing of its actions. And now the parties have an upcoming deposition that Defendants cannot confirm because they do not know whether they will have received all relevant material in advance of the deposition.

#### B.    BSD's Position

Defendants are manufacturing a dispute where none exists.  BSD has been working diligently with its discovery vendor to export underlying metadata in a form that will streamline preparation of the privilege log that Defendants requested.  Even with that technological shortcut, BSD must still manually review more than a thousand entries, many involving lengthy email chains, and confirm the accuracy of the information reflected in the log.  BSD has assured Defendants that it is taking all reasonable steps to produce the privilege log as soon as practicable.

Defendants' position is also difficult to square with their own "undue burden" objections in this litigation.  Defendants have refused to review approximately 100 AWS agreements on the ground that doing so would impose an undue burden.  Yet they now insist that BSD must review and log more than 1,000 emails on Defendants' preferred timeline.  If Defendants contend that such a privilege-log exercise is reasonable, BSD's requests that the review of a far smaller universe of AWS agreements should be viewed through the same lens.

The burden is also largely of Defendants' own making.  BSD warned Amazon that Defendants' search terms would capture extensive work product from prior litigations, but Defendants refused to modify their requests.  BSD also asked to explore ways to reduce the burden of reviewing those litigation materials, but Defendants again refused.  An order compelling production by Defendants' arbitrary deadline is therefore unnecessary.

65